MUNICIPIO DE PONCE, demandante y peticionario, *v.* AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN ET AL., demandados y recurridos.

*Números:* CC-98-241 *Resueltos:* 29 de diciembre de 2000
CC-98-258
CC-98-250
CC-98-231
CC-98-257
CC-98-259

2

4

6

*César A. Hernández Colón* y *Aracelis Vidal Rivera,* de *Hernández Colón & Vidal Rivera,* abogados de la parte peticionaria; *Jaime L. Vázquez Bernier, Juan A. Frau Escudero* y *Fernando Pérez Colón,* de *Martínez Odell & Calabria,* abogados de la Autoridad de Carreteras, Departamento de la Vivienda y Departamento de Recursos Naturales; *Wanda Cintrón Valentín* y *Reynaldo J. Salas Soler,* de *Salas Soler, Sánchez & Álvarez,* abogados de la Autoridad de Edificios Públicos; *Jorge Carazo Quetglas* y *Héctor E. Calle Ortiz,* de *Toledo Toledo & Carazo Quetglas,* abogados de la Autoridad de Acueductos Alcantarillados; *John García* y *Enrique Adames,* de *García & Fernández,* abogados de la Puerto Rico Telephone Company; *Julio Capó Capó,* abogado de la Autoridad de Energía Eléctrica.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

Nos corresponde evaluar, por vez primera en nuestra jurisdicción, un convenio suscrito por un municipio con el Gobierno Central para el desarrollo de proyectos progra-

mados al amparo de las innovadoras disposiciones del Capítulo XIII de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (en adelante Ley de Municipios Autónomos), relativas a planes de ordenación territorial. Luego de analizar ponderadamente los numerosos señalamientos de error que nos hacen todas las partes en este litigio, resolvemos modificar la sentencia del Tribunal de Circuito de Apelaciones.

## I

*A principios de 1990*, el Municipio de Ponce comenzó a recopilar información de diversa índole para elaborar un plan maestro que guiara el desarrollo ordenado del territorio de dicho municipio. Para ello, se creó una oficina que dirigía el arquitecto Javier Bonnin, acompañado por el personal técnico necesario para llevar a cabo sus funciones.

El 30 de agosto de 1991, se aprobó la Ley Núm. 81 (21 L.P.R.A. sec. 4001 *et seq.*) de vigencia inmediata, conocida como la Ley de Municipios Autónomos. Esta ley autorizó específicamente a los municipios del Estado Libre Asociado de Puerto Rico a elaborar y adoptar planes de ordenación territorial para disponer la política pública sobre el uso del suelo dentro de sus límites territoriales. Véanse: Arts. 2.004(g) y 13.004 (21 L.P.R.A. secs. 4054(g) y 4602). *El Municipio de Ponce se acogió a las disposiciones de esta ley y preparó un Plan de Ordenación Territorial en sustitución del plan maestro previsto originalmente.* En consecuencia, creó la Oficina de Ordenación Territorial.

De acuerdo con las determinaciones de hechos del Tribunal de Primera Instancia, *el Municipio de Ponce celebró una serie de vistas públicas para la elaboración de los planes de ordenación.* Además, *desde enero de 1991 hasta octubre de 1992 el Municipio, en estrecha coordinación con funcionarios de las instrumentalidades públicas demandadas, elaboró su Plan de Ordenación Territorial.* En dichas

conversaciones se involucraron funcionarios de la Oficina de Ordenación Territorial, el Alcalde de Ponce, personal técnico de las agencias concernidas, así como sus Secretarios y Directores, el Secretario de Estado, ayudantes del Gobernador, miembros de la Junta de Planificación, e incluso, el propio Gobernador.

A través de la multiplicidad de reuniones y misivas entre funcionarios del ayuntamiento, por un lado, y del Gobierno Central, por el otro, se determinaron los proyectos que cada una de las instrumentalidades demandadas habría de realizar para fines del programa de obras del Plan de Ordenación Territorial. El tribunal sentenciador concluyó que *la gran mayoría de los proyectos que se incluyeron en el Plan, se encontraban previamente en los respectivos programas de obras permanentes de las entidades públicas demandadas.*

La redacción del Plan de Ordenación Territorial de Ponce consta de tres (3) partes: el Memorial General, el Programa de Acción y el Reglamento. La parte B.5 del Programa de Acción comprende una sección titulada "Programa de Proyectos de Inversión Certificados". En ésta se incluyen varias tablas en la que se relacionan los "proyectos de inversión ... programados y certificados por las distintas agencias y corporaciones públicas [del Gobierno Central] en armonía con las políticas y objetivos del ... Plan". Apéndice Conjunto, Parte 6, pág. 3381. (II Plan Territorial de Ponce, Sec. B.5, pág. 28 (octubre 1992).)([1]) Las agencias y corporaciones públicas cuyos proyectos se consignan en las referidas tablas son: la Autoridad de Carreteras y Transportación (en adelante ACT), la Autoridad de Acueductos y Alcantarillados (en adelante AAA), la Autoridad de Edificios Públicos (en adelante AEP), la Autoridad de los Puertos (en adelante AP), la Autoridad de Energía Eléctrica (en adelante AEE), el Departamento de la Vivienda (en adelante DV), el Departamento de Recursos Naturales, actual-

---

([1]) 23 R.P.R. sec. 650.1262.

mente Departamento de Recursos Naturales y Ambientales (en adelante DRNA), y la Puerto Rico Telephone Company (en adelante PRTC).

Mediante ordenanza promulgada el 22 de octubre de 1992, la Asamblea Municipal de Ponce aprobó el Plan de Ordenación Territorial.[2] El alcalde, por su parte, aprobó esta ordenanza y le remitió el Plan a la Junta de Planificación para su consideración.

Durante su proceso de evaluación, la Junta de Planificación les solicitó a las agencias y corporaciones públicas mencionadas que examinaran y certificaran por escrito si los proyectos incluidos en el Plan reflejaban el acuerdo de inversión en el Municipio. *La mayoría de estos proyectos ya estaban incluidos en los programas de obras permanentes de dichas entidades.* Entre el 23 y el 28 de octubre, éstas suscribieron las certificaciones correspondientes según lo solicitado. No obstante, la ACT, la AAA y el DRNA hicieron algunas modificaciones a los proyectos relacionados en las tablas. El 28 de octubre de 1992, la Junta de Planificación adoptó el Plan, incluyendo las variaciones mencionadas,[3] y el 6 de noviembre siguiente, el Gobernador lo aprobó.[4]

El tribunal de instancia concluyó que entre *el 28 de octubre* y el 15 de diciembre de 1992, el Gobierno Central, el DV, la ACT, la AAA, la AEP, la AP, la AEE, la PRTC y el DRNA suscribieron el acuerdo objeto de análisis en este caso, con el Municipio, titulado "Convenio para el desarrollo de proyectos programados entre el Gobierno Central y el Municipio de Ponce" (en adelante el Convenio). *En él, las entidades públicas comparecientes se obligaron a desarrollar en el Municipio los proyectos incluidos en el Plan, según fueron certificados posteriormente.* El Municipio, por su parte, se comprometió a ofrecer el apoyo económico que

---

[2] Véase Ordenanza Municipal Núm. 60 de 22 de octubre de 1992.

[3] Véase la Resolución Núm. JP-PT-63-1 de la Junta de Planificación, de 28 de octubre de 1992.

[4] Véase Orden Ejecutiva de 6 de noviembre de 1992, Boletín Administrativo Núm. OE-1992-66.

su presupuesto le permitiera para la realización de los proyectos.[5] Según el Convenio, los proyectos se debían desarrollar entre el 1ro de enero de 1993 y el 31 de diciembre de 1996. El Municipio presentó el Convenio en el Registro de Contratos del Municipio de Ponce el 15 de septiembre de 1993 y en la Oficina del Contralor al día siguiente.

Por otra parte, en abril de 1993 se celebró una reunión en la Fortaleza en la cual participaron los recién nombrados jefes de los diferentes departamentos del Gobierno Central, directores y secretarios de las instrumentalidades públicas aquí demandadas, el Lcdo. Álvaro Cifuentes —Secretario de la Gobernación— y el Alcalde de Ponce. Según concluyeron los tribunales de instancia e intermedio apelativo, los representantes de las distintas instrumentalidades públicas indicaron cuáles de los proyectos iban a llevar a cabo y cuáles no. Además, unilateralmente, dejaron de cumplir con algunos de los compromisos de inversión establecidos en el Plan de Ordenación Territorial y en el Convenio. Dichas entidades gubernamentales no hicieron uso de los mecanismos dispuestos en la Ley de Municipios Autónomos para solicitar la revisión parcial del Plan. Véase el Art. 13.008 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4606.

En consecuencia, el 28 de octubre de 1993, el Municipio instó una acción para exigir el cumplimiento específico de las obligaciones impuestas por el Convenio y la Ley de Municipios Autónomos a las entidades demandadas. Según el Municipio, las demandadas dejaron de cumplir sus obligaciones en relación con varios de los proyectos incluidos en el Convenio y en el Plan. El Municipio solicitó además el resarcimiento de los daños y perjuicios que el alegado incumplimiento le había causado.

Luego de los trámites procesales de rigor, el Tribunal de Primera Instancia resolvió que tanto el Convenio como la

---

[5] El texto íntegro del Convenio, sin sus anejos, se incluye como anejo al final de esta opinión.

Ley de Municipios Autónomos les imponen a las demandadas las obligaciones reclamadas por el Municipio. En consecuencia, declaró con lugar la demanda y condenó a las demandadas a resarcir al Municipio los daños sufridos en concepto de pérdidas en los recaudos de arbitrios de construcción, patentes municipales y contribuciones sobre la propiedad, como consecuencia del incumplimiento. Por último, el tribunal designó un comisionado especial para llevar a cabo una auditoría del desarrollo de los proyectos hasta la terminación, entrega y aceptación de cada uno de ellos.

Inconformes, las demandadas apelaron ante el Tribunal de Circuito de Apelaciones. Éste modificó la sentencia apelada a los efectos de disponer la manera en que algunas de las demandadas debían cumplir sus obligaciones. Además, por considerar que no eran compensables en ese momento, pospuso la determinación de los daños hasta que todos los proyectos estuvieran terminados y el comisionado especial rindiera su informe. No obstante, sostuvo la adjudicación que hizo el tribunal de instancia sobre la responsabilidad de las partes demandadas por tales daños.

Revisamos, vía *certiorari*, la referida sentencia del Tribunal de Circuito de Apelaciones.

El Municipio señala en su alegato que el tribunal apelativo erró al modificar las obligaciones cuyo cumplimiento específico ordenó el foro de instancia, y al dejar sin efecto la cuantía de daños que éste concedió.

Las demandadas, por su parte, señalan en sus respectivos alegatos varios errores comunes y algunos particulares.[6] A través de los señalamientos comunes és-

---

[6] Los errores particulares son los siguientes. Señaló la Puerto Rico Telephone Company (en adelante PRTC) que el tribunal apelativo erró: "al resolver que la P.R.T.C. viene obligada a la realización de determinados proyectos de infraestructura en virtud de la Ley Núm. 84 de 29 de octubre de 1992 que enmienda el artículo 13.001 de la Ley de Municipios Autónomos y bajo el Convenio para el desarrollo de proyectos entre el Gobierno Central y el Municipio de Ponce[;]

"al confirmar la determinación del Tribunal de Primera Instancia de no desestimar la demanda contra la P.R.T.C. debido a que dicha corporación no incumplió con

tas cuestionan la validez de la sentencia del tribunal de instancia por falta de parte indispensable, la validez del Plan del Municipio y la validez y obligatoriedad del Convenio. Señalan también que el tribunal apelativo erró al no determinar que las obligaciones alegadamente pactadas en el Convenio resultan extremadamente onerosas, y al determinar la existencia de daños monetarios, aun cuando concluyó que éstos eran especulativos.

---

el convenio y porque la alteración y paralización de las obras se debió exclusivamente a las acciones del Municipio de Ponce[, y]

"al no revocar la imposición de daños a la P.R.T.C., aun cuando concluyó que la PRTC no tuvo responsabilidad en el alegado incumplimiento contractual." Caso Núm. CC-98-250, *Certiorari*, págs. 20–21.

La Autoridad de Edificios Públicos (en adelante AEP), por su parte, señaló que el tribunal apelativo erró:

"al determinar que una vez firmado el Plan de Ordenación Territorial la obligación de realizar los proyectos recae en la AEP y no en las agencias, quienes para poder reprogramar o cancelar sus compromisos tienen que solicitarlo a la AEP, y ésta cumplir con el trámite establecido en la *Ley de Municipios Autónomos*[;]

"al concluir que la AEP tenía que solicitarle a la Oficina de Presupuesto y Gerencia (OPG) que certificara y comprometiera el presupuesto de las agencias concernidas en cuanto a la realización de los proyectos que fueron certificados por la AEP en el Plan de Ordenación Territorial[;]

"al concluir que los proyectos incluidos en el Convenio formaban parte del programa de obras permanentes de la AEP y que ésta obligó su propio presupuesto para la realización de los mismos[;]

"al determinar que no es imposible para la AEP realizar los proyectos reprogramados o cancelados por las agencias[, y]

"al determinar que la AEP debe compensar al Municipio de Ponce por los daños alegados por dicha parte por concepto de los proyectos que fueron reprogramados o cancelados por las agencias originadoras de los mismos." Caso Núm. CC-98-258, Petición de *certiorari*, págs. 7–8.

Por último, la Autoridad de Energía Eléctrica (en adelante AEE) le imputó al Tribunal de Circuito la comisión de los siguientes errores:

"confirmar la determinación del Tribunal de Primera Instancia de no desestimar la demanda contra la Autoridad de Energía Eléctrica, ya que quien realmente paralizó las obras fue el propio Municipio de Ponce, quien [alega que] a falta de los empleados de la Administración de Derecho al Trabajo al igual que [d]el Instituto de Cultura Puertorriqueña[,] no proveyó empleados en sustitución para la continuación de las obras[;]

"no revocar la imposición de daños a la Autoridad de Energía Eléctrica de Puerto Rico[,] aun cuando concluyó que la Autoridad no tuvo responsabilidad en el alegado incumplimiento contractual[, y]

"sostener la determinación del Tribunal de Primera Instancia en cuanto a las obras en la zona históri[c]a de la Playa de Ponce, cuando la prueba desfilada demostró que no hubo un acuerdo final en cuanto a éstas." Caso Núm. CC-98-259, Petición de *certiorari*, pág. 6.

## II

A. Debido a que la falta de acumular a una parte en un pleito pudiera producir la invalidez de la sentencia que se dicte,[7] atendemos primero la alegación que a estos efectos hacen las entidades demandadas. Éstas alegan que la Oficina de Gerencia y Presupuesto (en adelante OGP), el Departamento de Renovación Urbana y Vivienda federal (en adelante HUD, por sus siglas en inglés) y el Cuerpo de Ingenieros de Estados Unidos —a quienes no se les incluyó en el pleito— son partes indispensables, ya que sin su presencia no se puede dictar un remedio completo y efectivo.

La Regla 16.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone, al referirse a la acumulación indispensable de partes, lo siguiente:

> Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada.

Hemos expresado que, "[a]l igual que en el ámbito federal, nuestra Regla 16 de Procedimiento Civil ... garantiza los valores siguientes: evitar multiplicidad de litigios, proveer a las partes un remedio final, completo y efectivo en el mismo pleito, y proteger a los ausentes de los efectos nocivos de una decisión sin su presencia". *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593, 605 (1989). Estos valores apuntan esencialmente hacia el objetivo de lograr una adjudicación completa y justa.

En *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 606 (1983), resolvimos que la acumulación obligatoria

---

[7] Véanse: *Unisys v. Ramallo Brothers*, 128 D.P.R. 842, 859 (1991); *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593, 603 (1989).

de partes no debe ser producto de una determinación a base de categorías abstractas, desvinculada del contexto particular de cada caso, sino el resultado de "consideraciones pragmáticas, de la evaluación de los intereses envueltos, lo que exige distinguir entre diversos géneros de casos". Íd. Analizamos, además, la Regla 16.1 de Procedimiento Civil, *supra*, adoptada en 1979. Al hacerlo, interpretamos y delimitamos su alcance.

Respecto del "interés común" al que se refiere la Regla, expresamos que no se trata de "cualquier interés en el pleito" sino de "un interés de tal orden que impida la confección de un decreto sin afectarlo". *Hernández Agosto v. López Nieves*, supra, pág. 607. "[E]l interés afectado tiene que ser de índole real e inmediata …". Íd., págs. 610–611.

En cuanto a la frase " 'sin cuya presencia no pueda adjudicarse la controversia' ", expresamos que ésta "entronca con la antigua doctrina inglesa sobre la indispensabilidad" y tiene en Puerto Rico un alcance limitado. *Hernández Agosto v. López Nieves*, supra, págs. 607–608. Con ello nos referimos a que, excepto en aquellas circunstancias en las que la adjudicación sin la persona ausente tendría un efecto perjudicial sobre el interés real e inmediato que ésta tiene en el pleito, en raras ocasiones será imposible resolver la controversia sin su presencia. Íd., págs. 607–608 y 610–611.

Por último, consignamos que "[e]l remedio completo a que se refiere la Regla 16 alude al remedio entre las personas y entidades *que ya son partes en el pleito* y no al obtenible entre una parte y el ausente". *Hernández Agosto v. López Nieves*, supra, pág. 607. Cabe destacar que el texto de la Regla 16.1 de Procedimiento Civil, *supra*, no incluye la frase "remedio completo". Véase, Regla 16.1 de Procedimiento Civil, *supra*. Ésta se encuentra en la Regla 16.2, referente a la discreción que tiene el tribunal para "orde-

nar la comparecencia de aquellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un *remedio completo a las personas que ya sean partes en el pleito*". (Énfasis suplido.) Regla 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

B. Este pleito tiene como objeto determinar cuáles son las obligaciones, si alguna, de las demandadas respecto a la realización de ciertos proyectos. De acuerdo con el Municipio, las demandadas tienen obligaciones específicas en relación con los proyectos en cuestión, las cuales derivan de dos (2) fuentes: (1) la Ley de Municipios Autónomos, *supra*, por razón de las certificaciones incluidas en el Plan, y (2) el Convenio suscrito entre el Municipio y las entidades demandadas. Por supuesto, en relación con el Convenio, la referencia conjunta a las "demandadas" no se debe entender inclusiva de la Junta de Planificación, ya que ésta no es parte otorgante. Tanto la validez del Plan como la del Convenio están en controversia.

Ninguna de las alegadas "partes indispensables" suscribió el Convenio entre el Municipio y las demandadas. Por otro lado, ninguna certificó proyecto alguno para su inclusión en el programa de proyectos de inversión del Plan.

El resultado de la determinación sobre la validez del Convenio no tendría consecuencias directas sobre las partes. Si resolviéramos que el Convenio es nulo en nada se perjudicarían. Si, por el contrario, determináramos que es un contrato válido, su eficacia tampoco las podría afectar, por razón del principio de eficacia relativa de los contratos. Sabido es que, como regla general, "[l]os contratos sólo producen efecto entre las partes que los otorgan y sus herederos ...". Art. 1209 del Código Civil, 31 L.P.R.A. sec. 3374. Es decir, "la reglamentación que crea [el contrato], con su cortejo de derechos, facultades y obligaciones, no le es aplicable [al tercero], ni en su provecho ni en su daño ...". L. Díez-Picazo y A. Guillón, *Sistema de*

*Derecho Civil*, 7ma ed., 1997, T. 2, pág. 91. Así lo reconocimos en *Dennis, Metro Invs. v. City Fed. Savs.*, 121 D.P.R. 197, 211 (1988), al expresar que "[l]a regla general es que en relación con un tercero un contrato es irrelevante, ya que éste simplemente regula las relaciones entre las partes contratantes y al tercero ni siquiera le afecta". Las obligaciones que nacen de los contratos, pues, sólo tienen "fuerza de ley",[8] entre los otorgantes y sus herederos.

En cuanto al programa de proyectos de inversión certificados, el Municipio basa las obligaciones en el Art. 13.011 de la Ley de Municipios Autónomos, *supra*, que establece, en lo pertinente, lo siguiente:

> Una vez aprobado por el Gobernador, el Plan de Ordenación obligará a las agencias públicas al cumplimiento con los programas de obras y proyectos incluidos en la Sección del Programa de Proyectos de Inversión certificados por las agencias públicas. L[a] Junta de Planificación le dará consideración prioritaria a dicha sección en la preparación de su Programa de Inversiones de Cuatro Años dispuesto en [su ley orgánica], *igualmente lo hará la Oficina de [Gerencia y Presupuesto] en el Presupuesto Anual que someta a la Asamblea Legislativa*. Las corporaciones públicas quedarán obligadas en sus propios presupuestos. (Énfasis suplido.)

En cuanto a HUD y al Cuerpo de Ingenieros, esta disposición no les impone obligación jurídica alguna. En cuanto a la OGP, la obligación que le impone el Art. 13.011 de la Ley de Municipios Autónomos, *supra*, de darle consideración prioritaria al programa de proyectos de inversión en la preparación del presupuesto anual, es una de carácter exclusivamente ministerial. La OGP es "un organismo asesor y auxiliar para ayudar al Gobernador en el descargo de sus funciones y responsabilidades de dirección y administración", carente de personalidad jurídica. Art. 2 de la Ley Orgánica de la Oficina de Gerencia y Presupuesto, Ley Núm. 147 de 18 de junio de 1980, según enmendada, 23 L.P.R.A. sec. 102.

---

[8] Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994.

La sentencia de instancia dispone, desde luego, que OGP, HUD y el Cuerpo de Ingenieros de Estados Unidos tienen funciones que descargar en torno a la realización de los proyectos de los departamentos recurrentes. Pero estas funciones son las que se llevan a cabo dentro del curso normal de su desempeño administrativo, y las entidades recurrentes sólo vienen obligadas a efectuar las correspondientes gestiones ante estos organismos, igual que ante otros organismos gubernamentales que tampoco forman parte del pleito. De la parte dispositiva de la sentencia, donde se adjudica y determina la controversia del caso, no surge lo contrario. Es frente a dicha parte dispositiva que se atienden los recursos, no contra los fundamentos o expresiones aisladas en dicha sentencia. *Zavala Vázquez v. Mun. de Ponce*, 139 D.P.R. 548 (1995); *Vélez Rodríguez v. Amaro Cora*, 138 D.P.R. 182, 198 (1995); *Zorniak Air Servs. v. Cessna Aircraft Co.*, 132 D.P.R. 170, 182 (1992).

Dicho lo anterior, nos parece prudente recordar, además, que "cuando el Estado o una de sus agencias o funcionarios es el tercero ausente, la tendencia moderna es a evitar dificultar la labor del demandante con planteamientos sobre partes indispensables. El Estado, sus agencias y funcionarios principales no son litigantes comunes. Su utilización de las Reglas de Procedimiento Civil debe guiarse, ante todo, por el deseo de allanar el camino de la justicia". (Citas omitidas.) *Hernández Agosto v. López Nieves*, supra, pág. 611.[9]

---

[9] El Municipio, en su Alegato Único de Réplica, presenta por vez primera el señalamiento de que la ACT, la AEP, la PRTC y el Departamento de la Vivienda (en adelante DV) y el Departamento de Recursos Naturales y Ambientales (en adelante DRNA), contrario a otras recurrentes, no notificaron a la Autoridad de los Puertos (en adelante AP) de los recursos que presentaron ante este Foro, por lo que carecemos de jurisdicción sobre sus recursos por falta de parte indispensable.

Surge del expediente que la AP, quien fue demandada también por incumplimiento del Convenio, acordó con el Municipio mediante estipulación transaccional que construirá el proyecto objeto de controversia entre las partes, con independencia del resultado de este litigio. Dicha estipulación transaccional fue aprobada por el Tribunal de Primera Instancia. Nos parece inmeritorio el señalamiento del Municipio. Claramente, la AP ya no es parte indispensable en el litigio, según lo

## III

A. Las demandadas alegan que el Plan de Ordenación Territorial y el Convenio son nulos por ser incompatibles con las leyes, la política pública y los reglamentos; que no hubo estrecha consulta ni coordinación entre el Municipio, la Junta de Planificación y las agencias públicas. Básicamente, impugnan las determinaciones de hecho que hizo el Tribunal de Primera Instancia. Alegan que los planes de proyectos de inversión no estuvieron certificados por las agencias correspondientes, que los convenios no son obligatorios, que no son contratos, que son nulos, que su aplicación menoscaba el interés público, y que su cumplimiento resulta en extremo oneroso. Además, impugnan la concesión de daños por considerarlos remotos y especulativos.

Permea, pues, en las agencias demandadas un argumento medular que sirve de eje central a todas sus alegaciones: que estos convenios transgreden el orden público porque fueron hechos a toda prisa, en el ocaso de una administración gubernamental enfrentada a la inminencia del cambio, comprometiendo ilegalmente a la próxima administración gubernamental. No tienen razón.

En vista de las alegaciones y los errores que se señalan en el presente caso, conviene precisar brevemente el trasfondo histórico que dio génesis a la Ley de Municipios Autónomos. Ello, con el propósito de comprender mejor y cabalmente lo que fundamentalmente se impugna en este recurso.

Desde el año 1985, la administración del entonces gobernador, Hon. Rafael Hernández Colón, comenzó a evaluar la situación de los municipios. Se anunciaba desde

---

dispone la Regla 53.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Véanse, en cuanto a la facultad de los tribunales de dictar sentencias en casos de partes múltiples, la Regla 43.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Torres Capeles v. Rivera Alejandro*, 143 D.P.R. 300 (1997); J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1979, Vol. II, Cap. VII, págs. 231-234.

entonces la gestación de un Plan de Rehabilitación de los Municipios para que pudieran enfrentar exitosamente sus problemas comunes. R. Hernández Colón, *La reforma municipal: un proyecto de democracia*, 23–24 Plerus 8 (1995).

Asimismo, la Comisión para la Revisión de la Ley Municipal (en adelante Comisión) fue creada mediante Orden Ejecutiva de 25 de octubre de 1985 con la misión de estudiar el ordenamiento orgánico del municipio y así poder recomendar los parámetros de una nueva relación autonómica con el Gobierno Central. C. Acosta Grubb, *La Transformación del Municipio en la Reforma Municipal*, 23–24 Plerus 28 (1995). En enero de 1987, dicha comisión sometió un informe sobre la situación socioeconómica y fiscal de los municipios puertorriqueños, documento clave para conocer de lleno los problemas que se intentaban enfrentar. Acosta Grubb, *supra*.

Para darle continuidad a los esfuerzos mencionados, el Gobernador creó la Oficina para el Desarrollo Autonómico de los Municipios (en adelante ODAM) mediante Orden Ejecutiva de 21 de abril de 1989. Los estudios de la Comisión, unidos a los realizados por la ODAM, fueron las bases en los cuales se erigió el edificio jurídico de la Reforma Municipal. R.L. Nieves, *La participación ciudadana en la Ley de Municipios Autónomos de 1991: un laboratorio de posibilidades democráticas para Puerto Rico*, 67 Rev. Jur. U.P.R. 467, 483 (1998).

■ La Ley de Municipios Autónomos es la piedra angular de la Reforma Municipal de 1991. Con esta reforma se pretendió "iniciar un proceso de renovación político-administrativa del gobierno municipal con la finalidad de fomentar una mayor autonomía y la descentralización gubernamental de Puerto Rico".[10] L. Santana Rabell y M.

---

[10] Las otras leyes aprobadas durante esta época son: (1) la Ley del Centro de Recaudación de Ingresos Municipales, Ley Núm. 80 de 30 de agosto de 1991 (21 L.P.R.A. sec. 5801 *et seq.*); (2) la Ley de Contribución Municipal sobre la Propiedad de 1991, Ley Núm. 83 de 30 de agosto de 1991 (21 L.P.R.A. sec. 5001 *et seq.*); (3) la Ley

Negrón Portillo, eds., *Introducción a la reforma municipal en Puerto Rico: retos y oportunidades*, Escuela Graduada de Administración Pública, U.P.R., 1995.[11] A estos efectos, el Art. 1.002 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4001 n., "declara como política pública del Estado Libre Asociado de Puerto Rico otorgar[les] a los municipios el máximo posible de autonomía y proveerles las herramientas financieras y los poderes y facultades necesarias para asumir un rol central y fundamental en su desarrollo urbano, social y económico". Su propósito era, sin duda, propiciar la gestación de un esquema de descentralización máxima del gobierno estatal y autonomía máxima para los municipios. Nieves, *supra.*

La Reforma Municipal se impuso las siguientes metas: (1) *la transferencia de poderes*, mecanismo de descentralización de competencias del Gobierno Central hacia los municipios mediante el establecimiento de convenios. Así, el municipio puede advenir a la autonomía de manera gradual y a su conveniencia; (2) *la reforma administrativa* y (3) *la autonomía fiscal*, razón por la cual se crea el Centro de Recaudación de Ingresos Municipales.

Nos parece necesario puntualizar, además, que las leyes que conforman la Reforma Municipal fueron concebidas por la Rama Ejecutiva, es decir, constituyeron proyectos de administración. El proceso de redacción de éstos, como hemos visto, se nutrió de las ideas y la búsqueda de consensos entre diversos agentes interesados en la Reforma, a

---

de Patentes Municipales, Ley Núm. 82 de 30 de agosto de 1991 (21 L.P.R.A. secs. 651a, 651c–651d, 651f, 651h–651j, 651l–651m y 652x); (4) la ley que autoriza al Gobierno Central a traspasar el equipo que sería utilizado para el sistema uniforme de contabilidad mecanizado, Ley Núm. 75 de 28 de agosto de 1991, Leyes de Puerto Rico, pág. 405; y (5) la Ley Núm. 73 de 22 de septiembre de 1992 (21 L.P.R.A. ants. secs. 4990–4990k), que creó la Comisión para Fomentar la Autonomía Municipal, derogada por la Ley Núm. 113 de 7 de diciembre de 1993, Leyes de Puerto Rico, pág. 525.

[11] Véase, además, el Informe Conjunto de las Comisiones de Asuntos Municipales, de Hacienda y de Desarrollo Económico y Planificación de la Cámara de Representantes y del Senado sobre el sustitutivo del P. de la C. 1296, 20 de agosto de 1991.

saber: la Asociación de Alcaldes (agrupación de alcaldes del Partido Popular Democrático); la Federación de Alcaldes (agrupación de alcaldes del Partido Nuevo Progresista), y diversas agencias de la Rama Ejecutiva. Acosta Grubb, *isupra.*

 Uno de los medios que la Ley de Municipios Autónomos dispone para la implantación de esta política pública es la facultad que les confiere a los municipios de adoptar planes de ordenación. Véase el Art. 13.004 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4602. Según se hace constar en dicho artículo, los planes de ordenación "constituirán instrumentos del territorio municipal. Los mismos protegerán los suelos, promoverán el uso balanceado, provechoso y eficaz de los mismos y propiciarán el desarrollo cabal de cada municipio". Íd.

La ley prevé tres (3) tipos de planes de ordenación, cada uno para atender distintos aspectos de la ordenación espacial municipal. Éstos son: (1) el plan territorial, (2) el plan de ensanche y (3) el plan de área. 21 L.P.R.A. sec. 4602. El plan de área está previsto "para disponer el uso del suelo en áreas del municipio que requieran atención especial", 21 L.P.R.A. sec. 4601(o); el plan de ensanche, "para disponer el uso del suelo urbanizable programado del municipio a convertirse en suelo urbano", 21 L.P.R.A. sec. 4601(p); y, el plan territorial, el cual debe comprender toda la extensión espacial municipal, para "enuncia[r] y dispone[r] la política pública sobre ... [el] desarrollo [del municipio] y el uso d[e su] suelo". 21 L.P.R.A. sec. 4601(s).

 Ahora bien, la ley limita el ejercicio de la prerrogativa de los municipios de preparar planes de ordenación, al preceptuar que el plan territorial será el primero que se elabore y, además, que su vigencia es un requisito indispensable para la adopción de cualquier otro. 21 L.P.R.A. sec. 4602. La ley establece también que, "[a] los fines de propiciar la máxima compatibilidad de los Planes de Ordenación con las políticas públicas regionales y generales de

Puerto Rico, el Gobierno Central, a través de la Junta de Planificación, retendrá la facultad de aprobar inicialmente los Planes de Ordenación y de revisar cualquier parte de los mismos". Íd. Asimismo, la ley le delegó a la Junta de Planificación la facultad de establecer, mediante reglamento, la forma y el contenido de los distintos planes de ordenación. Íd.

Sin embargo, no fue hasta 1994, luego de que el Plan de Ordenación Territorial del Municipio de Ponce hubiera sido aprobado por el gobernador, que la Junta de Planificación ejerció esta facultad y adoptó el Reglamento sobre Planes de Ordenación Municipal y la Transferencia y Administración de Facultades, Reglamento Núm. 24 de la Junta de Planificación, de 20 de enero de 1994 (23 R.P.R. secs. 650.551 *et seq.* (1997)). Por lo tanto, analizamos la validez del Plan de Ponce de acuerdo con los requisitos establecidos en la Ley de Municipios Autónomos.([12])

 La Ley de Municipios Autónomos establece requisitos de aplicación general a todos los planes de ordenación y requisitos de aplicación especial a cada uno de los planes particulares. En cuanto a los requisitos de aplicación general, el Art. 13.008 de la Ley de Municipios Autónomos, *supra*, preceptúa que los planes de ordenación serán elaborados por el municipio "en estrecha coordinación con la Junta de Planificación y con otras agencias públicas concernidas para asegurar su compatibilidad con planes estatales, regionales y de otros municipios". 21 L.P.R.A. sec. 4606. Además, según establece el Art. 13.011, los planes de ordenación deben estar conformes y ser compatibles con "todas las políticas públicas, leyes, reglamentos u otros documentos del gobierno central relacionados a la ordena-

---

([12]) Cabe señalar, no obstante, que los requisitos que establece el Reglamento sobre Planes de Ordenación Municipal y la Transferencia y Administración de Facultades para la preparación de planes territoriales son esencialmente un calco de los que establece la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (en adelante Ley de Municipios Autónomos).

ción territorial y a la construcción ...". 21 L.P.R.A. sec. 4609. El plan que se adopte, por lo tanto, deberá ser "el resultado de la consulta y coordinación entre las agencias públicas y el municipio". Art. 13.011 de la Ley de Municipios Autónomos, *supra.*

Un municipio que decida elaborar un plan de ordenación tiene que notificarlo a la Junta de Planificación. 21 L.P.R.A. sec. 4606. La elaboración de estos planes se tiene que hacer en etapas, a través de la preparación secuencial o concurrente de una serie de documentos. Durante este proceso se requiere la participación ciudadana mediante vistas públicas, cuya celebración tiene que ser notificada a la Junta de Planificación conjuntamente con los documentos que en éstas serán presentados. 21 L.P.R.A. sec. 4606. El Art. 13.013 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4611, le ordena asimismo al municipio crear, previo o durante la preparación de cualquier plan de ordenación, una oficina de ordenación territorial. Por último, el Art. 13.008 (21 L.P.R.A. sec. 4606) condiciona la vigencia de los planes de ordenación a la aprobación de la Asamblea Municipal, la adopción de la Junta de Planificación y la aprobación del gobernador.

Particularmente, en cuanto a los planes de ordenación territorial, el Art. 13.005 (21 L.P.R.A. sec. 4603) dispone que éstos se tienen que desarrollar a base de los siguientes tres (3) conjuntos de documentos, cuyo contenido específico se detalla en la ley: (1) el memorial, (2) el programa y (3) la reglamentación. Específicamente, el programa del plan territorial debe contener, entre otros documentos básicos, un programa de proyectos de inversión certificados por las agencias públicas concernidas. El Art. 13.010 (21 L.P.R.A. sec. 4608) de la ley establece, además, que los municipios deberán crear una o varias juntas de comunidad durante la preparación de un plan territorial y antes de la celebración de vistas públicas para la consideración del documento completo.

A base de la prueba que tuvo ante sí, el foro de instancia llegó a la determinación, avalada por el tribunal apelativo, de que el Plan de Ordenación Territorial de Ponce cumplió con todos los requisitos exigidos por la Ley de Municipios Autónomos.[13] Las demandadas cuestionan esta determinación a base de los tres argumentos siguientes.

En primer lugar, las demandadas argumentan que nunca hubo una coordinación estrecha entre ellas y el Municipio y la Junta de Planificación. El señalamiento se circunscribe a impugnar la apreciación de los hechos que hizo el tribunal de instancia. Las demandadas señalan que no se presentó prueba que sustente el hecho de que existió la coordinación requerida durante la preparación del Plan. Este argumento, además de que no está apoyado por el expediente, puesto que en él existen documentos a partir de los cuales se pueden verificar varias de las gestiones entre el Municipio y las demandadas, carece totalmente de méritos, por cuanto la Regla 3 de Evidencia, 32 L.P.R.A. Ap. IV, establece como medios de prueba tanto la evidencia documental como la testifical. Íd.

Pero las demandadas sostienen, además, que "la prueba testifical ... estableció que el proceso para la adopción del plan fue uno apresurado, llevado a cabo mayormente en gestiones ... [entre miembros la Rama Ejecutiva] bajo la dirección del [entonces Secretario de Estado] Dr. [Salvador] Padilla". Caso Núm. CC-98-257, Petición de *certiorari*, pág. 30.

En cuanto a la rapidez con que se llevaron a cabo las gestiones correspondientes, la propia Ley de Municipios Autónomos, en su Art. 13.011, establece, en lo pertinente:

En asuntos de su competencia, el municipio coordinará con otras agencias públicas concernidas un proceso dirigido a armo-

---

[13] Esta determinación se basó parcialmente en hechos estipulados por las partes. Véase la Sentencia del Tribunal de Primera Instancia, en las págs. 4–8, contenida en el Anejo V del expediente. (Apéndice Conjunto, Parte 5, pág. 2970.)

nïzar sus planes en el área municipal con los planes y programas de tales agencias públicas de forma mutuamente satisfactoria. *Las agencias públicas vendrán obligadas a responder en un proceso razonablemente acelerado, atendiendo en todo lo posible las inquietudes e intereses presentados por el municipio.* (Énfasis suplido.) 21 L.P.R.A. sec. 4609.

La intervención del ex Secretario de Estado se produjo por razón del cargo que ocupaba simultáneamente como Director de la Oficina de Expeditación de Proyectos de Construcción, creada por el ex Gobernador Rafael Hernández Colón mediante la Orden Ejecutiva Núm. OE-1992-10 de 24 de febrero de 1992.

La apreciación de los hechos que hizo el tribunal de instancia a base de la prueba ofrecida durante el juicio está plenamente justificada en el expediente, no denota error manifiesto, pasión, prejuicio o parcialidad y, por lo tanto, no intervendremos con ella. Véanse: *Aponte v. Sears Roebuck de P.R., Inc.*, 144 D.P.R. 830 (1998); *Mercado, Quilichini v. U.C.P.R.*, 143 D.P.R. 610 (1997); *López Vicil v. ITT Intermedia, Inc.*, 143 D.P.R. 574 (1997); *Méndez v. Morales*, 142 D.P.R. 26 (1996); *Orta v. Padilla*, 137 D.P.R. 927 (1995); *Rodríguez Oyola v. Machado Díaz*, 136 D.P.R. 250 (1994).

B. En segundo lugar, las demandadas argumentan que el Plan no está conforme y es incompatible con sus respectivos estatutos habilitadores. Sostienen que ni la Junta de Planificación ni el Municipio hicieron un estudio de la compatibilidad entre estos estatutos y el Plan.

El Art. 13.011 de la Ley de Municipios Autónomos, *supra*, preceptúa que los planes de ordenación estarán conformes "con todas las políticas públicas, leyes, reglamentos u otros documentos del gobierno central *relacionados a la ordenación territorial y a la construcción* ...". (Énfasis suplido.) Como se puede apreciar, esta disposición se refiere propiamente a la compatibilidad de lo dispuesto en los planes de ordenación con las demás fuentes

que rigen la planificación en Puerto Rico. No se refiere a la compatibilidad con todas las leyes que conforman nuestro ordenamiento jurídico. Es por ello que se requiere que los municipios, durante la elaboración de los planes de ordenación, coordinen "con otras agencias públicas concernidas un proceso dirigido a armonizar *sus planes en el área municipal con los planes y programas de tales agencias públicas de forma mutuamente satisfactoria*". (Énfasis suplido.) Íd.

Asimismo, el Art. 13.008 de la Ley de Municipios Autónomos, *supra*, requiere que las agencias, "[c]omo instrumento indispensable para la evaluación de los Planes de Ordenación que se sometan a la consideración de la Junta de Planificación ... manten[gan] actualizado y pon[ga]n a disposición de dicha agencia un inventario físico que incluya, entre otros, la ubicación de los recursos naturales que se deben proteger, el uso del suelo, las áreas susceptibles a riesgos naturales, las zonas de valor agrícola, histórico, arqueológico o turístico, así como el detalle disponible sobre la infraestructura". Al evaluar los planes de ordenación sometidos ante su consideración, la Junta de Planificación debe velar "por la compatibilidad de lo propuesto con otros Planes de Ordenación y otras políticas públicas relevantes a los asuntos incluidos en el plan bajo consideración ...". Art. 13.011 de la Ley de Municipios Autónomos, *supra*.

■ La Ley de Municipios Autónomos no requiere que la Junta de Planificación haga un estudio de la compatibilidad de lo dispuesto en los planes de ordenación con las leyes orgánicas de cada una de las demás agencias que intervienen en su elaboración e implantación. Tampoco tienen que hacerlo los municipios. Este análisis le corresponde a cada una de las agencias concernidas, al determinar cuál y cómo será su intervención en la preparación e implantación de un determinado plan de ordenación. Así lo hicieron las demandadas en este caso, según se desprende

de las gestiones habidas entre éstas y el Municipio durante todo el proceso de elaboración del Plan.

C. Por último, las demandadas argumentan que el Plan es inválido porque no contenía un programa de proyectos de inversión debidamente certificados por las agencias correspondientes cuando fue presentado en vistas públicas y al momento de su aprobación por parte de la Asamblea Municipal.

El Art. 13.005 de la Ley de Municipios Autónomos, *supra*, exige que todo plan de ordenación territorial contenga, entre otros documentos básicos, un programa de proyectos de inversión certificados por las agencias públicas concernidas. Por otra parte, el Art. 13.008, *supra*, requiere que el plan territorial completo sea sometido a evaluación en vistas públicas.

No obstante, el requisito que establece actualmente el Art. 13.005 de la Ley de Municipios Autónomos, *supra*, respecto de la obligación de incluir un programa de proyectos de inversión certificados en los planes de ordenación territorial, no constaba en la Ley de Municipios Autónomos cuando fue aprobada en ese año. Fue añadido posteriormente, mediante enmienda, por la Sec. 62 de la Ley Núm. 84 de 29 de octubre de 1992 (1992 Leyes de Puerto Rico 442, 489), de vigencia inmediata.

El Plan de Ponce fue preparado por el Municipio, aprobado por su Asamblea y adoptado por la Junta de Planificación bajo las disposiciones de la Ley de Municipios Autónomos antes de que fuera enmendada. El único trámite que faltaba para su efectividad cuando ya estaba en vigor la Ley Núm. 84, *supra*, era la firma del gobernador. Esto, sin embargo, no afecta la validez del Plan, ya que, independientemente de cuál es la eficacia temporal de las enmiendas efectuadas por dicha Ley Núm. 84, ésta retuvo la cláusula de reserva contenida en el Art. 13.019 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4617, para aquellos planes que se hubieran comenzado a elaborar antes de

la vigencia de esta última. El texto original del Art. 13.019, *supra*, establecía:

> Cualquier Plan Territorial para la ordenación de la totalidad de su área geográfica que esté en proceso de elaboración a la vigencia de esta ley y que cumpla con los requisitos establecidos en este Título podrá ser aprobado por la Asamblea Municipal, adoptado por la Junta de Planificación y aprobado por el Gobernador.
>
> Todo procedimiento pendiente ante la Junta de Planificación, la Administración de Reglamentos y Permisos, la Junta de Apelaciones de Construcciones y Lotificaciones o ante cualquier tribunal a la fecha de vigencia de esta ley se continuará tramitando hasta que recaiga una determinación final, de acuerdo con las leyes y reglamentos en vigor a la fecha en que tales procedimientos se iniciaron. 1991 Leyes de Puerto Rico 459, 613.

La Sec. 77 de la Ley Núm. 84, *supra*, 21 L.P.R.A. sec. 4617, eliminó el segundo párrafo del artículo y enmendó el primero para que leyera de la forma siguiente:

> Cualquier Plan Territorial que esté en proceso de elaboración a la vigencia de esta ley [la Ley de Municipios Autónomos] y que cumpla *significativamente* con los requisitos establecidos en este Capítulo [XIII sobre ordenación territorial] podrá ser aprobado por la Asamblea Municipal, adoptado por la Junta de Planificación y aprobado por el Gobernador. (Énfasis suplido.) 1992 Leyes de Puerto Rico 442, 514–515.

Así pues, el Plan de Ordenación Territorial del Municipio de Ponce podía no contener un programa de proyectos de inversión certificados y, aun así, ser aprobado por la Asamblea Municipal si cumplía significativamente, como lo hizo —según hemos discutido— con los requisitos establecidos en la Ley de Municipios Autónomos. Cabe señalar, no obstante, que el Plan del Municipio sí contenía una sección de proyectos de inversión cuando fue aprobado por la Asamblea Municipal; lo que faltaba eran las certificaciones de las agencias correspondientes, las cuales fueron suscritas a solicitud de la Junta de Planificación antes de adoptarlo, por lo que fueron consideradas por el gobernador al

aprobarlo. Por lo tanto, no erró el Tribunal de Circuito al confirmar la determinación que hizo el foro de instancia sobre la validez del Plan.

## IV

A. Consideramos ahora lo relacionado con la validez del Convenio. El tribunal apelativo confirmó la determinación del foro de instancia de que el Convenio otorgado entre el Municipio y las demandadas es un contrato válido, el cual les impone a éstas la obligación de cumplir con lo acordado, es decir, desarrollar los proyectos en controversia.

Las demandadas argumentan que el Convenio suscrito no es un contrato y que aun siéndolo, es nulo por ser carente de consentimiento y causa. Argumentan, además, que es también nulo porque no cumple con varios de los requisitos establecidos en los Arts. 8.016 y 14.002 de la Ley de Municipios Autónomos, 21 L.P.R.A. secs. 4366 y 4652.

■ Los primeros señalamientos tratan propiamente sobre la validez del Convenio de acuerdo con la teoría general de los contratos. Sin embargo, por tratarse de una relación entre entidades gubernamentales, y por ello de índole administrativa, regida especialmente por la Ley de Municipios Autónomos, consideramos primero la validez del Convenio a la luz de la mencionada ley. *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 114 D.P.R. 697, 699 (1983) ("Los contratos administrativos se rigen normalmente, en ausencia de régimen especial, por la teoría general de los contratos.").

B. El Art. 8.016 de la Ley de Municipios Autónomos, *supra*, dispone:

> *Todo contrato que se ejecute* en contravención a lo dispuesto en est[e artículo] será nulo y sin efecto. Si se han invertido fondos públicos, su importe podrá recobrarse a nombre del municipio mediante la acción adecuada incoada a tal propósito.

(a) El municipio no podrá otorgar contrato alguno en el que cualquiera de sus asambleístas, funcionarios o empleados tenga, directa o indirectamente, un interés pecuniario, a menos que lo autorice el Gobernador de Puerto Rico, previa recomendación del Secretario de Justicia y del Comisionado [de Asuntos Municipales].

(b) Ningún asambleísta, funcionario o empleado municipal prestará dinero a, ni tomará dinero a préstamo, ni aceptará donativos o regalos de ningún contratista que esté proveyendo servicios o suministros al municipio.

(c) Los contratos para la ejecución de obras y mejoras públicas no se suscribirán hasta tanto:

(1) El contratista evidencie ante el municipio el pago de la póliza correspondiente del Fondo del Seguro del Estado y de la correspondiente patente municipal;

(2) haga entrega de la fianza prestada para garantizar el pago de jornales y materiales que se utilicen en la obra, y

(3) entregue o deposite cualquier otra garantía que le sea requerida por la Junta de Subastas.

(d) Todo contrato de construcción de obra o mejora pública proveerá para la retención de un diez por ciento (10%) de cada pago parcial, hasta que se termine la obra, ésta sea inspeccionada y aceptada por el municipio y hasta tanto el contratista evidencie que ha sido relevado de toda obligación como patrono.

Los municipios mantendrán un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos y enviarán copia de éstos y de las escrituras de adquisición y disposición de bienes a la Oficina del Contralor de Puerto Rico, *conforme a l[a Ley Núm. 18 de 20 de octubre de 1975, según enmendada,] y su Reglamento*. (Énfasis suplido.) 21 L.P.R.A. sec. 4366 (ed. 1995).

Por su parte, el Art. 1 de la Ley Núm. 18 de 30 de octubre de 1975 (2 L.P.R.A. sec. 97) a la cual se refiere el último párrafo de la disposición transcrita, establece, en lo pertinente, que "[l]os departamentos, agencias, instrumentalidades, oficinas y todo otro organismo y los municipios del

Estado Libre Asociado de Puerto Rico, sin excepción alguna, mantendrán un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos, y deberán remitir copia de éstos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha de otorgamiento del contrato o la enmienda". Íd.

Las demandadas sostienen que el Convenio es nulo porque fue remitido a la Oficina del Contralor luego de quince (15) días desde su otorgamiento. No tienen razón. Como correctamente concluyeron los Tribunales de Primera Instancia y de Circuito de Apelaciones, los recurrentes tenían la misma obligación que el Municipio de presentar el Convenio ante la Oficina del Contralor. No cumplieron con ella en absoluto. El Municipio, no obstante, cumplió, aunque no dentro del término de quince (15) días. Coincidimos con el parecer de los tribunales inferiores, en el sentido de que esto choca con los más elementales principios de equidad que impiden que se vaya contra los actos propios. *NEMO AUDITUR SUAM TURPIDUDINEM ALLEGANS*. Arts. 1257 y 1258 del Código Civil, 31 L.P.R.A. secs. 3516 y 3517; *Rubio Sacarello v. Roig*, 84 D.P.R. 344, 350–351 (1962). Véase, además, *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 688–689 (1987).

De otro lado, el caso *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001, 1006 (1994), que citan las agencias demandadas en apoyo de su equivocada tesis, no es de aplicación a la controversia bajo análisis. Allí se declaró nulo un contrato por no haberse celebrado subasta pública y por no haber partida presupuestaria alguna para los fines de éste, según exige la Ley de Municipios Autónomos.

Además de lo dicho, una lectura correcta del Art. 8.016 de la Ley de Municipios Autónomos, *supra*, apoya nuestra conclusión. La sanción de nulidad que establece el Art. 8.016, *supra*, según se hace constar ("[t]odo contrato que se ejecute ..."), afecta la ejecución del contrato, entendido el término "ejecución", en este contexto, como refe-

rente tanto a la celebración como al cumplimiento del contrato. Será nulo, pues, el contrato que se celebre en violación de lo dispuesto en los incisos (a), (c) y (d) del Art. 8.016, *supra*, y aquel en cuyo cumplimiento se contravenga lo preceptuado en el inciso (b). La prescripción contenida en el último párrafo del Art. 8.016, *supra*, no rige ni la celebración ni el cumplimiento del contrato, sino que presupone la existencia de un contrato celebrado válidamente. Este último párrafo trata propiamente sobre el trámite de registro y remisión establecido en la Ley Núm. 18 de 30 de octubre de 1975 (2 L.P.R.A. secs. 97–98) cuyo propósito es "crear un mecanismo de cotejo para perpetuar circunstancial y cronológicamente" los contratos gubernamentales. *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 53–54 (1988).

 La consecuencia del incumplimiento del requisito de remisión no está prevista, pues, en el Art. 8.016 de la Ley de Municipios Autónomos, sino en el Art. 8.004 (21 L.P.R.A. sec. 4354) el cual establece, en lo pertinente, que "[n]o se autorizará desembolso alguno relacionado con contratos sin la constancia de haberse enviado el contrato a la Oficina del Contralor de Puerto Rico ...".

C. Entienden las agencias demandadas, de otro lado, que erró el Tribunal de Circuito de Apelaciones al no ejercer su "inherente facultad moderadora para impedir el menoscabo del interés público actual" y al no determinar que el cumplimiento con las obligaciones contractuales resulta en extremo oneroso. Concretamente, nos piden que en materia de contratación pública no se aplique la doctrina de *pacta sunt servanda*. Pretenden en sus extensas comparecencias persuadirnos para que, a la luz de la prueba que fue presentada en el juicio y que fuera apreciada y aquilatada por el Tribunal de Primera Instancia, lleguemos a una conclusión distinta a aquella alcanzada por dicho tribunal y avalada por el mencionado foro apelativo.

Para ello nos piden que rechacemos las determinaciones

de hecho que a tales efectos hizo el ilustrado tribunal sentenciador. No podemos acceder. Nada en el expediente nos presenta alguna indicación de que el juez de instancia haya errado de forma manifiesta en su apreciación de la prueba; mucho menos que haya actuado con pasión, prejuicio o parcialidad. En ausencia de ello, no vamos a variar sus determinaciones. *Aponte v. Sears Roebuck de P.R., Inc.*, supra; *Orta v. Padilla*, supra.

D. Sobre la validez del Convenio, en cuanto se impugna que éste constituya un contrato, discutiremos en conjunto los señalamientos de error. Las agencias demandadas alegan que el Convenio objeto del presente recurso no es un contrato a tenor de nuestro ordenamiento jurídico, que únicamente constituyó un mero "negocio jurídico bilateral"; que los convenios son nulos; que éstos propenden al menoscabo del interés público; que las obligaciones contractuales resultan en extremo onerosas. Nuevamente su planteamiento se impregna con las alegadas motivaciones del gobernador de turno antes de dejar el Poder y con la cercanía de las elecciones. Resolvemos que no tienen razón. Veamos.

Los municipios, de ordinario, contratan con agencias del Gobierno Central, y estos acuerdos voluntarios se rigen por principios generales de contratos. *Antieau, Municipal Corporations Law* Sec. 19.12. En materia de contratación gubernamental, ya hemos tenido ocasión de expresar que "[e]n nuestra jurisdicción el principio rector en materia de contratos es la libertad de contratación entre las partes. Los pactos entre contratantes tienen fuerza de ley y deben ser cumplidos". *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 787 (1994). Véase, además, *García v. World Wide Entmt. Co.*, 132 D.P.R. 378 (1992).

En apoyo a su alegación de la nulidad del contrato, las agencias señalan que su causa es ilícita porque se beneficia una de las partes desproporcionadamente. No vemos tal ilicitud. No estamos ante un típico contrato de com-

praventa en el que, de ordinario, debe existir cierta correspondencia entre el precio que se paga y el valor de la cosa que se entrega. No procede que se pretenda equilibrar las contraprestaciones en un convenio como el de autos mediante su valor económico para cada una de las instrumentalidades estatales o para el Municipio. El monto de la obligación de cada cual depende, naturalmente, de la naturaleza de sus responsabilidades. Nos encontramos propiamente ante un contrato sui géneris para descargar, conjuntamente, responsabilidades que separadamente ya se tenían por ley. A tenor del convenio bajo análisis, el patrimonio municipal no acrece en nada con las prestaciones de las recurrentes. Tampoco acrecen los patrimonios de las recurrentes con las prestaciones del Municipio. Véase *Morales v. Municipio de Toa Baja*, supra. Este contrato está conforme con la ley y la política pública. Su causa es, pues, el interés público. Véanse: *Casiano, Jr. v. Borintex Mfg. Corp.*, 133 D.P.R. 127 (1993); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985).

Por lo anteriormente expuesto, resolvemos que no tenían los tribunales inferiores que utilizar su facultad moderadora para impedir el menoscabo del interés público, en vista de que nos encontramos ante una causa lícita y racional, que intenta proteger el interés público. Por ello, estamos ante una situación muy distinta a la que teníamos frente a nos en *Levy v. Aut. Edif. Públicos*, 135 D.P.R. 382, 395 (1994), donde expresamos que los tribunales pueden atemperar la irracionalidad de la causa del contrato cuando ésta vulnera el principio de la reciprocidad de las prestaciones y la norma de la buena fe.

En cuanto a la revisión del contrato al amparo de la llamada claúsula *rebus sic stantibus*, claramente ello es improcedente. Para que tal doctrina se aplique, deben estar presente siete (7) requisitos. *Casera Foods, Inc. v. E.L.A.*, 108 D.P.R. 850, 856 (1979). En cuanto a dichos requisitos, hemos resuelto que deben cumplirse todos, y que

esta doctrina trata de un remedio de excepción, para situaciones extraordinarias en las cuales se impone un prudente y escrupuloso discernimiento judicial de moderación. Íd., pág. 857. El primer requisito es que el hecho o circunstancia que amerite la revisión del contrato sea imprevisible. Este requisito claramente no se cumple; la posibilidad de que haya cambios en la administración pública y en las prioridades presupuestarias son previsibles. No vemos la imprevisibilidad.

El segundo requisito exige que se produzca una dificultad extraordinaria, una agravación de las condiciones de la prestación, de manera que resulte mucho más onerosa para el deudor. Resolvemos que tampoco está presente este requisito. La prueba demostró, y los tribunales inferiores así lo determinaron, que las agencias demandadas cuentan con los recursos para llevar a cabo los proyectos, y que no los llevan a cabo porque han cambiado sus prioridades. En vista de que no se han cumplido los primeros dos requisitos, y que el incumplimiento con uno de ellos basta para que no proceda la revisión del convenio mediante la aplicación de la llamada cláusula *rebus sic stantibus*, es innecesario discutir los demás requisitos de la mencionada doctrina.

Resolvemos, además, por los fundamentos que recién hemos expresado, que el Tribunal de Circuito de Apelaciones no debió modificar, motu proprio, algunas de las obligaciones contenidas en el Convenio. El tribunal apelativo, utilizando un análisis flexible, modificó las obligaciones siguientes: la impuesta a la A.A.A. para que lleve a cabo el diseño y adquisición de terrenos para establecer la planta de filtración de la Represa Cerrillos e instalar el sistema de acueducto, tuberías y bombas en el sector La Yuca y El Paraíso; y la de que la AEP proceda a construir el Centro de Salud Familiar del Barrio Coto, el Centro Pediátrico del Hospital Regional y el Centro de Rehabilitación Siquiátrica.

La doctrina de revisión de los contratos, según discutida anteriormente, no autoriza tal curso de acción. El tribunal intermedio apelativo invocó el interés público. No alcanzamos a comprender qué razones de interés público pueden propiciar que no se desarrollen los proyectos en beneficio de la población que el Tribunal de Primera Instancia ordenó construir. Somos del criterio que lo que exige el interés público es el cumplimiento específico de las obligaciones contenidas en el Convenio. No se cumplen los requisitos de la doctrina. Erró el Tribunal de Circuito de Apelaciones al modificar algunas de las obligaciones pactadas.

## V

A. La PRTC y la AEE señalan como errores adicionales que debió desestimarse la demanda en su contra porque ellos no incumplieron con el convenio y porque la alteración y paralización de las obras se debió exclusivamente a acciones del Municipio de Ponce. Lo anterior se refiere a una controversia al momento en que se terminaban unas obras de soterrado en la zona histórica de Ponce. El Municipio de Ponce entendió que no se estaba cumpliendo con los requisitos que impone la Junta de Planificación y el Municipio para trabajos que se realizan en zonas históricas. Sobre esta controversia, el Juez Superior, Hon. Wilfredo Santos López, dictó sentencia a favor del Municipio el 12 de abril de 1995.

Nos parece inmeritorio el señalamiento. El reclamo de que las obras se hagan conforme a derecho, no puede interpretarse como un acto de paralización de éstas; como tampoco puede ser dicho reclamo una justificación para el incumplimiento del deber contractual de realizarlas.

B. De otro lado, tanto la PRTC como la AEE nos señalan que erró el tribunal apelativo al no revocar la imposición de daños que hizo el Tribunal de Primera Instancia en

cuanto a dichas entidades. Argumentan que ellos realizaron la mayor parte de las obras que les correspondía bajo el Convenio.

No obstante lo anterior, el Tribunal de Primera Instancia concluyó que hubo unas obras que no se construyeron, tanto de la PRTC como de la AEE. La condena de daños, según ordenó el juez de instancia, será satisfecha en proporción al incumplimiento de cada agencia. De hecho, el Municipio y la PRTC estipularon los trabajos que no se habían realizado de acuerdo con el compromiso de inversión certificado. Tampoco vemos los méritos de este señalamiento de error.

C. La AEE nos señala, además, que erró el tribunal apelativo en sostener la determinación del tribunal de instancia en cuanto a las obras en la Playa de Ponce que la agencia debía completar, pues la prueba alegadamente no demostró que hubiera acuerdo en cuanto a éstas. Tampoco tiene razón. El Tribunal de Primera Instancia reconoció tal acuerdo. Del expediente surge claramente prueba que sustenta tal determinación, específicamente en los testimonios del ingeniero Del Valle y del arquitecto Bonnin, en el sentido de que hubo tal acuerdo. El error no fue cometido.

D. Por su parte, la AEP presentó varios señalamientos de error, relacionados todos con la conclusión del Tribunal de Primera Instancia, al efecto de que, una vez firmado el Convenio, la obligación de realizar los proyectos recae en la AEP y no en las agencias, y que los proyectos incluidos en el Convenio formaban parte del programa de obras permanentes de la AEP, por lo que ésta obligó su presupuesto para la realización de los proyectos. Impugna, además, la imposición por dicho tribunal de responsabilizar así al Municipio por no considerar los proyectos que fueron cancelados o reprogramados por los Departamentos de Educación y de Salud, y por la Policía de Puerto Rico. Se basa, principalmente, en que la Ley de Municipios Autónomos es incompatible con la Ley Orgánica de la AEP.

La realidad choca con lo que nos expresa la AEP. Incluso, según surge del expediente, dicha entidad se niega a realizar aquellos proyectos en el Municipio en los cuales no intervienen las agencias antes mencionadas. La prueba que fue presentada en el juicio estableció categóricamente la participación de dichas agencias en el proceso de preparación del Plan de Ordenación Territorial y, además, clarificó el rol de éstas y de la AEP en cuanto a los compromisos de inversión asumidos por la certificación de esta última. Apéndice Conjunto, Parte V, pág. 2977.

La sentencia de instancia de ninguna manera releva a las agencias de cumplir las obligaciones que las leyes y los reglamentos les imponen. Es por ello que se designa un monitor para que supervise y dé seguimiento al progreso de las obras de modo que los proyectos se realicen.

■■■ La AEP tendrá, pues, que seguir el procedimiento ordinario. No puede plantear aquí cualquier reprogramación que se haga para pretender liberarse de su obligación. Enfatizamos, además, que cuando la AEP se comprometió a través del programa del Plan de Ordenación Territorial y del Convenio, ésta no estaba comprometiendo a terceros, ni estaba contratando a nombre de otro. Por el contrario, se obligó y comprometió, además, su propio presupuesto. El Art. 13.011 de la Ley de Municipios Autónomos, *supra*, es claro al disponer que una vez aprobado el Plan de Ordenación por el gobernador, las corporaciones públicas quedarían obligadas en sus propios presupuestos. Es forzoso concluir, entonces, que tales errores no se cometieron.

■■■ Es por todo lo anterior que no podemos acoger el planteamiento o tesis central invocado en conjunto por las entidades demandadas, en el sentido de que estos proyectos —que forman parte de los convenios— fueron pactados en el ocaso de una administración, comprometiendo impermisiblemente a una administración entrante. Como hemos visto, por el contrario, todo esto forma parte de la política

pública de una administración que comenzó a implantarse y a estudiarse desde 1985, y que naturalmente aceleró los trámites administrativos para completarlos antes de que los funcionarios cesaran en sus cargos. El Estado es un contratante como cualquier otro y tiene que cumplir con lo que se comprometió independientemente de los cambios en administraciones de gobierno. Esta obligación es independiente del partido político en el Poder. *Mun. de Ponce v. Gobernador*, supra.

## VI

En cuanto a los daños sufridos, las agencias demandadas impugnan la determinación que a tales efectos hizo el Tribunal de Circuito de Apelaciones. Repasemos brevemente. El Tribunal de Primera Instancia, luego de analizar la prueba presentada, así como los informes de los peritos, concluyó que el Municipio de Ponce había sufrido daños debido a la pérdida de ingresos fiscales en concepto de arbitrios de construcción, patentes municipales y contribuciones sobre la propiedad ocasionadas por la cancelación de los proyectos. Concluyó que el Municipio pudo probar *mediante el uso de peritos* que los daños sufridos ascendieron a cincuenta y ocho millones novecientos cuatro mil treinta y siete dólares ($58,904,037). Sin embargo, el tribunal a quo entendió que a la luz de la totalidad de las circunstancias que mediaron en el caso, y en vista de que se ordenó la realización de los proyectos cuyo cumplimiento específico se solicitaba, correspondía compensar al Municipio en dieciséis millones cuatrocientos dieciocho mil ochocientos cuarenta y cinco dólares ($16,418,845), es decir, menos del veintiocho por ciento (28%) del total que reconoció como daños sufridos.

Por su parte, el Tribunal de Circuito de Apelaciones a pesar de reconocer que no existe duda alguna de que las actuaciones de las agencias demandadas causaron y cau-

sarán daños al Municipio decidió posponer la concesión de los daños hasta que el Comisionado que nombró el tribunal sentenciador informara el cumplimiento que las agencias demandadas hayan exhibido con respecto a sus obligaciones. Ello, porque fue el parecer del Tribunal de Circuito de Apelaciones que las cuantías, al momento de resolver, eran "en algún grado inciertas, o producto de la especulación". Apéndice Conjunto, Parte VIII, pág. 4661. El tribunal apelativo entendió que en este momento las únicas cuantías identificables con certeza serían, por ejemplo y entre otras, la de intereses. Para llegar a esa conclusión el tribunal apelativo tomó en cuenta que las cantidades desglosadas por el tribunal a quo en varias tablas —que establecían qué agencias y cuáles proyectos debían responder en concepto de cada pérdida— no incluían todas las agencias ni todos los proyectos en controversia en el caso de autos. La sentencia del tribunal apelativo establece que "[e]n particular ... se excluyeron del cómputo los proyectos de las agencias que se realizarían por administración ... como [por] ejemplo ... las obras de soterrado de la zona histórica del Municipio". Íd., pág. 4660, esc. 69. Por otro lado, también evaluó las alegaciones de las partes apelantes en el sentido de que no hubo mitigación de daños de parte del Municipio, alegación que el Municipio rechaza, de que varias obras fueron construidas o adelantadas, y que cada agencia deberá responder por las pérdidas en proporción al monto de la inversión no realizada, además de circunstancias especiales que pudieran resultar en que el incumplimiento de la agencia no dé lugar a compensación por daños. A manera de ejemplo, la PRTC sostiene que la sentencia del Tribunal de Primera Instancia no cuantificó las cantidades en concepto de arbitrios sobre construcción no recaudados, patentes municipales y contribuciones sobre la propiedad por la que dicha agencia debería responder, por lo que no debe ser responsable de manera solidaria con otras agencias por daños que ésta no ocasionó, máxime

ya que concluirá las obras según las había planificado en su programa de infraestructura.

Como se sabe, los jueces pueden, con la ayuda de peritos en estadísticas y ciencias económicas, hacer un cálculo educado y razonable de los daños patrimoniales. A.J. Amadeo-Murga, *El valor de los daños en la responsabilidad civil*, San Juan, Ed. Esmaco, 1997, Vol. I, pág. 31.

Aunque la ilustrada sala de instancia tuvo ante sí abundante prueba pericial para asistirla en la difícil y angustiosa tarea de la estimación y valoración de los daños, *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975), no hay duda que la complejidad del asunto ante nos, que no ha finalizado y que involucra tantas agencias distintas con sus particularidades y diversas obras en sus diferentes etapas y presupuestos, conmina a avalar el curso de acción del tribunal apelativo de posponer la adjudicación de daños en este momento. Por un lado, aunque el foro de primera instancia determinó daños sufridos por el Municipio ascendentes a cincuenta y ocho millones novecientos cuatro mil treinta y siete dólares ($58,904,037), concluyó indemnizarlo sólo por la cantidad de dieciséis millones cuatrocientos dieciocho mil ochocientos cuarenta y cinco dólares ($16,418,845). Es nuestro criterio que si el Municipio efectivamente probó que sus daños ascendían a la cantidad mencionada, no debió el foro a quo reducir la suma que logró probar el demandante en el juicio. Por otro lado, el criterio de que son fondos públicos los que llevarán a cabo dichos pagos, nos alertan aún más de la necesidad de escoger un curso de acción intermedio y equilibrado que sopese todos los elementos que nos permitan ejercer con cumplida justicia. *Culebra Enterprises Corp. v. E.L.A.*, 143 D.P.R. 935 (1997). Por ello, contar con el beneficio de las aportaciones que en su día haga el Comisionado asignado, una vez haya finalizado la construcción de los proyectos por cada agencia responsable, pondrá a los tribunales en mejor posición de

computar con certeza los daños que las agencias causaron al Municipio.

En resumen, *se dictará sentencia para modificar la sentencia recurrida a los únicos fines de dejar sin efecto las modificaciones que a su vez le hiciera el Tribunal de Circuito de Apelaciones a la sentencia dictada por el Tribunal de Primera Instancia en armonía a lo expresado en el acápite IV, sección C de esta opinión. Así modificada, se confirmará la sentencia recurrida.*

La Jueza Asociada Señora Naviera de Rodón concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Rivera Pérez disintió con una opinión escrita. El Juez Asociado Señor Fuster Berlingeri no intervino. El Juez Asociado Señor Corrada Del Río se inhibió.

## ANEJO X
## CONVENIO PARA EL DESARROLLO
## DE PROYECTOS PROGRAMADOS ENTRE EL GOBIERNO
## CENTRAL Y EL MUNICIPIO DE PONCE

En San Juan de Puerto Rico, hoy día 28 de octubre de 1992.

### I. COMPARECENCIA

Por la primera parte, *EL GOBIERNO CENTRAL DEL ES-TADO LIBRE ASOCIADO DE PUERTO RICO*, en adelante denominado *"EL GOBIERNO CENTRAL,"* representado por el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Rafael Hernández Colón, la *Autoridad de Carreteras* representada por su Director, el Ing. José L. Bigas Mulero, [la] *Autoridad de Acueductos y Alcantarillados*[,] representada por su Directora, Ing. María Margarita Irizarry, la *Autoridad de Edificios Públicos*[,] representada por su Director, Arq. Luis Rafael Arias Albizu, la *Autoridad de los Puertos*[,] representada por su Director, Gen. José A. Buitrago, [la] *Autoridad de Energía Eléctrica*[,] representada por su Director, José A. Del Valle, el *Departamento de la Vivienda*[,] representad[o] por su Administrador, Sr. Rigoberto Figueroa, [el] *Departamento de Recursos Naturales*[,] representad[o] por su Secretario, Sr. Santos Rohena Betancourt, y la *Puerto Rico Telephone Company*[,] representada por su Director, el Ing. Ramón Arce, en adelante denominadas *"LAS AGENCIAS"*.

Por la segunda parte, *EL MUNICIPIO DE PONCE*, en adelante denominado *"EL MUNICIPIO"*, representado por su Alcalde, Hon. Rafael Cordero Santiago.

Las partes aseguran tener la capacidad y autoridad en Ley para otorgar este convenio, la cual surge de la Ley Núm. 81 de 30 de octubre de 1991, según enmendada, conocida como la Ley de Municipios Autónomos.

### II. PREÁMBULO

En este convenio se pone en vigor la política pública del Estado Libre Asociado de Puerto Rico establecida en la Ley de Municipios Autónomos consistente en otorgarle[s] a los municipios el máximo posible de autonomía[,] además de proveerles a [é]stos los poderes y facultades que sean necesarios para asumir un rol central y fundamental en su desarrollo urbano, social y económico.

El Municipio de Ponce[,] en cumplimiento de lo dispuesto en la Ley de Municipios Autónomos[,] ha invertido considerables recursos económicos y humanos y tiempo en elaborar un Plan de Ordenamiento Territorial para disponer el mejor uso del suelo dentro de sus límites territoriales y desarrollar proyectos

de infraestructura para la promoción del bienestar económico y social de su población mediante la adopción de un Plan de Ordenamiento Territorial.

El Plan de Ordenamiento contiene el Programa de Proyectos de Inversión en el Municipio de Ponce, debidamente certificados por las agencias públicas pertinentes y por el Municipio, según corresponde, como exige la referida Ley Núm. 81, según enmendada.

El análisis regional permite conocer las características sociales y económicas de la población, así como conocer las ventajas, oportunidades y limitaciones que presenta cada región. A su vez permite el tener un diagnóstico de los componentes de infraestructura básica y las necesidades de construcción y rehabilitación de los sistemas.

De esta forma se provee el análisis necesario que permita la identificación de oportunidades y condiciones para estimular un desarrollo balanceado a nivel regional y se optimice la competitividad inter-regional.

Entre los proyectos de inversión certificados se encuentran varios a ser desarrollados por las AGENCIAS aquí comparecientes. Los referidos proyectos deben ser desarrollados en su totalidad para poder dar efecto al Plan de Ordenación y efectuar el desarrollo del Municipio conforme a la política pública expuesta en la citada Ley de Municipios Autónomos.

En consideración a las contraprestaciones antes mencionadas, las partes contraen las siguientes *OBLIGACIONES*:

1. Las AGENCIAS completarán el desarrollo de los siguientes proyectos en el Municipio de Ponce:
 a. Autoridad de Carreteras — Ver Anejo A
 b. Autoridad de Acueductos y Alcantarillados Ver Anejo B
 c. Autoridad de Edificios Públicos — Ver Anejo [ ]
 d. Autoridad de los Puertos — Ver Anejo D
 e. Autoridad de Energía Eléctrica — Ver Anejo E
 f. Departamento de la Vivienda — Ver Anejo F
 g. Departamento de Recursos Naturales — Ver Anjo G
 h. Puerto Rico Telepbone Company — Ver Anejo H
2. El Municipio de Ponce[,] por su parte[,] ofrecerá el apoyo económico que esté dentro de su presupuesto para la consecución de los referidos proyectos.

### III. DISPOSICIONES GENERALES

### A. SEPARABILIDAD

Si cualesquiera de las disposiciones de este convenio resultara imposible de cumplir o no válida esto no afectará la validez o cumplimiento de cualquier otra disposición de este convenio.

### B. ENMIENDAS

Las partes cumplirán estrictamente con los términos y condiciones indicados en este convenio y no se reconocerá ninguna enmienda a los mismos excepto por acuerdo escrito entre las partes.

### C. ACCIONES JUDICIALES

Toda acción civil ordinaria o procedimiento legal especial relacionado con la interpretación[,] alcance o cumplimiento de este convenio será de la competencia exclusiva de la Sala de Ponce del Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico. Las partes estipulan que todo procedimiento judicial que sea presentado en otra Sala será trasladado a la Sala de Ponce.

### D. TÉRMINO

Este convenio entrará en vigor inmediatamente que sea firmado por las partes comparecientes. Los proyectos aquí descritos, se llevarán a cabo según programados entre el 1 de enero de 1993 y el 31 de diciembre de 1996.

### [I]V. ACEPTACIÓN

Los comparecientes acepta[mos] el presente documento por hallarlo a nuestra entera satisfacción y contento.

Y PARA QUE ASÍ CONSTE firmamos y otorgamos el presente en San Juan, Puerto Rico a 28 de octubre de 1992.

*[Fdo.]* Hon. Rafael Hernández Colón
　　　Gobernador de Puerto Rico

*[Fdo.]* Hon. Rafael Cordero Santiago
　　　Alcalde de Ponce

*[Fdo.]* Ing. Jorge L. Bigas Mulero
　　　Director
Autoridad de Carreteras

*[Fdo.]* Ing. María Margarita Irizarry
　　　Directora
Autoridad de Acueductos

48

*[Fdo.]* Arq. Luis Rafael Arias Albizu
Director
Autoridad de Edificios Públicos

*[Fdo.]* Gen. José A. Buitrago
Director
Autoridad de los Puertos

*[Fdo.]* Sr. José A. Del Valle Vázquez
Director
Autoridad de Energía Eléctrica

*[Fdo.]* Sr. Rigoberto Figueroa
Administrador
Departamento de la Vivienda

*[Fdo.]* Sr. Santos Rohena Betancourt
Secretario
Departamento de Recursos Naturales

*[Fdo.]* Ing. Ramón Arce
Presidente
Puerto Rico Telephone Co.

Apéndice Conjunto Parte II, págs. 1045-1049.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rivera Pérez.

Le corresponde a este Tribunal evaluar el convenio suscrito por un municipio con el Gobierno de Puerto Rico, al amparo de las disposiciones de la Ley Núm. 81 de 30 de agosto de 1991 (21 L.P.R.A. sec. 4001 *et seq.*), según enmendada por la Ley Núm. 84 de 29 de octubre de 1992, conocida como Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (en adelante Ley de Municipios Autónomos). Muy respetuosamente, disentimos de la Opinión mayoritaria que concluye sobre el cumplimiento específico de dicho convenio.

I

A mediados del año 1990, el Municipio de Ponce comenzó la recopilación de datos cartográficos y socioeconómicos, y a elaborar las líneas generales de un plan maestro. El 12 de diciembre de 1990, el Alcalde de Ponce, Hon. Rafael Cordero Santiago, presentó su idea a un grupo de personas reunidas en el Teatro La Perla de Ponce. En enero de 1991, el Municipio de Ponce creó la Oficina del Plan Maestro y en los meses siguientes contrató personal técnico especializado para su elaboración.

El 30 de agosto de 1991 entró en vigor la Ley de Municipios Autónomos, Ley Núm. 81, *supra*. El Municipio de Ponce se acogió a las disposiciones de esa ley para elaborar, en lugar del Plan Maestro, el Plan de Ordenación Territorial dispuesto en ésta. Dicho plan está compuesto del memorial, el programa y la reglamentación. El Municipio de Ponce celebró las vistas públicas requeridas por la Ley y notificó de dicha celebración a la Junta de Planificación. Creó las Juntas de Comunidad requeridas por la Ley para fines de la elaboración del Plan de Ordenación Territorial.

El 22 de octubre de 1992 la Asamblea Municipal de Ponce aprobó el Plan de Ordenación Territorial para ese municipio. El 23 de octubre de 1992, la Presidenta de la Junta de Planificación, para ese entonces la Ing. Patria Custodio, cursó una misiva a las instrumentalidades públicas demandadas para que, antes de adoptar el referido plan, cada agencia verificara la información contenida en el Programa de Proyectos y certificara la información allí contenida como correcta. Para ello incluyó, en las tablas de proyectos correspondientes a cada una de las agencias demandadas, una certificación que contenía el siguiente lenguaje:

CERTIFICO: Yo, [_____], que la presente tabla refleja los acuerdos de inversión para los próximos cuatro años para la implantación del Plan Territorial de Ponce.

———————

Fecha
Apéndice Conjunto, Parte 2, pág. 1030.

El espacio en blanco corresponde al nombre del Secretario o Director Ejecutivo de la instrumentalidad correspondiente.

Entre el 23 de octubre de 1992 y el 28 de octubre de 1992, las agencias del Gobierno de Puerto Rico y las corporaciones públicas, más adelante desglosadas, emitieron las certificaciones correspondientes al programa de obras y proyectos de ese Plan de Ordenación Territorial. La Junta de Planificación de Puerto Rico lo adoptó el 28 de octubre de 1992.

El 29 de octubre de 1992 se aprobó la Ley Núm. 84, *supra*, de vigencia inmediata, para enmendar la Ley Núm. 81, *supra*.

El 6 de noviembre de 1992, el Gobernador de Puerto Rico aprobó el Plan de Ordenación Territorial del Municipio de Ponce.([1])

Entre el 28 de octubre de 1992 y el 15 de diciembre de 1992, el Gobierno de Puerto Rico, el Departamento de la Vivienda (D.V.), la Autoridad de Carreteras y Transportación (A.C.T.), la Autoridad de Acueductos y Alcantarillados (A.A.A.), la Autoridad de Edificios Públicos (A.E.P.), la Autoridad de los Puertos (A.P.), la Autoridad de Energía Eléctrica (A.E.E.), la Puerto Rico Telephone Company (P.R.T.C.) y el Departamento de Recursos Naturales y Ambientales (D.R.N.A.) suscribieron un acuerdo, objeto de análisis en este caso, con el Municipio de Ponce. Titularon tal acuerdo como "Convenio para el Desarrollo de Proyectos Programados entre el Gobierno Central y el Municipio de Ponce" (en adelante el Convenio). Dicho documento dispone lo siguiente:

CONVENIO PARA EL DESARROLLO DE
PROYECTOS PROGRAMADOS ENTRE EL GOBIERNO
CENTRAL Y EL MUNICIPIO DE PONCE

En San Juan de Puerto Rico, hoy día 28 de octubre [de] 1992.

I. COMPARECENCIA

Por la primera parte, EL GOBIERNO CENTRAL DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, en adelante denominado "EL GOBIERNO CENTRAL", representado por el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Rafael Hernández Colón, la Autoridad de Carreteras representada por su Director, el Ing. José L. Bigas Mulero, [la] Autoridad de Acueductos y Alcantarillados[,] representada por su Directora, Ing. María Margarita Irizarry, [la] Autoridad de Edificios Públicos[,] representada por su Director, Arq. Luis Rafael Arias Albizu, [la] Autoridad de los Puertos[,] representada por su Director, Gen. José A. Buitrago, [la] Autoridad de Ener-

---

([1]) Véase Orden Ejecutiva de 6 de noviembre de 1992, Boletín Administrativo Núm. OE-1992-66.

gía Eléctrica[,] representada por su Director, Sr. José A. Del Valle, [el] Departamento de la Vivienda[,] representad[o] por su Administrador, Sr. Rigoberto Figueroa, [el] Departamento de Recursos Naturales[,] representad[o] por su Secretario, Sr. Santos Rohena Betancourt, y la Puerto Rico Telephone Company[,] representada por su Director, el Ing. Ramón Arce[,] en adelante denominadas "LAS AGENCIAS".

Por la segunda parte, EL MUNICIPIO DE PONCE, en adelante denominado "EL MUNICIPIO", representado por su Alcalde, Hon. Rafael Cordero Santiago.

Las partes aseguran tener la capacidad y autoridad en Ley para otorgar este convenio, la cual surge de la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, conocida como la Ley de Municipios Autónomos.

## II. PREÁMBULO

En este convenio se pone en vigor la política pública del Estado Libre Asociado de Puerto Rico establecida en la Ley de Municipios Autónomos consistente en otorgarle a los municipios el máximo posible de autonomía[,] además de proveerles a [é]stos los poderes y facultades que sean necesarios para asumir un rol central y fundamental en su desarrollo urbano, social y económico.

El Municipio de Ponce[,] en cumplimiento de lo dispuesto en la Ley de Municipios Autónomos[,] ha invertido considerables recursos económicos y humanos y tiempo en elaborar un Plan de Ordenamiento Territorial para disponer para el mejor uso del suelo dentro de sus límites territoriales y desarrollar proyectos de infraestructura para la promoción del bienestar económico y social de su población mediante la adopción de un Plan de Ordenamiento Territorial.

El Plan de Ordenamiento contiene el Programa de Proyectos de Inversión en el Municipio de Ponce, debidamente certificados por las agencias públicas pertinentes y por el Municipio, según corresponde, como exige la referida Ley Núm. 81, según enmendada.

El análisis regional permite conocer las características sociales y económicas de la población, así como conocer las ventajas, oportunidades y limitaciones que presenta cada región. A su vez permite el tener un diagnóstico de los componentes de infraestructura básica y las necesidades de construcción y rehabilitación de los sistemas.

De esta forma se provee el análisis necesario que permita la identificación de oportunidades y condicio[ne]s para estimular un desarrollo balanceado a nivel regional y se optimice la competitividad inter-regional.

Entre los proyectos de inversión certificados se encuentran varios a ser desarrollados por las AGENCIAS aquí comparecientes. Los referidos proyectos deben ser desarrollados en su totalidad para poder dar efecto al Plan de Ordenación y efectuar el desarrollo del Municipio conforme a la política pública expuesta en la citada Ley de Municipios Autónomos.

En consideración a las contraprestaciones antes mencionadas, las partes contraen las siguientes OBLIGACIONES:

1. Las AGENCIAS completarán el desarrollo de los siguientes proyectos en el Municipio de Ponce.

 a. Autoridad de Carreteras — Ver Anejo A
 b. Autoridad de Acueductos y Alcantarillados — Ver Anejo B
 c. Autoridad de Edificios Públicos — Ver Anejo C
 d. Autoridad de los Puertos — Ver Anejo D
 e. Autoridad de Energía Eléctrica — Ver Anejo E
 f. Departamento de la Vivienda — Ver Anejo F
 g. Departamento de Recursos Naturales — Ver Anejo G
 h. Puerto Rico Telephone Company — Ver Anejo H

2. El Municipio de Ponce[,] por su parte[,] ofrecerá el apoyo económico que esté dentro de su presupuesto para la consecusión [sic] de los referidos proyectos.

## III. DISPOSICIONES GENERALES

### A. SEPARABILIDAD

Si cualesquiera de las disposiciones de este convenio resultara imposible de cumplir o no válida esto no afectará la validez o cumplimiento de cualquier otra disposición de este convenio.

### B. ENMIENDAS

Las partes cumplirán estrictamente con los términos y condiciones indicados en este convenio y no se reconocerá ninguna enmienda a los mismos excepto por acuerdo escrito entre las partes.

### C. ACCIONES JUDICIALES

Toda acción civil ordinaria o procedimiento legal especial relacionado con la interpretación[,] alcance o cumplimiento de este convenio será de la competencia exclusiva de la Sala de Ponce del Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico. Las partes estipulan que todo procedimiento judicial que sea presentado en otra Sala será trasladado a la Sala de Ponce.

## D. TÉRMINO

Este convenio entrará en vigor inmediatamente que sea firmado por las partes comparecientes. Los proyectos aquí descritos, se llevarán a cabo según programados entre el 1 de enero de 1993 y el 31 de diciembre de 1996.

## [I]V. ACEPTACIÓN

Los comparecientes aceptan el presente documento por hallarlo a nuestra entera satisfacción y contento.

Y PARA QUE ASÍ CONSTE firmamos y otorgamos el presente en San Juan, Puerto Rico a 28 de octubre de 1992.

*[Fdo.]* Hon. Rafael Hernández Colón
Gobernador de Puerto Rico
*[Fdo.]* Hon. Rafael Cordero Santiago
Alcalde de Ponce
*[Fdo.]*Ing. Jorge L. Bigas Mulero
Director
Autoridad de Carreteras
*[Fdo.]* Ing. María Margarita Irizarry
Directora
Autoridad de Acueductos
*[Fdo.]* Arq. Luis Rafael Arias Albizu
Director
Autoridad de Edificios Públicos
*[Fdo.]* Gen. José A. Buitrago
Director
Autoridad de los Puertos
*[Fdo.]* Sr. José A. Del Valle Vázquez
Director
Autoridad de Energía Eléctrica
*[Fdo.]* Sr. Rigoberto Figueroa
Administrador
Departamento de la Vivienda
*[Fdo.]* Sr. Santos Rohena Betancourt
Secretario
Departamento Recursos Naturales
*[Fdo.]* Ing. Ramón Arce
Presidente
Puerto Rico Telephone Co.
Apéndice Conjunto, *supra*, págs. 1045–1049.

El 15 de septiembre de 1993 se inscribió el Convenio en el Registro de Contratos del Municipio de Ponce, y al día siguiente en la Oficina del Contralor de Puerto Rico.

Como mencionáramos previamente, el 29 de octubre de 1992 se aprobó y entró en vigor la Ley Núm. 84, *supra*. Por virtud de ésta, se enmendó el Art. 13.011 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4609. A la luz de dicha enmienda, las partes suscribientes del Convenio pretendieron imprimir efectividad obligatoria a los programas de obras y proyectos incluidos en la sección del Programa de Proyectos de inversión certificados por las agencias públicas suscribientes, conforme a las prioridades de la administración del gobierno saliente el 31 de diciembre de 1992.[2] Se pretendió imprimirle tal efectividad al Convenio durante el próximo período de gobierno, que se extendió de 1ro de enero de 1993 al 31 de diciembre de 1996, a cargo, por mandato democrático del pueblo de Puerto Rico, de una nueva administración de gobierno. No obstante, el Municipio de Ponce podía revisar su Plan de Ordenación, sobre el cual se suscribió el Convenio, durante dicho período ante la Junta de Planificación, a tenor del Art. 13.008 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4609. Dicha ley no incluyó expresamente disposición análoga que les permitiera a las agencias públicas revisar ante la Junta de Planificación las certificaciones emitidas y relacionadas con los programas de obras y proyectos que se realizarían

---

[2] 21 L.P.R.A. sec. 4609. Dicha enmienda, en lo pertinente, dispone de la forma siguiente:

"Una vez aprobado por el Gobernador, el Plan de Ordenación obligará a las agencias públicas al cumplimiento con los programas de obras y proyectos incluidos en la Sección del Programa de Proyectos de Inversión certificados por las agencias públicas. L[a] Junta de Planificación le dará consideración prioritaria a dicha sección en la preparación de su Programa de Inversiones de Cuatro Años dispuesto en las secs. 62 et seq. del Título 23, igualmente lo hará la Oficina de Presupuesto y Gerencia en el Presupuesto Anual que se someta a la Asamblea Legislativa. Las corporaciones públicas quedarán obligadas en sus propios presupuestos." Art. 13.011 de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (en adelante Ley de Municipios Autónomos), 21 L.P.R.A. sec. 4609.

dentro del Plan de Ordenación Territorial del Municipio de Ponce, y objeto del Convenio, para ajustarlas y armonizarlas a las prioridades de la nueva administración de gobierno, objeto del mandato democrático del pueblo de Puerto Rico.

Mediante la enmienda antes aludida, se pretendió obligar a la Junta de Planificación a dar consideración prioritaria, durante el período de 1ro de enero de 1993 al 31 de diciembre de 1996, a la sección del Programa de Proyectos de Inversión certificados por las agencias públicas concernidas, conforme a las prioridades de la administración del gobierno saliente. Dicho estatuto le imprimió instrucciones a la Junta de Planificación a dar consideración prioritaria, en la formulación de política pública de la nueva administración de gobierno, a dicha sección de Programas de Proyectos de Inversión en su Programa de Proyectos de Inversiones de Cuatro Años. Igual situación se extendió a la Oficina de Presupuesto y Gerencia, con relación al presupuesto anual que somete a la Asamblea Legislativa de Puerto Rico.

Durante el mes de abril de 1993, se celebró una reunión en la Fortaleza entre los recién nombrados jefes de los departamentos del Gobierno Central, secretarios y directores ejecutivos de las distintas instrumentalidades públicas que alegadamente estaban obligadas por el Convenio, el Secretario de la Gobernación del Gobierno Central entrante y el Alcalde del Municipio de Ponce. En dicha ocasión este último solicitó de los representantes del Gobierno Central y de las agencias allí presentes, el cumplimiento específico con los compromisos de inversión contraídos en el Convenio. Los representantes del Gobierno Central y de las instrumentalidades públicas le indicaron qué proyectos se llevarían a cabo y cuáles no.[3]

Resulta altamente perturbador y preocupante las con-

---

[3] Conclusión de hecho número 26 formulada por el Tribunal de Primera Instancia en su sentencia.

clusiones del Tribunal de Primera Instancia y del Tribunal de Circuito de Apelaciones sobre estos extremos. Veamos.

El Tribunal de Primera Instancia concluyó lo siguiente:

> 27- Las instrumentalidades públicas demandadas no hicieron uso de los mecanismos que contempla la Ley de Municipios Autónomos, *supra*, para solicitar al Municipio una revisión parcial del plan de ordenación territorial, sino que de manera unilateral dejaron de cumplir con varios de los compromisos de inversión contraídos en el Plan de Ordenación Territorial y el convenio objeto del presente litigio. Apéndice Conjunto, Parte 5, pág. 2983.

El Tribunal de Circuito de Apelaciones concluyó lo siguiente:

> Aunque en la Ley de Municipios Autónomos, *supra*, ni en los Reglamentos adoptados por la Junta existe expresamente procedimiento alguno para regular cualquier enmienda propuesta por las agencias gubernamentales, es menester señalar que resultaría difícil pensar que la Ley de Municipios Autónomos, *supra*, no dispone para que otra parte que no sea el Municipio pueda solicitar la revisión parcial de esos Planes. Tomando en consideración lo dispuesto en el Artículo 13.008 de dicha Ley, *supra,* entendemos que es razonable que si las agencias o la Junta quieren revisar el Programa del Plan de Ordenación Territorial, en específico los proyectos de inversión certificados, ya sea por ellos mismos o a través de la Junta -*quien tiene la obligación de incluirlos en el P.I.C.A.-* éstas deben solicitar a los municipios autónomos que inicien el proceso de revisión, dispuesto en dicho Artículo. Es decir, a solicitud de éstas, el municipio debe celebrar vistas públicas. Las enmiendas deben ser aprobadas por la asamblea [sic] municipal [sic] mediante Ordenanza, adoptados por la Junta y ratificadas por el Gobernador. En caso de que el municipio se niegue a revisar, las agencias y la Junta podrán, entonces, solicitar su revisión ante los tribunales. De ello no ocurrir o el municipio no estar conforme con lo adoptado por la Junta o lo ratificado por el Gobernador, entonces el municipio tiene el derecho de acudir a los Tribunales. Como en el caso de autos no se siguió dicho trámite, el Municipio presentó el pleito que origina los recursos de epígrafe, ya que las certificaciones que acompañaban al Plan de Ordenación Territorial y al Convenio antes referido, firmados por las agencias del Gobierno Central y adoptados válidamente por la Junta, y la Ley de

Municipios Autónomos, *supra*, no contemplan las enmiendas unilaterales a los Planes de Ordenación y menos aún a los proyectos certificados en el Programa de Proyectos de Inversión. (Énfasis suplido y escolios omitidos.) Apéndice Conjunto, Parte 8, 4591–4593.

El Tribunal de Primera Instancia determinó que las agencias públicas no hicieron uso de unos mecanismos que la Ley de Municipios Autónomos, *supra*, no consideró expresamente para ellas. Expresó, que las referidas agencias tenían que solicitarle al Municipio una revisión parcial del Plan de Ordenación Territorial, aun cuando concluyó que la posición del Municipio era el cumplimiento específico de parte del Gobierno Central con los compromisos de inversión contraídos en el "Convenio". Por otro lado, el Tribunal de Circuito de Apelaciones partió de la premisa que ni la Ley de Municipios Autónomos, *supra*, ni los Reglamentos de la Junta de Planificación[4] disponen expresamente sobre procedimiento alguno para permitir cualquier enmienda propuesta por las agencias públicas. No obstante, le resultó difícil pensar que la Ley de Municipios Autónomos, *supra*, no permitiera que otra parte que no fuera el Municipio pudiera solicitar la revisión parcial ante la Junta de Planificación del Plan de Ordenación Territorial. *La realidad es que su letra escrita no lo contempló.* A tenor del Art. 13.008 de la Ley de Municipios Autónomos, *supra*, razonó que si las agencias públicas referidas o la Junta de Planificación querían revisar el Programa de Proyectos del Plan de Ordenación Territorial, en específico los proyectos de inversión certificados, ya sea por ellos mismos o a través de la Junta de Planificación, debieron solicitarle al Municipio de Ponce que iniciara el proceso de revisión dispuesto para los municipios por el Art. 13.008, *supra*. El Tribunal de Circuito de Apelaciones hace relación a un procedi-

---

[4] Durante los meses de octubre, noviembre y diciembre de 1992, no se realizó enmienda alguna a dicho reglamento para disponer sobre tal procedimiento.

miento que no está disponible ni en la Ley de Municipios Autónomos, *supra*, ni en los Reglamentos de la Junta de Planificación, directamente para las agencias públicas del Poder Ejecutivo. El efecto directo de su razonamiento es que las agencias públicas que responden, de acuerdo con la Constitución de Puerto Rico, a la formulación de política pública del gobierno electo, conforme al mandato democrático del Pueblo, no están sujetas a las prioridades establecidas por ese gobierno para todo Puerto Rico, sino a aquellas que determine como prioritarias el Gobierno Municipal de Ponce para aquella región, a tenor de las prioridades del Gobierno Central saliente; que dichas agencias tendrían que pedirle a dicho municipio que inicie el referido proceso de revisión, pues ellas no pueden hacerlo directamente. De no estar de acuerdo el Municipio de Ponce con la revisión solicitada por las agencias y la Junta, afirma el Tribunal de Circuito de Apelaciones que podrían éstas acudir a los tribunales. El efecto del Convenio antes indicado se reduce a que las agencias públicas no podrían desarrollar la política pública del gobierno electo, armonizando los proyectos del Municipio de Ponce con los de los demás municipios de Puerto Rico, a menos que el Municipio de Ponce acceda, a petición de las agencias, a iniciar la revisión de su Plan de Ordenación Territorial ante la Junta de Planificación. Concluyó el Tribunal de Circuito de Apelaciones que, de no acceder el Municipio a tal reclamo, entonces el Gobierno de Puerto Rico tendría que acudir a los tribunales como su único recurso. De acudir el Municipio, a petición de las agencias, a revisar el Plan de Ordenación Territorial ante la Junta de Planificación, y éste no estar conforme con lo determinado por esta última y con lo aprobado por el nuevo Gobernador, entonces, expresa el Tribunal de Circuito de Apelaciones, el Municipio podría acudir a los tribunales. El efecto directo de su razonamiento es que del Municipio no estar de acuerdo con la revisión por él

iniciada ante la Junta de Planificación, el ayuntamiento tendría la potestad de depositar en los tribunales la formulación de política pública sobre tal asunto.

La Opinión mayoritaria concluye que la sentencia recurrida, en cuanto a la posposición de los daños determinados por el foro de instancia, debe ser modificada para dejar sin efecto las modificaciones que, a su vez, le hiciera el Tribunal de Circuito de Apelaciones a la sentencia dictada por el Tribunal de Primera Instancia. En cuanto a sus demás extremos la confirma, incluido lo antes indicado. No obstante, expresa que las agencias públicas no hicieron uso de los mecanismos dispuestos por el Art. 13.008 de la Ley de Municipios Autónomos, *supra*.

No nos presenta duda alguna cuál fue el propósito de la Ley Núm. 81, *supra*, de descentralizar el Gobierno de Puerto Rico. *No nos corresponde evaluar su sabiduría. El único juez de tal asunto es el Pueblo de Puerto Rico.* No obstante, nos corresponde velar que el ejercicio de formulación de política pública de Puerto Rico esté sujeto sólo a la "voluntad del Pueblo". No debemos permitir que esa voluntad quede limitada o restringida por los términos de un "convenio" entre una administración saliente del Gobierno de Puerto Rico y un municipio, limitando irrazonablemente la facultad del Gobierno Central, elegido por el mandato democrático del Pueblo, de establecer prioridades y determinar el interés público de toda la ciudadanía.

La Opinión mayoritaria expone, que debido a la no utilización por parte de las agencias públicas de los mecanismos dispuestos por el Art. 13.008 de la Ley de Municipios Autónomos, *supra*, para la revisión parcial del Plan de Ordenación Territorial, el Municipio de Ponce instó una acción ante el Tribunal de Primera Instancia para exigir el cumplimiento específico de las obligaciones impuestas por el Convenio y la Ley de Municipios Autónomos, *supra*, a las entidades demandadas. Como mencionáramos previamente, del texto de dicho estatuto surge claramente que no

se le extendió a tales agencias el uso de los referidos mecanismos.

Durante el proceso ante el Tribunal de Primera Instancia, Sala Superior de Ponce, se estipularon por las partes los hechos siguientes:

1- A mediados del año 1990 el Municipio de Ponce comenzó a recopilar datos cartográficos y socioeconómicos y a elaborar las líneas generales de un Plan Maestro.

2- El 12 de diciembre de 1990 el Alcalde de Ponce, Hon. Rafael Cordero Santiago, presentó la idea del Plan Maestro a una concurrencia que se dio cita en el Teatro La Perla de Ponce.

3- En enero de 1991 el Municipio creó la Oficina del Plan Maestro y en los meses siguientes contrató personal técnico especializado para la elaboración del Plan Maestro.

4- El 30 de agosto de 1991 entró en vigor al [sic] Ley Núm. 81, conocida como Ley de Municipios Autónomos, la cual ha sido objeto de distintas enmiendas desde su aprobación.

5- El Municipio de Ponce se acogió a las disposiciones de la Ley de Municipios Autónomos para elaborar en lugar del Plan Maestro, el Plan de Ordenación Territorial contemplado por dicha ley.

6- El Plan de Ordenación Territorial elaborado por el Municipio tiene vigencia de ocho (8) años y está compuesto del Memorial, el Programa y la Reglamentación.

7- El Programa del Plan Territorial del Municipio de Ponce tiene un plazo de (4) años.

8- Con participación ciudadana, el Municipio celebró todas la [sic] vistas públicas requeridas por la Ley y notificó dicha celebración a la Junta de Planificación.

9- Para fines de la elaboración del Plan, el Municipio creó las Juntas de Comunidad requeridas por la Ley.

10- Con fecha de 22 de octubre de 1992 la Asamblea Municipal aprobó el Plan de Ordenación para el Municipio de Ponce.

11- Con fecha del 28 de octubre de 1992 la Junta de Planificación adoptó el Plan de Ordenación.

12- El Estado Libre Asociado y todas la [sic] agencias públicas aquí demandadas exceptuando la Junta de Planificación, suscribieron un convenio con el Municipio de Ponce que titularon "Convenio para el Desarrollo de Proyectos Programados entre el Gobierno Central y el Municipio de Ponce". Este convenio está fechado el 28 de octubre de 1992, pero algunos de los que lo suscribieron en fechas posteriores al 28 de octubre, recayendo dichas fechas que no pueden identificar con precisión, entre los meses de noviembre a diciembre de 1992.

13- El Plan de Ordenación es administrado hoy día por el Municipio de Ponce, extendiendo éste en una buena medida los permisos de obras de urbanización, la autorización de planos de inscripción y otras autorizaciones en cuanto a proyectos que anteriormente otorgaba la Junta de Planes o la Administración de Reglamentos y Permisos. Apéndice Conjunto, Parte 5, págs. 2973–2974.

El Tribunal de Primera Instancia determinó que:

El primer Programa de Inversión de Cuatro Años (PICA) que aprobó la Junta de Planificación con posterioridad a haber adoptado el Plan de Ordenación Territorial para el Municipio de Ponce, lo fue para el cuatrienio que da comienzo con el año 1993–94 y se extiende el [sic] año 1996–97. A pesar de que el Municipio de Ponce le requirió a la Junta de Planificación que incluyera en dicho PICA todos los proyectos certificados por las intrumentalidades [sic] aquí demandadas e incluídos [sic] en el Plan de Ordenamiento Territorial del Municipio de Ponce, ésta sólo incluyó los proyectos que las instrumentalidades públicas demandadas le pidieron que incluyera. Los proyectos incluídos [sic] en el PICA 1993–2996–97 son:

PR-2, Extensión Ronda de Circunvalación Sur, conector a Expreso (Fase I) y construcción de las calles marginales (norte-sur). Incluído [sic] para 1993–94, 1994–95 y 1995–96.

PR-2, Desvío Norte o Ronda de Circunvalación Baldorioty de Castro. Incluídos [sic] para 1993–94, 1994–95 y 1995–96.

PR-9, desde la PR-10 existente hasta la RR-52 y desde la PR132 hasta la PR-2. Incluído [sic] para 1993–94, 1994–95, 1995–96 y 1996–97.

PR-9, desde la PR-14 o Ave. Tito Castro hasta la PR-503 (Fase II-A) y desde la PR 503 hasta la PR-10 existente (Fase II-B). Incluído [sic] para 1993–94, 1994–95, 1995–96 y 1996–97.

PR-10, Ave. Hostos -Mejorar y habilitar a cuatro carriles el tramo enre [sic] Ave. Abolición y la PR-52. Incluído [sic] para 1995–96 y 1996–97.

PR-14 Ave. Malecón-Construcción de intersección a desnivel con la calle Comercio, PR-133. Incluído [sic] para 1993–94, 1994–95 y 1995–96.

PR-14, Ave. Tito Castro (Fase I) desde la Ave. Fagot hasta la Int. con PR-9. Incluído [sic] para 1994–95 y 1995–96.

Puente La Guadalupe — Terminaciones Arquitectónicas. Incluído [sic] para 1993–94.

PR-139, Desde la PR-14 hasta la antigua PR-139. Incluído [sic] para 1994–95 y 1995–96.

Adquisición de Terrenos Planta de Filtración Cerrillos. Incluído [sic] para 1994–95, 1995–96 y 1996–97.

Línea de Transmisión 36″ a Las Monjitas. Incluído [sic] para 1993–94, 1994–95 y 1995–96.

Troncal Sanitaria 24″ Diá., PR-14. Incluído [sic] para 1993–94.

Soterrado de la Zona Histórica. Incluído [sic] para 1993–94, 1994–95 y 1995–96.

Expansión de pista hacia el oeste, Aereopuerto [sic] de Ponce. Incluído [sic] para 1993–94. Apéndice Conjunto, Parte 5, págs. 2992–2993.

Concluyó el Tribunal de Primera Instancia, que la Junta de Planificación de Puerto Rico actuó de esa forma, a pesar de que las instrumentalidades públicas demandadas no le solicitaron la revisión del Plan de Ordenación Territorial del Municipio de Ponce, a tenor del mecanismo que afirma éstas tenían disponible al amparo del Art. 13.008 de la Ley de Municipios Autónomos, *supra*.

El Tribunal de Primera Instancia, Sala Superior de Ponce, expresó que el no haber realizado los proyectos, cuyo cumplimiento específico solicitó el ayuntamiento, ha desarticulado la implantación del Plan de Ordenación Territorial del Municipio de Ponce e imposibilitó el logro de sus objetivos. Determinó, que dicho municipio sufrió daños como consecuencia del incumplimiento de las agencias demandadas con sus compromisos de inversión acordados en el Convenio. Estimó como daños sufridos por el ayuntamiento, la pérdida de recaudos en concepto de arbitrios de construcción por las obras y proyectos demorados o que no se realizaron, patentes municipales y contribuciones sobre la propiedad. Sobre estos dos últimos, el Tribunal de Primera Instancia expresó que "[l]a actividad económica derivada del conjunto de proyectos no efectuados por las entidades demandadas produjo que no se generaran los gastos, ingresos y ventas por lo que no se realizaron los recaudos municipales". Apéndice Conjunto, Parte 5, pág. 2997.

El Tribunal de Primera Instancia declaró con lugar la demanda interpuesta por el Municipio de Ponce y, en su

consecuencia, ordenó a las instrumentalidades públicas demandadas a la construcción de las obras y proyectos solicitados por el primero. Apoyó su decisión en el ordenamiento jurídico vigente sobre "los contratos que se producen entre [personas] particulares". Apéndice Conjunto, Parte 5, pág. 3007. Concluyó, como cuestión de derecho, que "[c]ualquier interpretación sobre la incidencia que dicho acuerdo produce sobre el interés público y el ejercicio de los poderes para su defensa, deben interpretarse sin perjudicar o menoscabar la filosofía íntima de la figura del contrato". Íd., págs. 3007–3008. Consideró como imperativo el ejercicio de la ponderación en este tipo de casos, porque de otra forma se esfumaría el concepto del contrato, y el Estado perdería un instrumento magnífico para las múltiples finalidades que precisa dicha institución. Expresó, ese tribunal que "[n]o existe, pues, fórmula jurídica más eficaz y transparente para regular las relaciones voluntarias en un convenio en que el Estado comparece como parte, que la figura del contrato". Íd., pág. 3008.

Las instrumentalidades públicas, demandadas de autos, sostuvieron ante el Tribunal de Primera Instancia que el Convenio era nulo. Se apoyaron en vicios del consentimiento, al realizarse el concurso de voluntades y la ilicitud de su causa. Alegaron que el referido acuerdo operaba en detrimento y perjuicio del público y del bienestar general de Puerto Rico y sus habitantes, en la medida que concentró indebidamente importantes inversiones y recursos, en un período de cuatro (4) años, en un área determinada del País, en perjuicio de otras áreas que tienen necesidades urgentes.

*El Tribunal de Primera Instancia concluyó que la causa del Convenio fue el interés público.* A pesar de que reconoce la prominencia que este convenio otorga al Municipio de Ponce, con relación a los demás municipios de la Isla, expresa que "el poder judicial no puede estar por encima de una determinación del poder ejecutivo, comprendida den-

tro del ámbito de sus prerrogativas y facultades constitucionales, que decidió descentralizar el gobierno y desarrollar el área sur utilizando los mecanismos que la Ley de Municipios Autónomos, *supra*, provee". Apéndice Conjunto, Parte 5, pág. 3011.

En apoyo de su decisión, el Tribunal de Primera Instancia expresó que "[e]l acto de aprobación de un acuerdo en el que interviene el Estado como parte contratante se identifica por medio de los programas de proyectos de inversión certificados por entidades gubernamentales contratantes. Por medio de estas certificaciones se evita que por impulso de la negociación contractual queden desbordadas las asignaciones presupuestarias. La importancia de los certificados de inversión para la validez y ejecución del convenio estriba en que la realización de las obras dependen, en muchas ocasiones, en los créditos disponibles. Por consiguiente, al asegurarse de la existencia y disponibilidad de los fondos, se evita que el factor financiero deforme el acuerdo de voluntades que recoge un convenio de esta naturaleza". Apéndice Conjunto, Parte 5, pág. 3011.

Expresó, además, que si bien es cierto que el Departamento de la Vivienda y el de Recursos Naturales y Ambientales no son entidades autónomas presupuestariamente, *su obligación* conforme al Art. 13.011 de la Ley de Municipios Autónomos, *supra*, consiste *en tener que solicitar los fondos para que los proyectos se incluyan en el Programa de Inversión de Cuatro Años (PICA), estando obligada la Junta de Planificación a someterlos a la Oficina de Presupuesto y Gerencia que, a su vez, estaba obligada a presentarlo y proponerlo de esa forma a la Asamblea Legislativa.*

Fundamentó el Tribunal de Primera Instancia su decisión con las expresiones de este Tribunal en *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 787 (1994), a los efectos que "[e]l Estado es un contratante como otro cualquiera y tiene que cumplir con lo que se comprometió independientemente de los cambios en administraciones de gobierno".

Razonó el Tribunal de Primera Instancia que la "ampliación del marco de acción de los municipios a áreas que hasta el presente le habían sido vedadas, representa una democratización de nuestro proceso político garantizándole a la ciudadanía un gobierno efectivo y responsivo a sus necesidades y aspiraciones". Apéndice Conjunto, Parte 5, pág. 3032. Expresó, además, que "[e]l sentido de autodisciplina judicial que impulsa al juzgador a aplicar la voluntad del legislador, desdeñando la propia, es indispensable para que funcione ordenadamente un sistema de organización gubernamental. Convalidar las defensas aducidas por las agencias públicas, aquí demandadas, representaría trastocar el orden constitucional y encadenaría en forma jurídica ineludible al orden jurídico puertorriqueño [sic] una visión arcaica de extrema centralización de los servicios que brinda el Estado". Íd., pág. 3033–3034.

Al declarar con lugar la demanda, el Tribunal de Primera Instancia reconoció como eficaz el Convenio y le imprimió fuerza vinculante entre las partes, y en cuanto al Poder Judicial se refiere, expresó: "reconocemos que dicho acuerdo también comporta y conlleva un deber de observancia por parte de los jueces y tribunales. Al reconocer la validez del mismo, elevamos a categoría de precepto jurídico entre las partes el acuerdo y le dotamos total eficacia legal, pues sus efectos son necesariamente impuestos por ley. De lo contrario, propiciaríamos litigios de esta índole cada vez que ocurre un cambio de gobierno que desaprueba la gestión municipal que logra acogerse a los beneficios de la Ley de Municipios Autónomos, *supra*". Apéndice Conjunto, Parte 5, pág. 3034.

Inconformes con lo actuado y la decisión del Tribunal de Primera Instancia, acudieron al Tribunal de Circuito de Apelaciones mediante sendos recursos de apelación, el Gobierno Central y las instrumentalidades públicas, deman-

dadas de autos, y señalaron como errores cometidos por el Tribunal de Primera Instancia los siguientes:([5])

A. determinar que el Plan de Ordenación Territorial cumple con los requisitos esenciales de la Ley de Municipios Autónomos para su validez. (Junta, P.R.T.C., A. de C., Vivienda, Recursos Naturales, A.E.P.)

B. no declarar inconstitucional la manera en que se implementó la Ley de Municipios Autónomos en este caso. (P.R.T.C., A. de C., Vivienda, Recursos Naturales)

C. pretender dar obligatoriedad a unos alegados compromisos en contraposición con la legislación vigente y rectora para la Junta de Planificación. (Junta)

D. anteponer las disposiciones de la ley [sic] de Municipios Autónomos a la ley orgánica de la autoridad [sic], cuando debió armonizar los mismos en pro de [sic] interés público. (A.A.A.)

E. considerar exclusivamente los intereses del Municipio en perjuicio del servicio público esencial que para todo Puerto Rico presta la autoridad. (A.A.A.)

F. declarar que el Convenio objeto del presente pleito es un contrato a tenor con nuestro ordenamiento jurídico. (P.R.T.C., A. de C., Vivienda, Recursos Naturales, A.A.A.)

G. no declarar que, de atender el Convenio suscrito entre el Municipio de Ponce y las codemandadas como un contrato el mismo es inválido, nulo e inexistente por carecer de causa, u ostentar causa ilícita, y por falta de consentimiento válido. (P.R.T.C., A. de C., Vivienda, Recursos Naturales, A.A.A.)

H. no determinar que el alegado Convenio considerado como contrato o como obligación legal, es nulo por ser contrario a la ley. (A.A.A.)

I. declarar que el Convenio se perfeccionó con la última firma de los contratantes. (Junta)

J. no declarar que, aún considerando el alegado convenio como un contrato en principio válido, la Autoridad, no viene obligada al cumplimiento específico de todas sus disposiciones, bajo la cláusula implícita de revisibilidad de los contratos (Rebus Sic Stantibus) (A.A.A.)

K. ordenar la terminación de obras de soterrado en la Zona Histórica de la Playa de Ponce, cuando la prueba testifical demostró que no hubo un acuerdo final sobre qué tipo de trabajos

---

([5]) Al final de cada error aparecen entre paréntesis las partes apelantes que lo presentaron.

se iban a realizar, ya que el nivel freático del suelo hacía imposible realizar dicho soterrado. (A.E.E.)

L. concluir que los proyectos que se incluyeron en el Plan de Ordenación Territorial son de la "íntegra responsabilidad" de AEP en particular. (A.E.P.)

M. concluir que la AEP contrajo la obligación de efectuar los proyectos incluidos en el convenio. (A.E.P.)

N. concluir que los proyectos incluidos en el convenio formaban parte del programa de obras permanentes de AEP. (A.E.P.)

O. concluir que la AEP determinó su propia capacidad financiera para ejecutar los proyectos dentro del plazo programado. (A.E.P.)

P. concluir que AEP comprometió su presupuesto para llevar a cabo los proyectos incluidos en el convenio. (A.E.P.)

Q. concluir que AEP incluyó los fondos para el financiamiento de los proyectos en el PICA que la Junta de Planificación sometió a la Asamblea Legislativa. (A.E.P.)

R. concluir que AEP debió traer al Departamento de Salud, Policía de Puerto Rico y Departamento de Educación como terceros demandados. (A.E.P.)

S. ordenar el cumplimiento específico de obras de soterrado contra la AEE y la Puerto Rico Telephone Company (PRTC) cuando no se trajo al pleito dos partes indispensables, a saber: el Instituto de Cultura Puertorriqueña y la Administración de Derecho al Trabajo. (A.E.E.)

T. no declarar la desestimación de la demanda por falta de partes indispensables, lo que invalida la Sentencia. (P.R.T.C., A. de C., Vivienda, Recursos Naturales)

U. conceder daños pecuniarios al Municipio de Ponce, en la computación de dichos daños y en no encontrar que el Municipio de Ponce no mitigó sus alegados daños. (P.R.T.C., A. de C., Vivienda, Recursos Naturales)

V. conceder partida de daños a el [sic] Municipio en contra de la Autoridad sin considerar la doctrina de mitigación de daños, ni los proyectos en controversia realizados por la autoridad o que resultasen innecesarios. (A.A.A.)

W. imponer daños a la AEE por haber detenido sus trabajos, cuando la prueba desfilada y no refutada demostró que dicha paralización se debió a la propia acción del Municipio de Ponce no mitigando los mismos y a la falta de recursos humanos para dicha obra, provenientes del Instituto de Cultura Puertorriqueña (ICP) y la Administración de Derecho al Trabajo (ADT). (A.E.E.)

Y. concluir que AEP debe compensar al Municipio de Ponce por los arbitrios sobre la construcción no recaudados, patentes

municipales no recaudadas y contribuciones sobre la propiedad no recaudadas. (A.E.P.)

Z. declarar que la Junta de Planificación es solidariamente responsable en proporción a los daños causados por los proyectos que dejó de incluir en el Programa de Inversión de Cuatro Años (PICA) de 1993–94 y 1996–97, de los que estaban incluidos en el convenio y que no se realizaron conforme a lo que se programó. (Junta), e

A.A. incluir a la PRTC, como instrumentalidad obligada al pago de $16,418,545.00, según la proporción del monto de inversión no realizada en los proyectos dejados de construir. (P.R.T.C.) Apéndice Conjunto, Parte 8, págs. 4553–4556.

El Tribunal de Circuito de Apelaciones modificó la sentencia del Tribunal de Primera Instancia, y así modificada la confirmó, determinando que las agencias públicas, demandadas de autos, estaban obligadas a cumplir con los compromisos contraídos en el Plan de Ordenación Territorial y el Convenio entre las partes, de desarrollar los referidos proyectos en el Municipio de Ponce.

La Autoridad de Carreteras, la Puerto Rico Telephone Company, el Departamento de la Vivienda y el Departamento de Recursos Naturales y Ambientales alegaron que la manera en que se aplicó la Ley de Municipios Autónomos, *supra*, a las circunstancias de este caso, es inconstitucional. Invocaron la invalidez del estatuto ante el Tribunal de Primera Instancia[6] y el Tribunal de Circuito de Apelaciones, en atención a que viola el principio de que las leyes deben ser en beneficio de la comunidad en general. El Tribunal de Circuito de Apelaciones despachó tal asunto acogiendo el planteamiento del Municipio de Ponce, de que tales agencias no tienen legitimación activa "para plantear en este aspecto la inconstitucionalidad de la Ley de Municipios Autónomos". Apéndice Conjunto, Parte 8, pág. 4569.

El Tribunal de Circuito de Apelaciones decidió que el Tribunal de Primera Instancia no erró al pretender dar

---

[6] El Tribunal de Primera Instancia no discutió el asunto en su sentencia.

obligatoriedad a los compromisos contraídos por las agencias públicas en el Convenio, por no estar en contraposición con la legislación vigente y rectora de la Junta de Planificación. Expresó ese tribunal que "la Ley de Municipios Autónomos, en su Artículo 13.011, *supra*, establece que una vez el Gobernador haya aprobado el Plan, éste obliga a las agencias en cuanto a los programas incluidos en la sección de proyectos de inversión certificados por las agencias. También este [a]rtículo dispone que será obligación de la Junta darle consideración prioritaria a dichos proyectos para incluirlos en el P.I.C.A., al igual que será obligación de la Oficina de Presupuesto y Gerencia (O.P.G.) someterlos a la Asamblea Legislativa quedando, de esta manera, las agencias obligadas según sus presupuestos". (Escolio omitido.) Apéndice Conjunto, Parte 8, pág. 4570. Al realizar una interpretación conjunta de la Ley de Municipios Autónomos, *supra*, y la Ley Orgánica de la Junta de Planificación, Ley Núm. 75 de 24 de junio de 1975, en su Art. 15 (23 L.P.R.A. sec. 62 *et seq.*) el Tribunal de Circuito de Apelaciones expresó: "notamos que entre éstos no existe conflicto irreconciliable alguno, ya que son las agencias gubernamentales quienes deciden y certifican qué proyectos van a ser incluidos dentro del Plan de Ordenación Territorial en la sección del Programa de Proyectos de Inversión certificados que es adoptado por la Junta y aprobado por el Gobernador y equivale, en un principio, a una solicitud a la Junta de que incluya dichos proyectos en el P.I.C.A. correspondiente. La Junta, a su vez, al adoptar el Plan de Ordenación se compromete a darle consideración prioritaria a dichos proyectos". Apéndice Conjunto, Parte 8, pág. 4571.

El Tribunal de Circuito de Apelaciones validó la posición del Tribunal de Primera Instancia, sobre la vigencia de la figura del contrato entre particulares en la controversia de autos. *Concluyó que la causa del Convenio entre las partes*

*es el interés público, porque éste pretende lograr el bienestar del Municipio de acuerdo con lo dispuesto en el Plan de Ordenación Territorial, que fue hecho conforme a lo dispuesto en la Ley de Municipios Autónomos,* supra.

Razonó el Tribunal de Circuito de Apelaciones, que la Ley de Municipios Autónomos, *supra,* no prohíbe la intervención de los tribunales; que las partes no se opusieron en ningún momento a seguir el trámite por la vía judicial. Expresó que "no estamos ante la presencia de una agencia administrativa especializada designada por Ley para atenderlo; y el enviar este caso al trámite administrativo, en esta etapa avanzada de los procedimientos, sería inútil, fútil, inefectivo, innecesario, costoso e injusto para todas las partes. No hay duda de que el derecho ni el debido proceso de ley están al servicio de las cosas inútiles o innecesarias. *Pueblo v. Andreu González,* 105 D.P.R. 315, 321 (1976) ...". Apéndice Conjunto, Parte 8, págs. 4598–4599. Añadió sobre este asunto ese tribunal, que ante esas circunstancias el único camino que tenía era el de atezarnos *al trámite judicial* escogido por las partes. Puntualizó que *al renunciar las agencias demandadas al trámite administrativo*, esas partes sólo podían acudir al tribunal conforme a las disposiciones aplicables de nuestro Código Civil. Concluye, que como tampoco lo hicieron, el Municipio acudió al foro judicial exigiendo a dichas agencias gubernamentales el cumplimiento específico de sus alegadas obligaciones, *arguyendo que éstas surgían de la Ley de Municipios Autónomos,* supra, *y que el Convenio firmado por el Municipio y las partes aquí apelantes es una fuente alterna e independiente de obligaciones que sirve para reforzar aquellas que surgen del Plan de Ordenación Territorial y de las certificaciones que lo acompañan.*

Inconforme con lo dictaminado por el Tribunal de Circuito de Apelaciones, las agencias demandadas de autos

acuden ante nos y señalan como errores cometidos por el Tribunal de Circuito de Apelaciones los siguientes:

*Autoridad de Carreteras y Transportación de*
*Puerto Rico, Departamento de Recursos Naturales y*
*el Departamento de la Vivienda*

Primer señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar que el convenio objeto del presente pleito no es un contrato a tenor con nuestro ordenamiento jurídico.

Segundo señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar que, de atender el Convenio suscrito entre el Municipio de Ponce y las codemandadas como un contrato, el mismo es inválido, nulo e inexistente por carecer de causa, u ostentar causa ilícita, y por falta de consentimiento válido.

Tercer señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar que el Plan de Ordenamiento del Municipio de Ponce es inválido y nulo por no cumplir con requisitos esenciales para su validez, según establecido por la Ley de Municipios Autónomos.

Cuarto señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar inconstitucional la manera en que se implementó la Ley de Municipios Autónomos en este caso.

Quinto señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar la desestimación de la demanda por falta de partes indispensables, lo que invalida la sentencia.

Sexto señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al conceder daños pecuniarios al Municipio de Ponce, en la computación de dichos daños y en no encontrar que el Municipio de Ponce no mitigó sus alegados daños. Alegato, Pieza 9, págs. 11–12.

*Puerto Rico Telephone Company*

Primer señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar que el convenio objeto del presente pleito no es un contrato a tenor con nuestro ordenamiento jurídico.

Segundo señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar que, de atender el convenio suscrito entre el Municipio de Ponce y las codemandadas como un contrato, el mismo es inválido, nulo e inexistente por carecer de causa, u ostentar causa ilícita, y por falta de consentimiento válido.

Tercer señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar que el Plan de Ordenamiento del Municipio de Ponce es inválido y nulo por no cumplir con requisitos esenciales para su validez, según establecido por la Ley de Municipios Autónomos.

Cuarto señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar inconstitucional la manera en que se implementó la Ley de Municipio [sic] Autónomos en este caso.

Quinto señalamiento de error

Erró el Honorable Tribunal [de] Primera Instancia al no declarar la desestimación de la demanda por falta de partes indispensables, lo que invalida la sentencia.

Sexto señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al conceder daños pecuniarios al Municipio de Ponce, en la computación de dichos daños y en no encontrar que el Municipio de Ponce no mitigó sus alegados daños. Caso Núm. CC-98-250, *Certiorari*, pág. 7.

*Autoridad de Energía Eléctrica de Puerto Rico*

Primer señalamiento de error

Erró el Honorable Tribunal de Circuito [de] Apelaciones al confirmar la determinación del Tribunal de Primera Instancia de no desestimar la demanda contra la Autoridad de Energía Eléctrica, ya que quien realmente paralizó las obras fue el propio Municipio de Ponce, quien a falta de los empleados de la Administración de Derecho al Trabajo al igual que el Instituto de Cultura Puertorriqueña no proveyó empleados en sustitución para la continuación de las obras.

Segundo señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al no revocar la imposición de daños a la Autoridad de Energía Eléctrica de Puerto Rico; aun cuando concluyó que la Autoridad no tuvo responsabilidad en el alegado incumplimiento contractual.

Tercer señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al sostener la determinación del Tribunal de Primera Instancia en cuanto a las obras en la Zona Histórica de la Playa de Ponce, cuando la prueba desfilada demostró que no hubo un acuerdo final en cuanto a éstas. Caso Núm. 98-259, Petición de *certiorari*, págs. 5–6.

*Autoridad de Acueductos y Alcantarillados*

1. Err[ó] el Honorable Tribunal de Circuito de Apelaciones al concluir que el Convenio objeto del presente caso es v[á]lido aun cuando no fue presentada copia del contrato a la Oficina del Contralor dentro de los quince (15) d[í]as siguientes a la fecha de su otorgamiento.

2. Err[ó] el Honorable Tribunal de Circuito de Apelaciones al no declarar que el alegado convenio es nulo e inexistente por falta de concentimiento [sic] v[á]lido al momento de su otorgamiento.

3. Err[ó] el Honorable Tribunal de Circuito de Apelaciones al sostener que el alegado convenio es de naturaleza contractual.

4. Erró el Honorable Tribunal de [Circuito de] Apelaciones al no declarar que aún [sic] considerando el alegado convenio suscrito entre el Municipio y la Autoridad como un contrato, dicho contrato es nulo por no tener causa válida.

5. Err[ó] el Honorable Tribunal de Circuito de Apelaciones al imponer a las agencias el pago de daños al municipio aún [sic] cuando determinó que [é]stos eran especulativos e inciertos. Caso Núm. CC-98-241, Petición de *certiorari*, págs. 5–6.

*Autoridad de Edificios Públicos*

A. ERRORES A TODAS LAS PARTES

Primer señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar que el Plan de Ordenamiento del Municipio de Ponce es inválido y nulo por no cumplir con requisitos esenciales para su validez, según establecidos por la Ley de Municipios Autónomos.

Segundo señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al no decretar la nulidad de los [sic] convenio por no cumplir con requisitos esenciales para su validez.

Tercer señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al determinar la obligatoriedad de los convenios bajo la Ley de Municipios Autónomos.

Cuarto señalamiento de error

Erró el Honorable Tribunal de Primera Instancia al no declarar que el convenio objeto del presente pleito no es un contrato a tenor con nuestro ordenamiento jurídico.

Quinto señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al no ejercer su inherente facultad moderadora para impedir el menoscabo del interés público.

Sexto señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al no determinar que el cumplimiento de las alegadas obligaciones contractuales resulta en extremo oneroso.

Séptimo señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al no declarar la desestimación por falta de partes indispensables, lo que invalida la sentencia.

Octavo señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al determinar la existencia de daños pecuniarios no obstante concluir que los mismos resultan remotos y especulativos.

## B. ERRORES PARTICULARES LEVANTADOS POR LA AEP

Noveno señalamiento de error

Erró el Tribunal de Circuito de Apelaciones al determinar que una vez firmado el Plan de Ordenación Territorial la obligación de realizar los proyectos recae en la AEP y no en las agencias, quienes para poder reprogramar o cancelar sus compromisos tienen que solicitarlo a la AEP, y ésta cumplir con el trámite establecido en la Ley de Municipios Autónomos.

Décimo señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al concluir que la AEP tenía que solicitarle a la Oficina de Presupuesto y Gerencia (OPG) que certificara y comprometiera el presupuesto de las agencias concernidas en cuanto a la realización de los proyectos que fueron certificados por la AEP en el Plan de Ordenación Territorial.

Undécimo señalamiento de error

Erró el Tribunal de Circuito de Apelaciones al concluir que los proyectos incluidos en el convenio formaban parte del Programa de Obras Permanentes de la AEP y que ésta obligó su propio presupuesto para la realización de los mismos.

Duodécimo señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al determinar que no es imposible para la AEP realizar los proyectos reprogramados o cancelados por las agencias.

Décimotercero [sic] señalamiento de error

Erró el Honorable Tribunal de Circuito de Apelaciones al determinar que la AEP debe compensar al Municipio de Ponce por los daños alegados por dicha parte por concepto de los proyectos que fueron reprogramados o cancelados por las agencias originadoras de los mismos. Caso Núm. CC-98-258, Petición de *certiorari*, págs. 6–8.

Inconforme con lo dictaminado por el Tribunal de Circuito de Apelaciones, el Municipio de Ponce acude ante nos señalando como errores cometidos por ese Tribunal los siguientes:

1. Erró el Tribunal de Circuito de Apelaciones al modificar obligaciones cuyo cumplimiento específico fue ordenado por el TPI.
2. Erró el Honorable Tribunal de Circuito de Apelaciones al posponer la adjudicación de daños al Municipio de Ponce hasta tanto se terminen los proyectos cuya construcción fue ordenada en la sentencia. Alegato del Municipio de Ponce, Parte 9, pág. 9.

La opinión mayoritaria concluye que las agencias demandadas *no tienen razón* cuando argumentan que el Convenio *transgredió el orden público*, porque fueron hechos a toda prisa, en el ocaso de una administración gubernamental enfrentada a la inminencia del cambio, comprometiendo ilegalmente a la próxima administración gubernamental.

La Mayoría determina que las demandadas de autos no tienen razón cuando sostienen que el Convenio es nulo, porque no fue remitido a la Oficina del Contralor e inscrito en el Registro de Contratos del Municipio, sino hasta el 13 de septiembre de 1993. Sostienen que tal proceder no tiene la consecuencia de la nulidad del Convenio, a tenor de lo dispuesto en el Art. 8.016 de la Ley de Municipios Autóno-

mos, 21 L.P.R.A. sec. 4366.[7] Expresa sobre tal extremo la Mayoría, que el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones concluyeron correctamente que "los recurrentes tenían la misma obligación que el Municipio de presentar el Convenio ante la Oficina del Contralor. No cumplieron con ella en absoluto. El Municipio, no obstante, cumplió, aunque no dentro del término de quince (15) días. Coincidimos con el parecer de los tribunales inferiores, en el sentido de que esto choca con los más elementales principios de equidad que impiden que se vaya contra los actos propios". Opinión mayoritaria, pág. 33. *Prescribe la Mayoría que la disposición contenida en el último párrafo del Art. 8.016 de la Ley de Municipios Autónomos,* supra, *no rige la celebración ni el cumplimiento del contrato, sino que presupone la existencia de un contrato celebrado válidamente.* Expresa que "[e]ste último párrafo trata propiamente sobre el trámite de registro y remisión

---

[7] Dicho artículo leía, al 15 de diciembre de 1992, de la forma siguiente:

*"Todo contrato que se ejecute en contravención a lo dispuesto en esta sección será nulo y sin efecto. Si se han invertido fondos públicos,* su importe podrá recobrarse a nombre del municipio mediante la acción adecuada incoada a tal propósito.

"(a) El municipio no podrá otorgar contrato alguno en el que cualquiera de sus asambleístas, funcionarios o empleados tenga, directa o indirectamente, un interés pecuniario, a menos que lo autorice el Gobernador de Puerto Rico, previa recomendación del Secretario de Justicia y del Comisionado.

"(b) Ningún asambleísta, funcionario o empleado municipal prestará dinero a, ni tomará dinero a préstamo, ni aceptará donativos o regalos de ningún contratista que esté proveyendo servicios o suministros al municipio.

"(c) Los contratos para la ejecución de obras y mejoras públicas no se suscribirán hasta tanto:

"(1) El contratista evidencie ante el municipio el pago de la póliza correspondiente del Fondo del Seguro del Estado y de la correspondiente patente municipal;

"(2) haga entrega de la fianza prestada para garantizar el pago de jornales y materiales que se utilicen en la obra, y

"(3) entregue o deposite cualquier otra garantía que le sea requerida por la Junta de Subastas.

"(d) Todo contrato de construcción de obra o de mejora pública proveerá para la retención de un diez por ciento (10%) de cada pago parcial, hasta que se termine la obra, ésta sea inspeccionada y aceptada por el municipio y hasta tanto el contratista evidencie que ha sido relevado de toda obligación como patrono.

*"Los municipios mantendrán un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos y enviarán copia de éstos y de las escrituras de adquisición y disposición de bienes a la Oficina del Contralor de Puerto Rico, conforme a las secs. 97 et seq. del Título 2 y su Reglamento."* (Énfasis suplido.) Art. 8.016 de la Ley de Municipios Autónomos), 21 L.P.R.A. sec. 4366 (ed. 1995).

establecido en la Ley Núm. 18 de 30 de octubre de 1975 (2 L.P.R.A. secs. 97–98) cuyo propósito es 'crear un mecanismo de cotejo para perpetuar circunstancial y cronológicamente' los contratos gubernamentales. *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 53–54 (1988)". Opinión mayoritaria, pág. 34. Añade que "[l]a consecuencia del incumplimiento del requisito de remisión no está prevista, pues, en el Art. 8.016 de la Ley de Municipios Autónomos, sino en el Art. 8.004 (21 L.P.R.A. sec. 4354) el cual establece, en lo pertinente, que '[n]o se autorizará desembolso alguno relacionado con contratos sin la constancia de haberse enviado el contrato a la Oficina del Contralor de Puerto Rico ...' ".[8] Opinión mayoritaria, pág. 34.

La Mayoría determina que no tienen razón las agencias demandadas cuando alegan que el Convenio objeto del presente recurso no es un contrato, a tenor de nuestro ordenamiento jurídico, y que es nulo por ser contrario al interés

---

[8] Dicho Art. 8.004, leía, al 15 de diciembre de 1992, de la forma siguiente:

"Las obligaciones y desembolsos de fondos públicos municipales sólo podrán hacerse para obligar o pagar servicios, suministros de materiales y equipo, reclamaciones o cualesquiera otros conceptos autorizados por ley, ordenanza o resolución aprobada al efecto y por los reglamentos adoptados en virtud de las mismas.

"(a) Los créditos autorizados para las atenciones de un año fiscal específico serán aplicados exclusivamente al pago de gastos legítimamente originados e incurridos durante el respectivo año, o al pago de obligaciones legalmente contraídas y debidamente asentadas en los libros del municipio durante dicho año.

"(b) No podrá gastarse u obligarse en año fiscal cantidad alguna que exceda de las asignaciones y los fondos autorizados por ordenanza o resolución para dicho año. Tampoco se podrá comprometer, en forma alguna, al municipio en ningún contrato o negociación para pago futuro de cantidades que excedan a las asignaciones y los fondos. Estarán excluidos de lo dispuesto en este inciso los contratos de arrendamiento de propiedad mueble e inmueble y de servicios.

"(c) Las subvenciones, donativos, legados y otros similares que reciba el municipio con destino a determinadas obras y servicios municipales sólo se utilizarán para la atención de los fines para los cuales sean concedidas u otorgadas, a menos que se trate de sobrantes para cuya utilización no se proveyó al hacerse la concesión.

"(d) Todos los desembolsos que efectúe el municipio se harán directamente a las personas o entidades que hayan prestado los servicios o suplido los suministros o materiales, excepto en los casos que haya mediado un contrato de cesión de crédito y se haya cumplido con los requisitos reglamentarios del Comisionado.

*"No se autorizará desembolso alguno relacionado con contratos sin la constancia de haberse enviado el contrato a la Oficina del Contralor de Puerto Rico, conforme a lo dispuesto en las secs. 97 et seq. del Título 2 y su Reglamento."* (Énfasis suplido.) Art. 8.004 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4354 (ed. 1995).

público. Razona que los municipios, de ordinario, contratan con agencias del Gobierno Central, y estos acuerdos voluntarios se rigen por los principios generales de los contratos. Añade, que en materia de contratación gubernamental, ya hemos tenido la ocasión de expresar que " '[e]n nuestra jurisdicción el principio rector en materia de contratos es la libertad de contratación entre las partes. Los pactos entre contratantes tienen fuerza de ley y deben ser cumplidos.'[9] *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 787 (1994)". Opinión mayoritaria, pág. 35. Decide la Mayoría, que no ve ilicitud alguna en la causa del Convenio, que afirma es un contrato. No le impartió mérito alguno a la alegación de las demandadas de autos, aquí peticionarias, que la causa del Contrato es ilícita, porque se benefició el Municipio de Ponce desproporcionalmente. Considera que no procede que se pretenda equilibrar las contraprestaciones en un Convenio, como el del caso de autos, mediante su valor económico para cada una de las instrumentalidades estatales o para el Municipio. El manto de la obligación de cada uno depende, según la Mayoría, de la naturaleza de sus responsabilidades. Califica el Convenio como un contrato sui géneris, para descargar, conjuntamente, responsabilidades que separadamente ya se tenían por ley. Determina que *su causa es el interés público*.[10]

## II

### Contrato

El Tribunal de Primera Instancia, el Tribunal de Circuito de Apelaciones y la Mayoría de este Tribunal entienden como presente la figura del "contrato" en el Convenio

---

[9] Véase, también, *García v. World Wide Entmt. Co.*, 132 D.P.R. 378 (1992).

[10] Apoyan tal conclusión en lo resuelto en *Casiano, Jr. v. Borintex Mfg. Corp.*, 133 D.P.R. 127 (1993); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985).

celebrado entre las partes, a tenor con el orden jurídico general de los contratos, cuya causa, afirman, es el interés público.

El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio.[11] Contrato es el acuerdo de voluntades de dos o más partes por el que se crean, modifican o extinguen relaciones pertenecientes al derecho de obligaciones. En este sentido, todo contrato es un negocio jurídico bilateral, pero no todo negocio jurídico bilateral es un contrato. Si los sujetos en una negociación persiguen un interés común y mediante el acuerdo de voluntades colaboran los unos junto a los otros a su realización, nos encontramos con una figura jurídica a la que no debe en puridad denominarse *contrato*, ni puede aplicársele la mayor parte de las normas específicas dictadas para regular la contratación.[12] Un contrato otorgado entre el Gobierno y una persona particular debe interpretarse como si se tratara de un contrato entre dos personas particulares.[13]

No hay contrato sino cuando concurren los requisitos siguientes: consentimiento de los contratantes, objeto cierto que sea materia del contrato y causa de la obligación que se establezca.[14] Es inexistente o nulo un pretendido contrato por faltar uno o más de los requisitos esenciales para su constitución. Cuando concurren los requisitos esenciales para su consumación, el contrato existe. No obstante, de estar afectado por algún vicio podría ser anulado.

En los *contratos onerosos* se entiende por causa, para cada parte contratante, la prestación o promesa de una cosa o servicio por la otra parte.[15] Los contratos sin causa, o con causa ilícita, no producen efecto alguno. Es ilícita la

---

[11] Art. 1206 del Código Civil, 31 L.P.R.A. sec. 3371.

[12] *Santiago Nieves v. A.C.A.A.*, 119 D.P.R. 711, 718–719 (1987).

[13] *Zequeira v. CRUV*, 83 D.P.R. 878 (1961); *Rodríguez v. Municipio*, 75 D.P.R. 479 (1953).

[14] Art. 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3391.

[15] Art. 1226 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3431.

causa cuando se opone a las leyes y a la moral.([16]) *Se trata de una lesión a un interés general de orden jurídico o moral.*([17]) La causa como elemento indispensable en todo contrato, según el Art. 1227 del Código Civil, 31 L.P.R.A. sec. 3432, no puede oponerse a las leyes o a la moral, y su enfoque no puede limitarse a la vertiente objetiva que visualiza sólo el contenido de las contraprestaciones objeto del contrato. *Esto es, los motivos o móviles que indujeron a las partes a contratar son elementos extrajurídicos que en principio pueden ponderarse en la consideración de la ilicitud de la causa, "si lo aconsejan razones poderosas."*([18])

Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, a la moral ni al orden público.([19]) En Puerto Rico hay libertad para contratar. Las partes pueden celebrar los contratos que tuvieren a bien, en ausencia de algún principio de derecho constitucional, estatutario o de política pública que se lo impida.([20])

En Puerto Rico prevalece la autonomía de la voluntad de los contratantes. No obstante, esta autonomía tiene como límite que lo pactado *no puede ser contrario a las leyes, a la moral ni al orden público.* Por tal razón, independientemente del tipo de contrato de que se trate y de la importancia que éste merezca para las partes contratantes, es nulo e inexistente cuando resulta contrario a las leyes, a la moral o al orden público.([21])

---

([16]) Art. 1227 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3432.

([17]) *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 182 (1985).

([18]) *Reyes v. Jusino*, 116 D.P.R. 275, 282–283 (1985).

([19]) Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3372.

([20]) *Hennes v. Sun Life Assurance Company of Canada*, 291 F. Supp. 670 (D. P.R. 1968); *Clausells v. Commercial Union A. Co.*, 37 D.P.R. 117 (1927).

([21]) *De Jesús González v. A.C.*, 148 D.P.R. 255, 264 (1999); *Dennis, Metro Invs. v. City Fed. Savs.*, 121 D.P.R. 197 (1988); *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 684–685 (1987); *In re Pagán Ayala*, 117 D.P.R. 180 (1986); *Sánchez Rodríguez v. López Jiménez*, supra; *Reyes v. Jusino*, supra, pág. 287; *Flores v. Municipio de Caguas*, 114 D.P.R. 521, 529 (1983); *Umpierre v. Torres Díaz*, 114 D.P.R. 449, 459 (1983); *Tastee Freez v. Negdo. Seg. Empleo*, 108 D.P.R. 495, 501 (1979); *Asoc. de Condóminos*

Conforme a nuestro deber de dar concreción en cada caso a los conceptos generales del ordenamiento jurídico, nos hemos pronunciado in extenso respecto al concepto de "orden público".[22]

"Orden público" es el conjunto de valores eminentes que guían la existencia y el bienestar de una sociedad. El concepto de "orden público" recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger. En gran medida el orden público es acopio de normas de moral y de ética pública, que en ocasiones alcanzan su exposición en la Constitución o en la ley pero que aun en ausencia de esta expresa declaración normativa, constituyen principios rectores de sabio gobierno nacidos de la civilización, fortalecidos por la cultura, la costumbre, por la manera de ser, en fin, por el estilo de vida de una sociedad. El orden público necesariamente no se refiere, cuando se habla de contratos, al material mantenimiento de la paz pública. Es aquel que representa el interés público, social y de ley en el Derecho privado. Es lo permanente y esencial de las instituciones, lo que aun favoreciendo a algún individuo en quien se concreta algún derecho, no puede quedar a su arbitrio. La evolución jurídica camina decididamente hacia una infiltración cada vez mayor de elementos éticos y sociales, de tono imperativo, que de modo general en absoluto disciplinan las relaciones de Derecho privado, imprimiéndoles carácter público a expensas del principio de autonomía de la voluntad que, de

---

v. Seguros Arana, 106 D.P.R. 133 (1977); Hernández v. Méndez & Assoc. Dev. Corp., 105 D.P.R. 149, 153 (1976); Franceschi v. Texaco P.R., Inc., 103 D.P.R. 759 (1975); Berrocales v. Tribunal Superior, 102 D.P.R. 224 (1974); C.R.U.V. v. Peña Ubiles, 95 D.P.R. 311 (1967); Castell Enterprises, Inc. v. Registrador, 87 D.P.R. 775, 781 (1963); Rasa Eng. Corp. v. Daubón, 86 D.P.R. 193, 196 (1962).

[22] De Jesús González v. A.C., supra, págs. 994–995; Casiano, Jr. v. Borintex Mfg. Corp., supra.

esta suerte, va perdiendo volumen en su clásica y amplia esfera de acción.[23]

*Al reiterar la definición de "orden público", hemos expresado que aun cuando éste restringe la voluntad de la persona en el ámbito contractual, tal restricción en gran medida sirve para garantizar esa misma libertad.*[24]

*El orden público es considerado como parte integrante del bien común y constituye el fin al que las normas de un determinado ordenamiento jurídico tienden. El orden público tiene como finalidad el evitar que el Estado tenga que imponer algo que repugne al buen sentido de lo justo o de lo moral, sólo porque se trata de la voluntad de los contratantes.*[25]

*El orden público es un límite contra los abusos del ejercicio de la autonomía de la voluntad en materia contractual. Es un instrumento de operatividad de valores, reflejo de unas convicciones sociales. Actúa como instrumento jurídico progresivo y dimanante del ordenamiento jurídico para acomodarlo al sentir y la realidad social del tiempo en que deba ser aplicado. Incorpora los principios fundamentales sobre los que descansa el ordenamiento jurídico de un país.*[26]

Nuestros pronunciamientos anteriores reflejan la eficacia del concepto del "orden público" como medio para lograr un balance entre la autonomía de la voluntad de los contratantes y la imprescindible protección del bienestar común.[27] Como señalamos en *Serra v. Salesian Society*, 84 D.P.R. 322, 335 (1961), *los tribunales no podemos auxiliar a litigantes que han incurrido en conducta contraria a la ley, la moral o al orden público. Allí expresamos que no podemos auxiliar a esos litigantes para que perfeccionen su*

[23] *De Jesús González v. A.C.*, supra, pág. 995.

[24] *De Jesús González v. A.C.*, supra, pág. 995; *Unisys v. Ramallo Brothers*, 128 D.P.R. 842, 851 (1991).

[25] *De Jesús González v. A.C.*, supra, pág. 995.

[26] *De Jesús González v. A.C.*, supra, pág. 995.

[27] *De Jesús González v. A.C.*, supra, pág. 996.

*transgresión. "[H]ay una equidad que le debemos a la comunidad en general."* Íd. *La doctrina en Puerto Rico ha encontrado en el orden público una base dogmática para declarar nulas cláusulas contractuales que atentan crasamente contra el buen orden del sistema jurídico.*[28]

Como norma general, para los efectos de la aplicación de las disposiciones y doctrinas referentes a los contratos, el Estado se considera como un contratante privado. Cuando el Estado contrata, la interpretación del contrato debe hacerse como si se tratara de una contratación entre dos personas particulares.[29] Ello significa que una vez el Estado suscribe un contrato con una persona privada, ambos están obligados por las normas generales relativas a los contratos; y sus correspondientes interpretaciones a la luz de nuestros pronunciamientos aplicables.[30]

Por otro lado, cuando la contratación involucra el uso de bienes o fondos públicos, hemos insistido, además, en la *aplicación rigurosa* de todas las normas pertinentes a la contratación y desembolso de esos fondos, a los fines de proteger los intereses y dineros del Pueblo. Hemos enfatizado que el manejo prudente de fondos públicos está saturado de intereses de orden público. Hemos resaltado normativamente la imperiosa necesidad de evitar el dispendio, la extravagancia, el favoritismo y la prevaricación en los contratos gubernamentales.[31] Ciertamente, al interpretar el sentido contemporáneo de la disposición del Código Civil que requiere que los contratos no sean contrarios al orden público, no podemos ignorar que en la contra-

---

[28] *De Jesús González v. A.C.,* supra.

[29] *De Jesús González v. A.C.,* supra, pág. 996; *Zequeira v. CRUV,* supra; *Rodríguez v. Municipio,* supra.

[30] *De Jesús González v. A.C.,* supra, pág. 996.

[31] *De Jesús González v. A.C.,* pág. 996; *Fernández & Gutiérrez v. Mun. San Juan,* 147 D.P.R. 824 (1999); *Hatton v. Mun. de Ponce,* 134 D.P.R. 1001 (1994); *Mar-Mol Co., Inc. v. Adm. Servicios Gens.,* 126 D.P.R. 864 (1990); *Ocasio v. Alcalde Mun. de Maunabo,* 121 D.P.R. 37, 54 (1988); *Morales v. Municipio de Toa Baja,* 119 D.P.R. 682, 693 (1987); *Cancel v. Municipio de San Juan,* 101 D.P.R. 296, 300 (1973); *Justiniano v. E.L.A.,* 100 D.P.R. 34, 338 (1971).

tación por el Estado, la sana y recta administración de los fondos del pueblo está revestida del más alto interés público, y que *todo organismo gubernamental está obligado a observar cabalmente la esencia del principio consagrado en la Sec. 9 del Art. VI de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, de que los fondos públicos sólo pueden gastarse para fines públicos legítimos. Como hemos señalado antes, todas las actuaciones del Gobierno están siempre circunscritas por la Constitución. El gobierno como contratante sigue siendo el gobierno, y no puede actuar de un modo que esté reñido con los principios que encarna el orden constitucional. El concepto de "orden público" del Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372, pues, incluye en su contenido la prohibición de cláusulas contractuales contrarias a la política pública de origen constitucional que preconiza el uso escrupuloso de los fondos públicos. El concepto "orden público", como acopio y reflejo de los principios generales del Derecho, ciertamente recoge un alto valor jurídico.*

*El desembolso indebido o ilegal de fondos públicos son actos incompatibles con el sistema de gobierno democrático consagrado en nuestra Constitución y apuntalado en el respeto a la dignidad humana y los dineros del Pueblo, como único soberano. No importa las modalidades que adopten, ni la jerarquía del funcionario involucrado, éstas son intolerables. En última instancia, quien verdaderamente se perjudica, no sólo en lo económico sino en lo moral, es la ciudadanía en general. Es, pues, obligación de los tribunales reivindicar esos valores fundamentales.*[32]

Concluimos que el Convenio suscrito entre las partes contraviene el interés público inmanente en el conjunto de valores democráticos contenidos en la Constitución de Puerto Rico, y que forman parte del orden público. Sobre este asunto abundaremos más adelante.

---

[32] *De Jesús González v. A.C.*, supra, pág. 997.

*Ley de Municipios Autónomos*

Como mencionáramos previamente, durante el período del 23 de octubre al 15 de diciembre de 1992 se aprobaron enmiendas a la Ley Núm. 81, *supra*, se emitieron certificaciones por las agencias demandadas de autos y se otorgó el Convenio antes indicado, con el propósito de que la formulación de política pública de la administración saliente el 31 de diciembre de 1992 tuviera vigencia durante el período de 1ro de enero de 1993 al 31 de diciembre de 1996, y no pudiera ser alterada por la nueva administración electa por la voluntad del Pueblo. Se pretendió adscribir a dicho Convenio el carácter de un contrato, a tenor de la normativa dispuesta por nuestro Código Civil y la propia Ley Núm. 81, *supra*, enmendada el 29 de octubre de 1992, para hacer obligatorias las certificaciones emitidas para las agencias demandadas. Se le permitió al Municipio de Ponce hacer revisiones ante la Junta de Planificación del Plan de Ordenación Territorial, contenido en el referido Convenio, excluyendo en el texto del estatuto las dichas agencias de mecanismo análogo de revisión. Veamos.

La Exposición de Motivos de la Ley Núm. 81, *supra*, aprobada el 30 de agosto de 1991, leía de la forma siguiente:

En un sistema de gobierno democrático como el nuestro, donde el poder emana del pueblo, las estructuras de gobierno deben [ser] concebidas para atender sus necesidades en la medida en que los recursos económicos lo permitan. Hasta ahora, la prestación de servicios básicos y esenciales reside en el Gobierno Central, que por su gigantismo no ha podido llenar las expectativas de nuestra gente.

Este enfoque de mantener servicios esenciales a los ciudadanos en manos del Gobierno Central ha menoscabado el rol que deben desempeñar los municipios en nuestro sistema de gobierno, por ser las estructuras socio políticas más cercanas y con mayor conocimiento de las necesidades de sus habitantes.

Hasta ahora se concebía a los municipios como proveedores de servicios simples y su capacidad para compartir el Gobierno

del país y aportar a las soluciones de los problemas que genera una sociedad tan compleja como la nuestra parecía una meta inalcanzable.

Ha llegado la hora de otorgarle a los municipios un mayor grado de autonomía fiscal y de gobierno propio para que puedan atender cabalmente sus responsabilidades.

Delegar responsabilidad mediante esta legislación y colocar en el pueblo la obligación de exigir cumplimiento a los alcaldes cada cuatro años por el trabajo que han realizado, debe ser el marco de referencia en que habrán de moverse en el futuro nuestros municipios.

Esta Ley de Municipios Autónomos le otorga a los municipios la capacidad fiscal necesaria para continuar desempeñando las tareas que hasta ahora han atendido, para asumir nuevas funciones que le delegue el Gobierno Central y, más aún, para utilizar su propia iniciativa y ofrecer servicios que hasta ahora no han estado asequibles a sus habitantes. Con su aprobación se inicia una nueva era en la administración pública de nuestro país. Exposición de Motivos de la Ley Núm. 81, *supra*, 1991 Leyes de Puerto Rico 459, 459–460.

La Exposición de Motivos de la Ley Núm. 81, *supra*, después de ser enmendada por la Ley Núm. 84, *supra*, lee de la forma siguiente:

En un sistema de gobierno democrático como el nuestro, donde el poder emana del pueblo, las estructuras de gobierno deben ser concebidas para atender sus necesidades en la medida en que los recursos económicos los permitan. Hasta ahora, la prestación de servicios básicos y esenciales reside en el Gobierno Central, que por su gigantismo no ha podido llenar las expectativas de nuestra gente. Sec. 1 de la Ley Núm. 84, *supra*, 1992 Leyes de Puerto Rico 445.

El Art. 13.008 de la Ley Núm. 81, *supra*, según aprobada el 30 de agosto de 1991, leía de la forma siguiente:[33]

Artículo 13.008 — Adopción y Revisión de Planes de Ordenación.—

---

[33] El texto sombreado fue enmendado o eliminado como consecuencia de las enmiendas hechas por la Ley Núm. 84 de 29 de octubre de 1992, Leyes de Puerto Rico, pág. 442.

Los Planes de Ordenación serán elaborados, aprobados y revisados por los municipios en estrecha coordinación con la Junta de Planificación y con otras agencias públicas concernidas para asegurar su compatibilidad con planes gubernamentales, estatales, regionales y de otros municipios. Los municipios podrán entrar en convenios con la Junta de Planificación para la elaboración de dichos planes o parte de estos o la Junta podrá, a iniciativa propia, preparar un Plan Territorial en coordinación con los municipios, en caso de que un municipio no esté preparando un Plan Territorial y no esté en vías de comenzar su elaboración.

Como instrumento indispensable para la evaluación de los Planes de Ordenación que se sometan a la consideración de la Junta de Planificación, las agencias concernidas mantendrán actualizado y pondrán a disposición de dicha agencia un inventario físico que incluya, entre otros, la ubicación de recursos naturales que se deben proteger, el uso de la tierra, las áreas susceptibles a riesgos naturales, las zonas de valor agrícola, histórico, arqueológico o turístico, así como un detalle de la infraestructura disponible y de la zonificación vigente.

Cuando un municipio notifique a la Junta de Planificación su intención de elaborar un Plan de Ordenación que afecte otro municipio, ésta determinará mediante resolución al efecto, el conjunto de factores que deberán considerarse en relación a municipios contiguos, incluyendo, pero sin limitarse a, la morfología urbana, sistemas de transportación e interrelación en general.

Dos o más municipios podrán disponer la elaboración de Planes de Ordenación conjuntos mediante convenio al efecto, con la autorización de la Asamblea Municipal y el endoso de la Junta de Planificación. Dicha Junta velará porque el territorio que cubra tal Plan sea razonablemente contiguo, que los municipios guarden características similares, que se cumplan con los objetivos y requisitos dispuestos en este Título y que no se afecten adversamente otros municipios. La Junta de Planificación aprobará mediante resolución aquellas disposiciones complementarias que sean necesarias para regir la forma y contenido de los Planes de Ordenación que se elaboren en forma conjunta por dos o más municipios.

La elaboración o revisión de Planes de Ordenación se desarrollará en etapas y a través de la preparación secuencial o concurrente de una serie de documentos. La misma seguirá un proceso intenso de participación ciudadana mediante vistas públicas de acuerdo a lo dispuesto en este Capítulo. Se cumplirá además, con lo establecido en la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como "Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de

Puerto Rico". El municipio celebrará vistas públicas mandatorias en los casos que a continuación se detallan.

Durante la elaboración del Plan Territorial se requerirán vistas públicas para la evaluación de los siguientes documentos:

(1) Enunciación de Objetivos y Programación de Trabajos,

(2) Memorial General,

(3) Avance del Plan Territorial,

(4) Plan Territorial.

En la preparación del Plan de Ensanche se requerirán vistas públicas con respecto a los siguientes documentos:

(1) Enunciación de Objetivos y Programación de Trabajos,

(2) Programa de Ensanche,

(3) Propuesta de Planos y Normas para ordenar el Plan de Ensanche,

(4) Plan de Ensanche.

Además, se requerirán vistas públicas para analizar los siguientes documentos relacionados con el Plan de Area:

(1) Enunciación de Objetivos y Programación de Trabajos;

(2) Inventario, Diagnóstico y Recomendaciones;

(3) Plan de Area.

El Municipio notificará a la Junta de Planificación de todas las vistas públicas y le enviará copia de los documentos a presentarse en éstas. La Junta de Planificación ofrecerá comentarios al municipio sobre los documentos recibidos.

Para entrar en vigencia, los Planes de Ordenación Territorial requerirán su aprobación por la Asamblea Municipal, su adopción por la Junta de Planificación y su aprobación por el Gobernador. Si la Junta de Planificación no considera adecuado un Plan, expresará mediante resolución los fundamentos de su determinación. De no producirse un acuerdo de adopción por la Junta de Planificación, se someterá el Plan al Gobernador con las posiciones asumidas por la Junta de Planificación y el municipio, quien tomará la acción final que corresponda.

Los Planes de Ordenación se revisarán en el plazo que determinen los mismos o cuando las circunstancias lo ameriten. Todo Plan de Ordenación Territorial se revisará por lo menos cada ocho (8) años.

La revisión de todo Plan de Ordenación requerirá la celebración de vistas públicas en el municipio correspondiente, la aprobación por la Asamblea Municipal, su adopción por la Junta de Planificación y la aprobación por el Gobernador. El municipio vendrá obligado a celebrar vistas públicas, que podrán celebrarse conjuntamente con la Junta de Planificación dentro de término municipal, para las siguientes partes del Plan de Ordenación: Plan Territorial (1. Planos de Clasificación de Suelos, 2. Planos de Ordenación, 3. Normas Urbanísticas); Plan de Ensanche (1. Plano de Ensanche, 2. Normas Urbanísticas); y Plan

de Area (1. Plano de Ordenación, 2. Normas Urbanísticas). El municipio, vendrá obligado a celebrar vista pública mandatoria para la revisión de la programación de los proyectos de desarrollo del Programa de Acción, así como la revisión de la programación de la ejecución de las obras de desarrollo en el Plan de Ensanche, pero éstas no requerirán la adopción de la Junta de Planificación o la aprobación del Gobernador.

La Junta de Planificación aprobará mediante el reglamento que rige la forma y contenido de los Planes de Ordenación aquellas disposiciones complementarias a este Capítulo que sean necesarias para regir la celebración de las vistas públicas requeridas para la elaboración y revisión de los Planes de Ordenación. Dicho reglamento incluirá, entre otras, disposiciones sobre el contenido de los documentos a someterse a vistas públicas, notificación de las mismas y aquellas garantías necesarias para propiciar una efectiva participación de la comunidad. Dicho reglamento establecerá la uniformidad en la aplicación de la norma en el área correspondiente dentro de cada municipio. Art. 13.008 de la Ley Núm. 81, *supra*, 1991 Leyes de Puerto Rico 597–600).

El Art. 13.008 de la Ley Núm. 81, *supra*, enmendada por la Ley Núm. 84, *supra*, aprobada el 29 de octubre de 1992, lee de la forma siguiente:([34])

"Artículo 13.008.—Elaboración, Adopción y Revisión de los Planes de Ordenación.—

Los Planes de Ordenación serán elaborados *o* revisados por los municipios en estrecha coordinación con la Junta de Planificación y con otras agencias públicas concernidas para asegurar su compatibilidad con planes estatales, regionales y de otros municipios. Los municipios podrán entrar en convenios con la Junta de Planificación para la elaboración de dichos planes o parte de éstos.

Como instrumento indispensable para la evaluación de los Planes de Ordenación que se sometan a la consideración de la Junta de Planificación, las agencias públicas concernidas mantendrán actualizado y pondrán a disposición de dicha agencia un inventario físico que incluya, entre otros, la ubicación de los recursos naturales que se deben proteger, el uso *del suelo*, las

---

([34]) El texto enfatizado fue enmendado o añadido mediante la Ley Núm. 84 del 29 de octubre de 1992, *supra*.

áreas susceptibles a riesgos naturales, las zonas de valor agrícola, histórico, arqueológico o turístico, así como el detalle disponible de la infraestructura.

*Todo municipio que decida desarrollar o revisar integralmente un Plan de Ordenación deberá así notificarlo a la Junta de Planificación antes de comenzar sus trabajos.* Cuando un municipio notifique a la Junta de Planificación su intención de elaborar *o revisar integralmente un Plan Territorial, o de elaborar o revisar integralmente* un Plan de Ordenación que *tenga un impacto significativo sobre* otro municipio, *la Junta de Planificación* determinará, mediante resolución al efecto, el conjunto de factores que se considerarán en el Plan, *pudiendo incluir*, sin limitarse, lo siguiente: densidades mínimas a requerirse en la ocupación del suelo, morfología urbana, sistemas de transportación, *sistemas de infraestructura regional, vertederos regionales, represas e* interrelación general *con su región.*

Dos o más municipios podrán *acordar* la elaboración de Planes de Ordenación en conjunto mediante convenio al efecto, previa autorización *de sus correspondientes Asambleas Municipales* y el endoso de la Junta de Planificación. Dicha Junta velará porque el territorio que cubra tal Plan sea razonablemente contiguo, que los municipios tengan características similares, que se cumplan con los objetivos y requisitos dispuestos en este Capítulo y que no se afecten adversamente otros municipios. La Junta de Planificación aprobará mediante resolución aquellas disposiciones complementarias que sean necesarias para regir la forma y contenido de los Planes de Ordenación que se elaboren en forma conjunta por dos o más municipios.

La elaboración o revisión de los Planes de Ordenación se desarrollará en etapas y a través de la preparación secuencial o concurrente de una serie de documentos. La misma seguirá un proceso intenso de participación ciudadana mediante vistas públicas de acuerdo a lo dispuesto en este Capítulo. Se cumplirá, además, con lo establecido en la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como "Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico". El municipio celebrará vistas mandatorias en los casos que a continuación se detallan.

Durante la elaboración o revisión integral del Plan Territorial se requerirán vistas públicas para la evaluación de los siguientes documentos.—

(a) Enunciación de Objetivos y *Plan de Trabajo;*
(b) Memorial;
(c) Avance del Plan Territorial; y
(d) Plan Territorial *(completo).*

En la preparación o revisión integral del Plan de Ensanche se requerirán vistas públicas con respecto a los siguientes documentos.—

(a) Enunciación de Objetivos y *Plan* de Trabajo; y Programa de Ensanche;

(b) Propuesta de Plano *de Ensanche y de Reglamentos de Ordenación*; y

(c) Plan de Ensanche (*completo*).

*En la elaboración o revisión integral* del Plan de Area se requerirán vistas públicas para analizar *los siguientes documentos.*—

(a) Enunciación de Objetivos y Plan de Trabajo;

(b) Inventario, Diagnóstico y Recomendaciones; *Programa y Propuesta del Plan*: y

(c) Plan de Area (*completo*).

El municipio notificará a la Junta de Planificación de todas las vistas públicas y le enviará copia de los documentos a presentarse en éstas. La Junta de Planificación ofrecerá comentarios al municipio sobre los documentos recibidos en un tiempo razonablemente breve.

Para entrar en vigencia, los Planes de Ordenación requerirán su aprobación por la Asamblea Municipal, su adopción por la Junta de Planificación y su aprobación por el Gobernador. *En el caso de Planes de Ordenación que incluyan más de un municipio éstos deberán ser aprobados por las Asambleas Municipales de cada uno de los municipios de que se trate.* Si la Junta de Planificación no considera adecuado un Plan, expresará mediante Resolución los fundamentos de su determinación. De no producirse un acuerdo de adopción por la Junta de Planificación, se someterá el Plan al Gobernador con las posiciones asumidas por la Junta de Planificación y el municipio; *el Gobernador* tomará la acción final que corresponda.

Los Planes de Ordenación se revisarán en el plazo que se determinen en los mismos o cuando las circunstancias lo ameriten. El Plan Territorial se revisará de forma integral por lo menos cada ocho (8) años.

*Los Planes de Ordenación podrán revisarse de forma parcial.* La revisión *parcial* de los Planes de Ordenación requerirá la celebración de vistas públicas en el municipio correspondiente, la aprobación por la Asamblea Municipal *mediante ordenanza*, su adopción por la Junta de Planificación y la *ratificación* por el Gobernador *en los siguientes elementos de un Plan de Ordenación; en el caso de planes adoptados en conjunto por más de un municipio, en cada uno de ellos se requerirá vista pública y la aprobación por la Asamblea Municipal de cada uno*:

(a) Plan Territorial.—

(1) *Documento de las Políticas del Plan incluido en el Memorial*;

(2) *Los siguientes planos incluidos en el Programa*:

(i) *Infraestructura*,

(ii) *Plan Vial*,

(iii) *Dotaciones Generales*;

(3) *La sección del Programa de Proyectos de Inversión, certificados por las agencias públicas*;

(4) *Plano de Clasificación de Suelos*;

(5) *Planos de Ordenación (excepto las enmiendas a los planos en conformidad con lo establecido en el Artículo 13.012); y*

(6) *Reglamentos de Ordenación.*

(b) Plan de Ensanche.—

(1) Plano de Ensanche;

(2) Planos de Ordenación (excepto las enmiendas a los planos en conformidad con lo establecido en el Artículo 13.012); y

(3) Reglamentos de Ordenación.

(c) Plan de Area.—

(1) Planos de Ordenación (*excepto las enmiendas a los planos en conformidad con lo establecido en el Artículo 13.012*); y

(2) Reglamentos de Ordenación.

*La revisión de los Planes de Ordenación en otros asuntos, incluyendo las enmiendas a los Planos de Ordenación según facultado en el Artículo 13.012 de esta ley, sólo requerirá la celebración de vistas públicas en el municipio correspondiente y en el caso de planes adoptados en conjunto por más de un municipio en cada uno de ellos, así como la aprobación de la Asamblea o Asambleas Municipales mediante ordenanza y una notificación de la revisión aprobada a la Junta de Planificación. Dicha revisión será efectiva cuarenta y cinco (45) días después de la notificación a la Junta de Planificación, según conste en el correspondiente acuse de recibo. Durante ese período la Junta podrá determinar que la revisión parcial está en contra de las Políticas del Plan o que tiene impacto fuera de los límites municipales, por lo cual la Junta podrá no aceptar la revisión parcial. En este caso la Junta realizará dicha determinación a través de Resolución y notificación de ésta al municipio.*

*La Junta de Planificación podrá determinar, mediante Resolución, que la revisión parcial que solicita el municipio requiere una revisión integral del Plan de Ordenación en su totalidad; esta determinación deberá estar debidamente explicada.* (Énfasis suprimido.) Sec. 65 de la Ley Núm. 84, *supra*, 1992 Leyes de Puerto Rico 492–495.

El Art. 13.011 de la Ley Núm. 81, *supra,* aprobado el 30 de agosto de 1991, leía de la forma siguiente[35]

Artículo 13.011.—Conformidad y Compatibilidad de los Planes de Ordenación.—

Los Planes de Ordenación estarán en conformidad con todas las políticas públicas, leyes, reglamentos u otros documentos del gobierno central relacionados a la ordenación territorial y a la construcción, incluyendo, entre otros, los planes reguladores, planes de uso del terreno y planes viales.

Al momento de realizar o revisar los Planes de Ordenación y sus Reglas Urbanísticas, un municipio, en asuntos que sean de su exclusiva competencia, podrá proponer enmiendas a disposiciones incluidas en los reglamentos u otros documentos del gobierno central, excepto aquellas contenidas en el Reglamento de Edificación, el Reglamento de Zonas Susceptibles a Inundaciones, el Reglamento de Sitios o Zonas Históricas y otros reglamentos que apliquen a zonas especiales o que se adopten específicamente como de aplicación regional o general en Puerto Rico. En este caso, el municipio coordinará con las agencias públicas concernidas un proceso dirigido a que se armonicen los planes en cuestión de forma mutuamente satisfactoria. Las agencias públicas vendrán obligadas a responder en un proceso razonablemente acelerado, atendiendo en todo lo posible las inquietudes e intereses presentadas por el municipio. La adopción final del documento se realizará de acuerdo a lo dispuesto en el Artículo 13.008 de este Título.

El municipio se asegurará de mantener un estrecho enlace y colaboración entre el municipio y la Junta de Planificación en todo lo relacionado a la elaboración y adopción de los Planes de Ordenación. También establecerá la necesaria coordinación con otras agencias públicas, especialmente aquellas relacionadas a la transportación, la infraestructura, los recursos naturales, la agricultura y el desarrollo industrial. La Junta velará por la compatibilidad de lo propuesto con otros planes de ordenación territorial y otras políticas públicas relevantes a los asuntos incluidos en el plan bajo consideración y podrá permitir criterios más estrictos pero no más laxos que los establecidos en los documentos de política pública de aplicación general en el país.

Una vez adoptado un Plan de Ordenación, el gobierno central se reserva la facultad, a través de la Junta de Planificación, de adoptar determinaciones de aplicación para uno o varios muni-

---

[35] El texto sombreado fue enmendado o eliminado como consecuencia de las enmiendas hechas por la Ley Núm. 84 de 29 de octubre de 1992, *supra.*

cipios dirigidas a propiciar una mejor salud, seguridad y bienestar de la región o dirigidas a la consideración y aprobación de obras y proyectos del gobierno central. Estas determinaciones se comunicarán a la Oficina de Ordenación Territorial y a la Oficina de Permisos del municipio a través de resolución de la Junta de Planificación y éstas prevalecerán sobre cualquier Plan de Ordenación Territorial. De estas determinaciones no ser compatibles con los Planes de Ordenación Territorial, éstos se revisarán para conformarlos en un plazo que no excederá de un (1) año. Cualquier determinación sobre usos de terrenos por el Municipio acatará lo establecido en la resolución de la Junta de Planificación aunque no se hayan revisado aún los Planes de Ordenación Territorial.

Los Planes de Ordenación y todos los reglamentos y acciones que efectúen los municipios a tenor con las facultades que se les confieren en este título cumplirán con las disposiciones de la Ley Núm. 9 de 18 de junio de 1970, según enmendada, conocida como "Ley sobre Política Pública Ambiental", y con los reglamentos aprobados por la Junta de Calidad Ambiental para la implantación de dicha ley. Art. 13.011 de la Ley Núm. 81, *supra*, 1991 Leyes de Puerto Rico 603–604.

El Art. 13.011 de la Ley Núm. 81, *supra*, enmendada por la Ley Núm. 84, *supra*, aprobada el 29 de octubre de 1992, lee de la forma siguiente:([36])

"Artículo 13.011.—Conformidad y Compatibilidad de los Planes de Ordenación.—

Los Planes de Ordenación estarán de conformidad con todas las políticas públicas, leyes, reglamentos, u otros documentos del gobierno central relacionados a la ordenación territorial y a la construcción, *excepto por los reglamentos que se sustituyan o enmienden de acuerdo a lo indicado a continuación.*

Al momento de *elaborar o* revisar *la sección de reglamentación de* los Planes de Ordenación un municipio, en asuntos que sean de su competencia, podrá proponer *sustituciones o* enmiendas a los reglamentos u otros documentos *de la Junta de Planificación o la Administración de Reglamentos y Permisos,* excepto por el Reglamento de Edificación, el Reglamento de Zonas Susceptibles a Inundaciones, el Reglamento de Sitios o Zonas Históricas, *el Reglamento de Zonificación de la Zona Cos-*

---

([36]) El texto enfatizado fue enmendado o añadido mediante la Ley Núm. 84 de 29 de octubre de 1992, *supra.*

*tanera y de Accesos a las Playas y Costas de Puerto Rico*, y otros reglamentos o documentos que se adopten específicamente como de aplicación regional o general en Puerto Rico.

*En asuntos de su competencia*, el municipio coordinará con otras agencias públicas concernidas un proceso dirigido a armonizar sus planes *en el área municipal con los planes y programas de tales agencias públicas* de forma mutuamente satisfactoria. Las agencias públicas vendrán obligadas a responder en un proceso razonablemente acelerado, atendiendo en todo lo posible las inquietudes e intereses presentadas por el municipio.

El municipio se asegurará de mantener un estrecho enlace y colaboración *con* la Junta de Planificación en todo lo relacionado a la elaboración y adopción de los Planes de Ordenación. También establecerá la necesaria coordinación con otras agencias públicas, especialmente aquellas relacionadas a la transportación, la infraestructura, los recursos naturales, la agricultura y el desarrollo industrial. La Junta de Planificación velará por la compatibilidad de lo propuesto con otros Planes de Ordenación y otras políticas públicas relevantes a los asuntos incluidos en el plan bajo consideración y podrá permitir criterios más estrictos pero no más laxos que los establecidos en los documentos de política pública de aplicación general en el país. *El Plan de Ordenación que se adopte será el resultado de la consulta y coordinación entre las agencias públicas y el municipio.*

*Una vez aprobado por el Gobernador, el Plan de Ordenación obligará a las agencias públicas al cumplimiento con los programas de obras y proyectos incluidos en la Sección del Programa de Proyectos de Inversión certificados por las agencias públicas. La Junta de Planificación le dará consideración prioritaria a dicha sección en la preparación de su Programa de Inversiones de Cuatro Años dispuesto en la Ley Núm. 75 de 24 de junio de 1975, según enmendada, igualmente lo hará la Oficina de Presupuesto y Gerencia en el Presupuesto Anual que se someta a la Asamblea Legislativa. Las corporaciones públicas quedarán obligadas en sus propios presupuestos.*

Una vez adoptado un Plan de Ordenación, el gobierno central se reserva la facultad, a través de la Junta de Planificación, de adoptar determinaciones de aplicación para uno o varios municipios dirigidas a propiciar una mejor salud, seguridad y bienestar de la región o dirigidas a la consideración y aprobación de obras y proyectos del gobierno central. En el proceso de consideración de [e]stas determinaciones se notificará y oirá a los municipios afectados. Estas determinaciones *se realizarán y* se comunicarán a la Oficina de Ordenación Territorial y a la Oficina de Permisos del municipio a través de una Resolución de la

Junta de Planificación y éstas prevalecerán sobre cualquier Plan de Ordenación. De estas determinaciones no ser compatibles con los Planes de Ordenación, éstos se revisarán para conformarlos en un plazo que no excederá de un (1) año, *a partir de la fecha en que se adoptó la Resolución por la Junta de Planificación.* Cualquier determinación sobre uso del *suelo* por el municipio acatará lo establecido en la Resolución de la Junta de Planificación aunque, *al momento de su aplicación* no se hayan revisado aún los Planes de Ordenación. *Estas determinaciones de la Junta de Planificación no serán aplicables a los proyectos incluidos en la sección del Programa de Proyectos de Inversión certificados por las agencias públicas.*

Los Planes de Ordenación y todos los reglamentos y acciones que efectúen los municipios a tenor con las facultades que se les confieren en este Capítulo cumplirán con las disposiciones de la Ley Núm. 9 de 18 de junio de 1970, según enmendada, conocida como "Ley sobre Política Pública Ambiental", y con los reglamentos aprobados por la Junta de Calidad Ambiental para la implantación de dicha Ley. (Escolios omitidos.) Sec. 68 de la Ley Núm. 84, *supra*, 1992 Leyes de Puerto Rico 500–502.

## III

*Democracia: Constitución de Puerto Rico*

La democracia es una forma de vida. Para que exista una sociedad o comunidad democrática, todos y cada uno de los individuos que la componen deben fijar en su vida y desarrollo como ciudadanos su significado. Como ningún otro sistema, la democracia depende del consenso permanente y voluntario de los ciudadanos que la componen. El orden democrático nace de la coincidencia de valores, principios e instituciones y del mantenimiento de tal consenso sobre éstos.

La obediencia y el compromiso del ciudadano con el ordenamiento jurídico constitucional que lo garantiza debe ser una vocación permanente para la subsistencia y desarrollo de la democracia sobre la cual está asentada.[37] Los juristas no son excepción. Los jueces tienen la obligación y

---

[37] C.J. Friedrich, *La democracia como forma política y como forma de vida*, 2da ed., Madrid, Ed. Tecnos, 1966, pág. 13.

deber de así hacerlo. Sobre los hombros de este Tribunal descansa el logro de un ordenamiento jurídico que alcance el crecimiento y desarrollo de nuestra democracia constitucional.

Una constitución, en el sentido del constitucionalismo occidental, es decisiva para la democracia. La Constitución se crea por los representantes del pueblo, legitimados por su elección. La creación de la Constitución es sólo un punto de partida para una evolución constante, en la que los usos y costumbres desempeñan un gran papel.(38)

Una democracia libre, que involucre la participación de los miembros de la sociedad en el proceso político democrático, requiere de una adecuada organización jurídico-estatal. Democracia y estado de derecho constituyen una unidad indivisible, entendiéndose por estado de derecho a todos aquellos principios y procedimientos que garantizan la libertad individual y la participación en la vida política.(39)

El consenso define una situación en la que la mayoría de los ciudadanos se adhiere en forma voluntaria a un cierto sistema político, orden social, sistema jurídico y sistema económico. La democracia necesita contar con un mínimo de consenso respecto de sus valores e ideas esenciales. El fundamento de la democracia descansa sobre un consenso de valores, fruto del cual surgen las fuerzas indispensables para lograr la cohesión del sistema.(40)

Juridicidad es el principio fundamental del estado democrático. El estado de derecho es un estado democrático, cuya actividad se ve determinada y limitada por el Derecho. Tiene por objetivo fundamental limitar el poder político en beneficio de la libertad individual y colectiva.

---

(38) Friedrich, *op. cit.*, pág. 14.

(39) Besson y Jasper, *Elementos del estado de derecho: el principio de legalidad en toda actuación del poder público*, en J. Thesing, ed., *Estado de Derecho y Democracia*, Argentina, Ed. Grancharoff J.A., 1997, pág. 121.

(40) Thesing, *Estado de derecho y democracia: una introducción*, en Thesing, *op. cit.*, págs. 11, 18.

Political democracy is partly a form and partly a process of government. A functioning electorate seems to be the essential feature of the form; while the control exercised by public opinion over the governing authorities appears to be the essential feature of the process. In brief, the essence of political democracy is popular control.

Popular control is realized in a democracy through the expression of opinion. Opinion may be formally or informally expressed. It is expressed formally in elections where citizens generally are free to register their choices and where the majority decides. In a democracy an election is not a mere formality. The voters actually determine governmental policies; they choose the persons who are to be ultimately responsible for policy-determination; or they both determine policies and choose policy-determining officials. Democracy, fully realized, implies that all policies shall be subject ultimately to popular control.

If public opinion is to control policy-determination, the organs of government charged with the policy-determining function must be responsible to opinion. Government must be able and willing to function in the democratic way. It must translate the electoral mandate into terms of law and action and must reflect fresh manifestation of opinion that appear between elections. Government must be representative and responsive. A.C. Millspaugh, *Democracy, Efficiency, Stability*, Washington, D.C., Ed. Brookings Institution, 1942, págs. 4–5.

Representación significa actuar en interés de los representados en una forma sensible ante ellos. La vida política no es meramente la elaboración de elecciones arbitrarias ni meramente la negociación entre distintos deseos privados. Es siempre la combinación de negociación y compromiso, en la que existen compromisos sin resolver y en conflicto, y una deliberación común sobre política pública en la que los hechos y los argumentos racionales son relevantes.[41]

En los estados contemporáneos, debido a su gran extensión física y a su mucha población, se hace inevitable que la democracia se ejerza indirectamente a través de representantes. Ya no es posible gobernar mediante el ágora de la Grecia clásica o el *town meeting* de la Nueva

---

[41] H. Fenichel Pitkin, *El Concepto de Representación*, Madrid, Imp. FARESO, 1985, págs. 233–236.

Inglaterra del siglo 17. La democracia moderna funciona mediante los partidos políticos. Éstos presentan al electorado una síntesis de ideas y programas de gobierno, lo que se llama la plataforma, y con un grupo de hombres y mujeres ofrecen gobernar en consonancia con esas ideas y programas. Generalmente el electorado tiene ante sí dos o tres alternativas, y al votar endosa la de su preferencia. Como es imposible que varios programas, contradictorios entre sí, sean realizados a la vez, universalmente se acepta que gobernará la mayoría. La minoría fiscaliza para mantener al gobierno dentro de la moral, la ley y la Constitución, y espera su turno o su oportunidad de convertirse en mayoría mediante la persuasión del electorado. Ese sistema coloca la responsabilidad política en un partido, el partido del gobierno, y en un grupo de hombres que dirigen el gobierno, junto a sus colaboradores más destacados.

La Constitución de Puerto Rico entró en vigor el 25 de julio de 1952. Dicho documento fue redactado por el pueblo de Puerto Rico y prevaleció sustancialmente la redacción que de tal documento realizó la Convención Constituyente de Puerto Rico durante el proceso de su aprobación.

A través de la Constitución de Puerto Rico se organizó un sistema de gobierno interno para el pueblo, sobre una base plenamente democrática para promover el bienestar general y asegurar el goce cabal por sus ciudadanos de los derechos humanos. Se consideró como fundamental para la vida de la comunidad puertorriqueña el sistema democrático. Conceptualizó tal sistema como aquél en el que la voluntad del pueblo es la fuente del poder público, en el que el orden político está subordinado a los derechos del hombre y en el que se asegura la libre participación del ciudadano en las decisiones colectivas.[42]

El Art. I de la Constitución de Puerto Rico dispone que *el poder del Estado emana del pueblo y se ejercerá de acuerdo con su voluntad. Establece un gobierno de forma*

---

[42] Preámbulo de la Constitución de Puerto Rico.

*republicana dividido en el Poder Legislativo, Ejecutivo y Judicial, según fueron establecidos y organizados en dicho documento, que están igualmente subordinados a la soberanía del Pueblo de Puerto Rico.*

*El Art. II de la Constitución de Puerto Rico, contiene la Carta de Derechos. Consagra como inviolable la dignidad humana, que todos los hombres son iguales ante la ley, sin que se pueda establecer discrimen entre ellos. Emite mandato a los efectos de que las leyes tendrán que garantizar la expresión de la voluntad del pueblo mediante el sufragio universal.* Permite a las personas asociarse y organizarse libremente para cualquier fin lícito. Se reconoce como fundamental del ser humano el derecho a la vida, *a la libertad* y al disfrute de su propiedad. Garantiza al individuo *el debido proceso de ley para que el Estado pueda intervenir con su libertad o propiedad y la igual protección de las leyes.* Contiene otra serie de garantías, libertades y derechos que evidencia la naturaleza de avanzada democrática de nuestro magno documento. *En su Sec. 19, dicho artículo dispone que la enumeración de derechos allí contenida no se entenderá en forma restrictiva, ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia.* Art. II, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1.

El Art. III de nuestra Constitución dispone que el Poder Legislativo se ejerce por una Asamblea Legislativa, que se compone de dos (2) Cámaras —el Senado y la Cámara de Representantes— cuyos miembros son elegidos por votación directa en cada elección general. El Senado se compone de veintisiete (27) miembros y la Cámara de Representantes de cincuenta y uno (51), excepto cuando dicha composición resultare enmendada para proteger la representación de las minorías democráticas manifestadas a través de la institución de los partidos políticos bajo una sola candidatura o cuando resultaren electos más de dos terceras (2/3) partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos están definidos por ley. Para los fi-

nes de la elección de los miembros a la Asamblea Legislativa, Puerto Rico estará dividido en ocho (8) distritos senatoriales y en cuarenta (40) distritos representativos. Cada distrito senatorial elige dos (2) senadores y cada distrito representativo un representante. Se eligen, además, once (11) senadores y once (11) representantes por acumulación. Ningún elector puede votar por más de un (1) candidato a senador por acumulación ni por más de un candidato a representante por acumulación. Establece que cada distrito senatorial incluirá siempre cinco (5) distritos representativos. La división en distritos senatoriales y representativos es revisada cada diez (10) años, a partir de 1960, por una junta compuesta por el Juez Presidente del Tribunal Supremo de Puerto Rico, como Presidente, y de dos (2) miembros adicionales nombrados por el Gobernador con el consejo y consentimiento del Senado. Los dos (2) miembros adicionales no pueden pertenecer a un mismo partido político. *Cualquier revisión mantendrá el número de distritos senatoriales y representativos creados originalmente, los cuales estarán compuestos de territorios contiguos y compactos y se organizarán, hasta donde sea posible, sobre la base de la población y medios de comunicación.* La Junta adopta sus acuerdos por mayoría. Para ser electo senador o representante por un distrito, es requisito haber residido en éste durante no menos de un (1) año con anterioridad a su elección. Cuando hubiere más de un distrito representativo en un municipio, se cumple este requisito con la residencia en el municipio. *El término del cargo de los senadores y representantes comienza el 2 de enero inmediatamente siguiente a la fecha en que se celebre la elección general en la cual hayan sido electos.*

*La Asamblea Legislativa es un cuerpo con carácter continuo durante el término de su mandato* y se reúne en sesión ordinaria cada año, a partir del segundo lunes de enero. La duración de las sesiones ordinarias y los plazos para la presentación y la consideración de proyectos son prescritos por ley. Cuando el Gobernador convoque a la

Asamblea Legislativa a sesión extraordinaria, sólo puede considerarse en ella los asuntos especificados en la convocatoria o en mensaje especial que el Gobernador le envíe en el curso de la sesión, la cual no puede extenderse por más de veinte (20) días naturales. *Las sesiones de las cámaras son públicas.*

*La Asamblea Legislativa tiene facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones. Aprobar el presupuesto general del Gobierno, y leyes para obtener rentas. Cualquier proyecto de ley aprobado por una mayoría del número total de los miembros que componen cada cámara se somete al Gobernador y se convierte en ley si éste lo firma o, si no, lo devuelve con sus objeciones a la cámara de origen dentro de diez (10) días, contados a partir de la fecha en que lo hubiese recibido.* Cuando el Gobernador devuelve un proyecto, la cámara que lo reciba consignará las objeciones del Gobernador en el libro de actas y ambas cámaras pueden reconsiderar el proyecto que, de ser aprobado por dos terceras (2/3) partes del número total de los miembros que componen cada una de ellas, se convierte en ley.

*La Cámara de Representantes tiene el poder exclusivo de iniciar procesos de residencia y con la concurrencia de dos terceras (2/3) partes del número total de sus miembros formula acusación. El Senado tiene el poder exclusivo de juzgar y dictar sentencia en todo proceso de residencia; y al reunirse para tal fin los senadores actúan a nombre del pueblo y lo harán bajo juramento o afirmación. No se pronuncia fallo condenatorio en un juicio de residencia sin la concurrencia de tres cuartas (3/4) partes del número total de los miembros que componen el Senado, y la sentencia se limita a la separación del cargo.*

El Art. IV del Magno Documento dispone que *el Poder Ejecutivo se ejerce por un Gobernador, quien es elegido por voto directo en cada elección general. El Gobernador ejerce su cargo por el término de cuatro (4) años, a partir del 2 de enero del año siguiente al de su elección y hasta que su*

*sucesor sea electo y tome posesión.* El Gobernador tiene los deberes, las funciones y las atribuciones que allí se dispone. Tiene el deber de cumplir y hacer cumplir las leyes. Convoca la Asamblea Legislativa a sesión extraordinaria cuando a su juicio los intereses públicos así lo requieran. Nombra, en la forma dispuesta en la Constitución o en la ley, todos los funcionarios para cuyo nombramiento esté facultado. Es el comandante en jefe de la milicia y la puede convocar a fin de impedir o suprimir cualquier grave perturbación del orden público, rebelión o invasión. Sanciona o desaprueba, con arreglo a lo dispuesto en la propia Constitución, las resoluciones conjuntas y los proyectos de ley aprobados por la Asamblea Legislativa. *Presenta al Poder Legislativo, al comienzo de cada sesión ordinaria, un mensaje sobre la situación del Estado y le presenta, además, un informe sobre las condiciones del Tesoro de Puerto Rico y los desembolsos propuestos para el año económico siguiente. Dicho informe contiene los datos necesarios para la formulación de un programa de legislación.*

*Para el ejercicio del Poder Ejecutivo, el Gobernador está asistido de secretarios de gobierno que nombra con el consejo y consentimiento del Senado. Los secretarios de gobierno constituyen colectivamente un consejo consultivo del Gobernador.* El nombramiento del Secretario de Estado, además del consejo y consentimiento del Senado, requiere el de la Cámara de Representantes.

El Art. V dispone sobre el Poder Judicial de Puerto Rico, que se ejerce por un Tribunal Supremo y por aquellos otros tribunales establecidos por ley.

*El Art. V dispone que la Asamblea Legislativa tiene facultad para crear, suprimir, consolidar y reorganizar municipios, modificar sus límites territoriales y determinar lo relativo a su régimen y función; y puede autorizarlos, además, a desarrollar programas de bienestar general y a crear aquellos organismos que fueren necesarios a tal fin. El poder del Estado para imponer y cobrar contribuciones y*

*autorizar su imposición y cobro por los municipios se ejerce según dispuesto por la Asamblea Legislativa y nunca puede ser vendido o suspendido. Las reglas para imponer contribuciones serán uniformes en Puerto Rico.*

*Las elecciones generales se celebran cada cuatro (4) años en el día del mes de noviembre que determine la Asamblea Legislativa. En dichas elecciones son elegidos el Gobernador, los miembros de la Asamblea Legislativa y los demás funcionarios cuya elección en esa fecha se disponga por ley. Nadie es privado del derecho al voto cuando tiene dieciocho (18) años de edad, aunque no sepa leer y escribir. Todo funcionario de elección popular es elegido por voto directo y se declara electo aquel candidato para un cargo que obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo.*

Las asignaciones hechas para un año económico no pueden exceder de los recursos totales calculados para dicho año económico, a menos que se provea para la imposición de contribuciones suficientes para cubrir dichas asignaciones. *Sólo se dispone de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley.*

Como hemos podido observar, la Constitución de Puerto Rico fue creada por los representantes del pueblo, legitimados por su elección. La democracia que enmarca descansa sobre el control popular, el cual se manifiesta con la expresión de la opinión de su ciudadanía. Tal opinión es formalmente expresada en las elecciones generales, cuando los ciudadanos escogen sus preferencias y la mayoría decide. A través de ese proceso democrático la ciudadanía determina la política pública que ha de formularse, selecciona el partido político que ha de realizar tal ejercicio y las personas que han de desempeñar tal rol. Nuestra democracia constitucional mantiene como premisa fundamental que toda política pública formulada queda sujeta al poder último del pueblo. Si la opinión pública expresada a través de la elec-

ción general tiene el efecto directo de producir el control por el pueblo de la determinación sobre política pública, los organismos del gobierno encargados del proceso de formularla tienen que ser responsables a esa opinión pública. De esa forma nuestra Constitución permite y obliga al gobierno electo por el pueblo a funcionar en una forma democrática. Debe traducir el mandato electoral en acción, en beneficio de la ciudadanía, de conformidad con sus valores e intereses en un momento dado.

El derecho al sufragio, universal, igual, directo, secreto y libre de toda coacción, garantizado por la Sec. 2 del Art. II de nuestra Carta de Derechos, L.P.R.A., Tomo 1, constituye, a todos los fines prácticos, la única herramienta que tiene ese pueblo soberano para ejercer su poder de fiscalización sobre el gobierno y sus funcionarios; constituyendo el ejercicio de dicho derecho la única manera de canalizar el sentir y el mandato de la ciudadanía, para alcanzar el norte y objetivo de todos, cual es, el bienestar general de la comunidad.([43])

Los partidos políticos presentan su plataforma de gobierno al pueblo en las elecciones generales. Una vez esa plataforma recibe el mandato del pueblo, se convierte en el programa del gobierno electo para la formulación de política pública, en la búsqueda del bienestar general. Por eso el poder último en Puerto Rico reside en el pueblo, que lo ejerce a través de los funcionarios que elige en las elecciones generales cada cuatro (4) años. La legislación que promueve y aprueba la Asamblea Legislativa y el Gobernador representa el sentir mayoritario de ese pueblo en un momento determinado de su historia. No obstante, ese gobierno que ejerce y desempeña un papel en el libro de la historia de Puerto Rico no puede limitar ni restringir el poder de gobiernos posteriores, que reciben igualmente el

---

([43]) *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 617 (1988); *Fuster v. Busó*, 102 D.P.R. 327, 346–347 (1974).

mandato democrático del pueblo para moverse en espacio y tiempo hacia su crecimiento y desarrollo.[44]

Los funcionarios normativos (*policy making*) del Ejecutivo y de la mayoría legislativa deben tener una filosofía de gobierno y unas actitudes frente a los problemas del país que sean compatibles a las del gobierno electo por el pueblo y bajo el cual sirven. Eso le imprime vigencia al mandato popular, pues hace posible realizar el programa de gobierno que el electorado favoreció en las urnas. Lo contrario sería frustrar dicho mandato popular.[45]

La función principal de este Tribunal es la de intérprete máximo de nuestra Constitución. La deferencia que merecen las determinaciones legislativas, en torno a cómo se acomodan los intereses en conflicto en la arena económica, social y política, descansa sobre el principio básico y fundamental de que el proceso político y de gobierno de una democracia responde al deseo y al mandato de una mayoría del pueblo. Los tribunales no deben pasar juicio sobre la sabiduría o conveniencia de la formulación de la política pública de los representantes electos por la ciudadanía.[46]

*La Constitución de Puerto Rico no tolera obstrucciones al legítimo ejercicio del poder que emana de la soberanía del pueblo. La voluntad del pueblo es la fuente del poder público. El poder del Estado emana del pueblo y se ejerce de acuerdo a su voluntad. La franquicia electoral perdería su propósito si los hombres elegidos para gobernar no pudieran impartir eficacia al voto depositado en la urna.[47]*

*No es sólo la emisión del voto o su conteo mecánico lo que protege la Constitución. Es la función y el efecto del voto lo que está protegido. El voto no es un objeto de arte. Es el*

---

[44] *Pueblo v. Tribunal de Distrito*, 70 D.P.R. 678, 681 (1949); *Mercado v. Mercado*, 66 D.P.R. 811, 817 (1947).

[45] *Pierson Muller II v. Feijóo*, 108 D.P.R. 261, 269 (1978); *Díaz González v. Tribunal Superior*, 102 D.P.R. 195, 210 (1974).

[46] *Berberena v. Echegoyen*, 128 D.P.R. 864, 921–922 (1991), citando los casos siguientes: *Vance v. Bradley*, 440 U.S. 93 (1979); *Dandridge v. Williams*, 397 U.S. 471 (1970); *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972).

[47] *Pierson Muller II v. Feijóo*, supra, págs. 269–270.

*sagrado y más importante instrumento de la democracia y la libertad. El voto nada significa, deja de servir el propósito de la sociedad democrática, a menos que, contado en la suma con los votos de otros ciudadanos, resulte en la realización de la voluntad de dichos ciudadanos, siempre que sean más numerosos que los proponentes de un criterio contrario. Ahí descansa el sagrado ministerio de este Tribunal en el significado, efecto y desarrollo de nuestra democracia constitucional. Debemos ser guardianes de ese esquema y siempre proteger no simplemente el derecho a depositar un voto, sino el derecho a que ese voto sirva a plenitud su propósito.[48]*

La facultad constitucional del Gobernador, de ser director general de la administración pública, comprende el control, la supervisión y la inspección de los departamentos y las agencias del Gobierno, así como de las corporaciones públicas y las entidades autónomas creadas por ley; y tiene facultad legal para firmar un convenio, mediante el cual comprometa a las corporaciones públicas y a las entidades autónomas.[49]

*La formulación de política pública puede originarla el Primer Ejecutivo, cuando esa iniciativa directamente modifica, altera y es contraria a una política pública específica, plasmada previamente en un estatuto; su validez y oficialidad sólo se configura —y es constitucionalmente posible— con el consentimiento de la Asamblea Legislativa mediante la aprobación de una nueva ley. La misma dinámica opera a la inversa. Para que la Legislatura introduzca variaciones a una política pública en particular, preestablecida en leyes anteriores, precisa del concurso del Primer Ejecutivo.*

*Al amparo de nuestro ordenamiento constitucional, el Gobernador tiene autoridad para utilizar fondos públicos con el propósito de formular cambios en la política pública y promover la legislación correspondiente. La prudencia ju-*

---

[48] *Pierson Muller II v. Feijoó*, supra, pág. 271.

[49] Op. Sec. Just. Núm. 1992-19.

*dicial aconseja que no intervengamos en controversia alguna sobre la razonabilidad de los gastos o los medios utilizados para lograr estos propósitos.*

*A base del principio de separación de poderes, nuestra Constitución otorgó al Primer Ejecutivo la facultad de originar acción legislativa, al requerir que presente anualmente a la Asamblea Legislativa un mensaje sobre la situación del país con los datos necesarios para la formulación de un programa de legislación. A tenor de esta facultad, todos los gobernadores electos que han dirigido los destinos de nuestro país han utilizado esa oportunidad para proponer nueva legislación y cambios en la política pública, para implantar sus respectivos mandatos electorales y para atender los problemas más apremiantes del país.*

## IV

El Tribunal de Circuito de Apelaciones, acogiendo lo planteado por el Municipio de Ponce, determinó que la Autoridad de Carreteras, la Puerto Rico Telephone Company, el Departamento de la Vivienda y el Departamento de Recursos Naturales y Ambientales no tienen legitimación activa para plantear la inconstitucionalidad de la aplicación de la Ley de Municipios Autónomos, dentro de las circunstancias del caso de autos. No compartimos tal óptica. Veamos.

### Justiciabilidad

Como paso previo a cualquier análisis de los méritos de un planteamiento de la inconstitucionalidad de una ley realizada por una agencia del Poder Ejecutivo, debemos analizar los hechos del asunto a la luz del principio de justiciabilidad, en cuanto a las doctrinas de legitimación activa, academicidad y cuestión política. Este asunto es inherente al ejercicio de los poderes conferidos al Poder Judicial, dentro de nuestro sistema republicano de gobierno.

La autoridad para analizar los aspectos relacionados a la justiciabilidad de las causas, nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas, que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.[50] Los tribunales nos imponemos las limitaciones que emanan de estas doctrinas para, entre otras cosas, observar y garantizar el justo balance que se requiere de las distintas Ramas de gobierno en la administración de la cosa pública. El análisis de este principio es, por lo tanto, un imperativo necesario dentro de nuestro sistema de separación de poderes. *Las limitaciones que surgen de éste imponen un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que, de otro modo, constituiría una clara amenaza para la calidad democrática del sistema.*[51]

La aplicación de las diversas doctrinas que dan vida al principio de justiciabilidad determina la jurisdicción de los tribunales, particularmente con relación a las controversias que se le presentan, al amparo de los derechos que garantiza nuestra Constitución y la democracia que instrumenta. Se trata, pues, de una cuestión de umbral que debemos analizar ante las controversias que nos ocupa.[52]

La doctrina de cuestión política, según desarrollada en la jurisdicción federal, surge de consideraciones sobre el principio constitucional de separación de poderes.[53] Si en un caso hay presente una cuestión política, el caso no será justiciable, y el tribunal debe abstenerse de adjudicarlo. La doctrina de cuestión política plantea, en esencia, que hay asuntos que no son susceptibles de determinación judicial, porque su resolución corresponde a las otras ramas del go-

---

[50] *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558–559 (1958).

[51] *E.L.A. v. Aguayo*, supra, pág. 597.

[52] *P.P.D. v. Peña Clos I*, 140 D.P.R. 779 (1996).

[53] *Baker v. Carr*, 369 U.S. 186, 210 (1962).

bierno, la legislativa o ejecutiva, o en última instancia al electorado.[54]

Una cuestión política no es susceptible de determinación judicial, porque su resolución corresponde propiamente al proceso político de gobierno, que se produce en las otras dos ramas, y no al Poder Judicial.[55]

Los criterios judiciales para determinar qué constituye una cuestión política son:

(A) La Constitución delega expresamente el asunto en controversia a otra Rama del Gobierno;

(B) No existen criterios o normas judiciales apropiadas para resolver la controversia;

(C) Resulta imposible decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales;

(D) Resulta imposible tomar una decisión sin expresar una falta de respeto hacia otra Rama de gobierno;

(E) Hay una necesidad poco usual de adherirse sin cuestionar a una decisión política tomada previamente;

(F) Hay el potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del gobierno sobre un punto.[56]

> *The political question doctrine —which holds that certain matters are really political in nature and best resolved by the body politic rather than by courts exercising judicial review— is a misnomer. It should more properly be called the doctrine of nonjusticiability, that is, a holding that the subject matter is inappropriate for judicial consideration. ...*
>
> *An important consequence of the political question doctrine is that a holding of its applicability to a theory of a cause of action renders the government conduct immune from judicial review.* Unlike other restrictions on judicial review —doctrines such as case or controversy requirements, standing, ripeness and pre-

---

[54] *Noriega v. Hernández Colón*, 135 D.P.R. 406, 422 (1994).

[55] *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); *Powell v. McCormack*, 395 U.S. 486 (1969).

[56] *Baker v. Carr*, supra, reafirmado en nuestra jurisdicción en *Silva v. Hernández Agosto*, supra.

maturity, abstractness, mootness, and abstention— all of which may be cured by different factual circumstances, a holding of nonjusticiability is absolute in its foreclosure of judicial scrutiny. (Escolios omitidos y énfasis suplido.) 1 *Rotunda, Nowak y Young, Treatise on Constitutional Law, Substance and Procedure* Sec. 2.16(a), págs. 311–312 (1999).

Hemos expresado, aludiendo al Prof. Raúl Serrano Geyls, que existen tres (3) vertientes de la doctrina de cuestión política, a saber: (1) la que requiere que los tribunales no asuman jurisdicción sobre un asunto porque éste ha sido asignado textualmente por la Constitución a otra Rama del Gobierno; (b) aquella según la cual los tribunales deben abstenerse de intervenir, bien porque no existen criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, o bien por la presencia de otros factores análogos, y (c) la que aconseja la abstención judicial por consideraciones derivadas de la prudencia.[57]

Si la Constitución confiere una facultad expresa a una Rama de gobierno, y ésta es de naturaleza política, no estará sujeta a revisión judicial, salvo que se ejecute incorrectamente, afectando derechos constitucionales de igual jerarquía.[58]

Lo realmente importante en los casos que involucran la doctrina de cuestión política, es el análisis sobre si una cláusula constitucional provee derechos que pueden ser compelidos mediante acción judicial.[59]

La doctrina de cuestión política debe ser aplicada en términos funcionales, a tenor de los hechos específicos de cada caso en particular. La doctrina no es aplicable cuando

---

[57] *C.E.S. U.P.R. v. Gobernador*, 137 D.P.R. 83, 102 (1994); *Noriega v. Hernández Colón*, supra.

[58] *Powell v. McCormack*, supra; *United States v. Nixon*, 418 U.S. 683 (1974); *Silva v. Hernández Agosto*, supra; R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 697–698.

[59] L.H. Tribe, *American Constitutional Law*, New York, Ed. Foundation Press, 1988, págs. 98 y 106.

existen derechos individuales importantes que podrían ser afectados si el Poder Judicial no actúa.[60]

Como regla general, la doctrina de cuestión política impide la revisión judicial de asuntos cuya resolución corresponde a las otras ramas políticas del gobierno o al electorado.[61] En *Silva v. Hernández Agosto*, 118 D.P.R. 45, 55 (1986) reiteramos nuestros pronunciamientos anteriores y expresamos que "ante reclamos de cuestión política hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional". La interpretación inicial que de la Constitución haga otra rama merece deferencia, pero debe prevalecer la norma de que la determinación final corresponde a los tribunales.[62]

## Legitimación activa

La capacidad de una parte para realizar con eficacia actos procesales como parte litigante y comparecer como demandante o demandado, o en representación de cualquiera de ellos, se conoce propiamente como "legitimación en causa". Se requiere legitimación activa para ser demandante y pasiva para ser demandado.[63]

La persona que pretende ser parte ha de tener una capacidad individualizada y concreta en su reclamación ante los tribunales. Para que haya "acción legitimada" tiene siempre que existir la "capacidad para demandar". No obstante, no todo el que tiene "capacidad para demandar" tiene "acción legitimada" en un pleito específico. En cada pleito, además de "capacidad para demandar", la parte in-

---

[60] F.W. Scharpf, *Judicial Review and The Political Question: A Functional Analysis*, 75 Yale L.J., 517 566–597 (1966); *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994).

[61] *Noriega Rodríguez v. Jarabo*, supra.

[62] *United States v. Nixon*, 418 U.S. 683 (1974).

[63] L. Ribó Durán, *Diccionario de Derecho*, Barcelona, Ed. Bosch, 1987, pág. 364.

teresada deberá demostrar que tiene un "interés legítimo".([64])

La legitimación activa es un instrumento de autolimitación y de prudencia judicial que tiene su génesis en la doctrina de la justiciabilidad de las controversias.([65])

> The doctrine of standing is a judicial tool that permits courts to adjudicate only claims in which the plaintiff has a direct interest and has suffered a legally cognizable injury. The Supreme Court [United States] has identified several factors that help determine whether a plaintiff has standing to challenge legislation. These factors include the relationship between the plaintiff and the challenged legislation, separation of powers issues, and the duty and political prudence of judicial intervention in the dispute. (Escolios omitidos.) T.R. Yu, *"Standing" in a Quagmire: Rines v. Byrd, 117 S. Ct. 2312 (1997)*, 67 U. Cin. L. Rev. 639, 641 (1999).

La doctrina mediante la cual se ausculta la legitimación activa de un reclamante ha sido sostenida por nuestra jurisdicción como uno de los ingredientes necesarios para establecer la jurisdicción de los tribunales, en consideración a principios de justiciabilidad. Tiene legitimación activa una parte que cumple con los siguientes requisitos: (1) la parte que reclama debe haber sufrido un daño claro y palpable; (2) el daño debe ser real, inmediato y preciso, no abstracto o hipotético; (3) debe existir una relación causal razonable entre la acción que se ejecuta y el daño alegado; (4) la causa de acción debe surgir al amparo de la Constitución o de alguna ley.([66]) No hay necesidad de demostrar un daño económico. El daño puede basarse en consideraciones ambientales, recreativas, espirituales o aun simplemente estéticas.([67])

Durante las últimas décadas los requisitos de acción le

---

([64]) Serrano Geyls, *op. cit.*, pág. 132; *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989).

([65]) *E.L.A. v. Aguayo*, supra.

([66]) *García Oyola v. J.C.A.*, 142 D.P.R. 532 (1997); *P.P.D. v. Gobernador I*, 139 D.P.R. 643 (1995); *P.P.D. v. Peña Clos I*, supra.

([67]) *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974).

gitimada han sido interpretados por este Tribunal de forma flexible, ocasionando nuevos desarrollos en las áreas de derecho ambiental, protección del consumidor y defensa de los intereses gremiales.[68] Esta nueva visión hemos dicho que responde a un reconocimiento de que para cumplir con nuestra responsabilidad constitucional en esta época, debemos interpretar liberalmente los requisitos de legitimación activa de aquellos que acuden al foro judicial en auxilio de nuestra jurisdicción.[69] Hemos expresado que, "[d]e lo contrario, cerramos las puertas de los tribunales a personas y entidades que han sido adversamente afectadas por actuaciones del Estado o de entidades particulares y que presentan reclamaciones que pueden ser debidamente atendidas por el foro judicial".[70] *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559, 564 (1989).

En ausencia de una expresa autorización estatutaria, se reconoce capacidad como parte de los organismos administrativos: (1) cuando sus decisiones implican la formulación de una política pública y la revisión de su decisión ante un tribunal puede constituir un ataque a esa política pública, y (2) cuando el organismo es afectado, "es parte interesada y perjudicada" por la decisión de un tribunal que revisa sus actuaciones.[71]

En los últimos años este Tribunal ha exhibido mayor generosidad que el Tribunal Supremo de Estados Unidos en el reconocimiento de legitimación en el caso de litigantes individuales. Se ha cuestionado la sabiduría de la tendencia que se le atribuye a este Tribunal de extender esa generosidad al reconocimiento de legitimación a

[68] *Col. Ópticos de P.R. v. Vani Visual Center*, supra; *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229 (1988); *Solís v. Municipio de Caguas*, 120 D.P.R. 53 (1987).

[69] B. Schwartz, *Administrative Law*, 2da ed., Boston, Ed. Little, Brown and Co., 1985, Sec. 8.11, págs. 459–461.

[70] *Salas Soler v. Srio. de Agricultura*, supra; *Cerame-Vivas v. Srio. de Salud*, 99 D.P.R. 45 (1970).

[71] *Carrero v. Depto. de Educación*, 141 D.P.R. 830 (1996); *Ortiz v. Autoridad de Tierras*, 129 D.P.R. 213 (1991).

legisladores.([72]) Algunos comentaristas proponen que se rechace completamente la noción de que los legisladores, a distinción del cuerpo legislativo, pueden accionar ante los tribunales en esa capacidad contra funcionarios ejecutivos, y sostienen que, en ese contexto, el interés de un legislador en el ejercicio de sus funciones no debe considerarse el "interés personal" que requiere la doctrina de justiciabilidad. No obstante, todos esos comentaristas comparten una preocupación común: *el peligro institucional que supone para la Judicatura el intervenir, como cuestión de rutina, en las disputas entre las ramas políticas.*([73])

Opina el Prof. José Julián Álvarez González, que la normativa de este Tribunal, en cuanto a la legitimación de legisladores, contrasta con su postura, asumida al determinar el ejercicio de su jurisdicción, con relación a planteamientos sobre legitimación de las agencias administrativas para cuestionar la constitucionalidad de un estatuto.([74]) Critica severamente el razonamiento en que se apoyan aquellos que esgrimen la posición de que las agencias están impedidas de acudir a los tribunales para cuestionar la constitucionalidad de un estatuto, por tener a su haber el proceso legislativo para armonizarlo o cambiarlo. Afirma que tal razonamiento contrasta marcadamente con la legitimación activa reconocida por este Tribunal a los legisladores en su carácter individual. Opina el profesor Álvarez González, que "[l]a realidad es también que en algunas circunstancias hay razones de más peso para reconocer legitimación a agencias y funcionarios ejecutivos que a legisladores individuales". J.J. Álvarez González, *Derecho Constitucional*, 61 Rev. Jur. U.P.R. 637, 654 (1992).

La tendencia en el Tribunal Supremo de Estados Unidos es que las agencias y los funcionarios gubernamentales

---

([72]) J.J. Álvarez González, *Derecho Constitucional*, 61 Rev. Jur. U.P.R. 637, 642 (1992).

([73]) Álvarez González, *supra*, pág. 645.

([74]) Íd., pág. 652.

118

pueden cuestionar la constitucionalidad de las leyes aprobadas por los estados de la Unión.[75]

El Prof. Demetrio Fernández Quiñones ha expresado su pensamiento crítico sobre la normativa propuesta por el entonces Juez Asociado Señor Negrón García, en *Ortiz v. Autoridad de Tierras,* supra, por virtud de un voto concurrente, a los efectos de que las corporaciones públicas no tienen legitimación activa para cuestionar la constitucionalidad de una ley. Ha comentado el distinguido profesor, que "la norma que se propugna en este caso de negarle legitimación a una corporación pública para cuestionar la constitucionalidad de la ley, no debe tener cabida en el presente ordenamiento.[76] La defensa de los intereses públicos se le ha encomendado a los funcionarios. Ellos están capacitados para desempeñar esa función, y la integridad de la agencia como del proceso público se encuentran mejor protegidos si se le reconoce la legitimación". Yu, *supra.*

En la reunión sostenida en la Fortaleza en abril de 1993, el alcalde del Municipio de Ponce solicitó de los representantes del Gobierno Central, y de las agencias allí presentes, el cumplimiento específico con los compromisos de inversión contraídos en el Convenio. Presentó una demanda ante el Tribunal de Primera Instancia exigiendo el cumplimiento específico de lo pactado en el referido convenio por el Gobierno Central y las agencias, por entender que tenía el carácter de un contrato. Exigió el cumplimiento de lo pactado, por haber sido consumado el Contrato a tenor de la Ley Núm. 81, *supra,* según fue enmendada el 29 de octubre de 1992 por la Ley Núm. 84, *supra,* que le imprimió obligatoriedad a los programas de obras y servicios certificados por las agencias demandadas.[77] El Art. 13.008 de la Ley de Municipios Autónomos, *supra,* no dispuso en su letra escrita mecanismo disponible para el

---

[75] *Board of Education v. Allen,* 392 U.S. 236 (1968).

[76] *Board of Education v. Allen,* supra, pág. 241.

[77] Art. 13.011 de la Ley de Municipios Autónomos, *supra.*

Gobierno Central y sus agencias para revisar ante la Junta de Planificación el Plan de Ordenación Territorial del Municipio de Ponce, contenido en el Convenio, para armonizarlo con las prioridades de la nueva administración. No obstante, prescribió tal privilegio para el referido municipio. Se pretendió que lo actuado no pudiera ser alterado por estatuto por la nueva Asamblea Legislativa, al adscribirle al Convenio el carácter de un contrato. A base del cuadro fáctico que presenta este caso, no tenemos la más mínima duda de que la Autoridad de Carreteras, la Puerto Rico Telephone Company, el Departamento de la Vivienda y el Departamento de Recursos Naturales y Ambientales tenían legitimación activa para plantear la inconstitucionalidad de la aplicación de la Ley de Municipios Autónomos, *supra*. Veamos.

El carácter justiciable de la reclamación de las agencias demandadas que tenían la facultad de formular la política pública durante el período de 1ro de enero de 1993 al 31 de diciembre de 1996, como parte del nuevo gobierno electo por el pueblo, es incuestionable. La razón principal de ello es que bajo el esquema de hecho y de derecho bajo el cual fue otorgado el Convenio, se persiguió por los suscribientes que éste no pudiera ser alterado. Lo planteado por las referidas agencias sobre la inconstitucionalidad de la aplicación de la Ley de Municipios Autónomos, *supra*, en relación con el Convenio, es un asunto que es susceptible de determinación judicial, porque éstas no tenían a su alcance en el texto del estatuto la facultad de solicitar directamente a la Junta de Planificación que ajustara a sus prioridades el Plan de Ordenación Territorial, contenido en el Convenio. Tampoco tenían la facultad de variar el contenido del Convenio, que se le atribuyó el carácter de un contrato, proponiendo enmiendas al Poder Legislativo a los Arts. 13.008 y 13.011 de la Ley de Municipios Autónomos, *supra*.

Dentro de lo planteado por las agencias demandadas se desprende claramente, que arguyeron que el Convenio les

dirigía y les limitaba en la formulación de la política pública de la nueva administración de gobierno. El limitar o restringir el mandato democrático del gobierno electo, fijándole una obligatoriedad en los asuntos específicos contenidos en el Convenio, no puede considerarse como algo abstracto o hipotético. Por el contrario, es un menoscabo real, inmediato y preciso que produce un daño claro y palpable al sistema de gobierno democrático contenido en la Constitución de Puerto Rico. Se observa claramente una relación causal entre lo contenido en el Convenio y el referido menoscabo. El reclamo de las agencias surge del propio esquema democrático de la Constitución.

## V

En materia de hermenéutica constitucional, y ante estatutos que adolecen de inconstitucionalidad por subinclusión, se reconoce la facultad de los tribunales de extender los beneficios estatutarios a aquellos grupos o clases excluidos.([78]) La regla es cosustancial con el principio de que el Poder Judicial, en abono de una deferencia hacia el Poder Legislativo, debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley. En su operación, el impedimento constitucional podrá ser salvado, no mediante la interpretación del texto, que por sus claros términos no es susceptible de serlo de otra manera, sino por la extensión de los beneficios a la clase excluida. El propósito legislativo, que quedaría frustrado con la anulación del estatuto, queda así en vigor y se supera el discrimen.([79])

---

([78]) *Nadal v. Depto. Rec. Nat.*, 150 D.P.R. 715 (2000); *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618 (1981); *Orr v. Orr*, 440 U.S. 268 (1979); *Califano v. Goldfarb*, 430 U.S. 199 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975); *Frontiero v. Richardson*, 411 U.S. 677 (1973); *Welsh v. United States*, 398 U.S. 333, 361 (1970).

([79]) *Milán Rodríguez v. Muñoz*, supra, págs. 618–619.

En esta difícil tarea judicial el criterio rector lo constituye la importancia de la intención del legislador. En esta misión de encontrar la *mens* legislativa, hemos de evitar guiarnos, en lo posible, por una mecánica literal y eludir mirar las palabras y frases con una óptica empañada, estereotipada o de clisé que adjudique a dicho poder un interés a destiempo, discriminatorio y excluyente.[80]

No hay duda alguna, que el Art. 13.008 de la Ley de Municipios Autónomos, *supra*, no proveyó para las agencias demandadas mecanismo análogo al prescrito para los municipios, para revisar ante la Junta de Planificación el Programa de Proyectos del Plan de Ordenación Territorial. Dicho estatuto adolece de inconstitucionalidad por la referida exclusión del Gobierno Central. Los tribunales inferiores y la mayoría de este Tribunal pudieron escoger la ruta de extender igual mecanismo o beneficio a las agencias demandadas, de encontrar que la *mens* legislativa lo permite. De no haber dejado espacio la intención legislativa para tal interpretación, la única ruta viable para los tribunales es decretar que la aplicación de ese estatuto, sobre el efecto que se pretendió impartirle al Convenio, es inconstitucional y, por ende, este último es nulo e inexistente.

## VI

El Art. 1 de la Ley Núm. 75 de 30 de octubre de 1975 (2 L.P.R.A. sec. 97) dispone lo siguiente:

Los departamentos, agencias, instrumentalidades, oficinas y todo otro organismo y los municipios del Estado Libre Asociado de Puerto Rico, sin excepción alguna, mantendrán un registro de todos los contratos que otorguen, incluyendo enmiendas a los mismos, y deberán remitir copia de éstos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha de otorgamiento del contrato o la enmienda. Este período será extendido a treinta (30) días cuando el contrato se otorgue fuera

---

[80] *Milán Rodríguez v. Muñoz*, supra, pág. 619.

de Puerto Rico. Cuando se otorguen escrituras sobre la adquisición o disposición de bienes raíces se le enviará también al Contralor, copia de todo escrito y documento relacionado con la negociación. Se extenderá el período de quince (15) o treinta (30) días, según aplique, por quince (15) días adicionales siempre que se demuestre causa justificada y así lo determine la Oficina del Contralor. Se entenderá que un contrato o una enmienda a un contrato es otorgado fuera de Puerto Rico cuando se otorgue por todos los comparecientes fuera de Puerto Rico o el último de éstos en firmar el documento lo haga fuera de Puerto Rico.

El término "instrumentalidad" incluirá a toda corporación pública, sus subsidiarias o cualesquiera entidad gubernamental que tenga personalidad jurídica propia, creada por ley o que en el futuro pudiere crearse sin [sic], sin excepción alguna.

No será necesario el envío al Contralor de copia de los siguientes contratos:

(1) De servicios personales de naturaleza esporádica, por un término menor de seis meses, no prorrogable, y un costo menor de dos mil (2,000) dólares.

(2) De servicios personales de naturaleza profesional por un término de un año o menos, no prorrogable, y cuyos servicios no constituyan un puesto o empleo y su costo no exceda de cinco mil (5,000) dólares.

(3) Para obras con un costo que no exceda de dos mil (2,000) dólares.

(4) Los que se otorguen mediante subasta pública con excepción de aquellas relacionadas con proyectos u obras de construcción.

(5) Cualquier otro tipo de contrato que el Contralor por reglamentación al efecto determine que no le sea enviado.

Hemos expresado que el estatuto antes indicado es uno de sana política administrativa pública y refleja la intención legislativa de crear un mecanismo de cotejo y publicidad de los contratos otorgados por los municipios *"que tiene carácter constitutivo con respecto a la eficacia de éstos"*. *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 830 (1999). Por ello, hemos recogido dicha política pública en varios de nuestros pronunciamientos. *Constituyen requisitos formales que deberán seguirse rigurosamente al momento de pactarse acuerdos con municipios, a saber: (1) que se reduzcan a contrato escrito; (2) se mantenga un re-*

*gistro fiel con miras a establecer prima facie su existencia; (3) se remita copia a la Oficina del Contralor como medio de una doble constancia de su otorgamiento, términos y existencia; y (4) se acredite la certeza de tiempo, esto es, haber sido realizado y otorgado quince (15) días antes.*[81]

*Hemos expresado previamente, que la anterior norma no podía descartarse ni siquiera en casos de emergencia, y que se requería una "escrupulosa adhesión" a éstas para "prevenir el despilfarro, la corrupción y el amiguismo". Nos hemos reiterado caso tras caso en que " 'el manejo prudente de fondos públicos está saturado de intereses de orden público.' "* (Énfasis suplido.) *Fernández & Gutiérrez v. Mun. San Juan*, supra, pág. 831.[82]

No compartimos la óptica de la Mayoría, al interpretar la norma antes indicada en la aplicación de los Arts. 8.004 y 8.006 de la Ley de Municipios Autónomos, *supra*, 21 L.P.R.A. secs. 4354 y 4356, a la controversia de autos. El interés público derivado de ésta, es proteger el desembolso de fondos públicos de *todo* el gobierno, no sólo de los municipios.

## VII

*Conclusiones*

Concluimos que el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones erraron al decidir en la forma y manera que se desprende de sus respectivas sentencias. Entiendo, muy respetuosamente, que la decisión de la Mayoría, al confirmar lo actuado por esos tribunales, oscurece y produce un tenebroso ambiente para nuestra democracia constitucional y su desarrollo.

El Convenio validado contraviene el interés público inmanente en el esquema democrático de la Constitución de

---

[81] *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 830 (1999); *Ocasio v. Alcalde Mun. Maunabo*, supra.

[82] *Hatton v. Mun. de Ponce*, supra.

Puerto Rico. Por más esfuerzo que hemos realizado, no podemos compartir la óptica de la Mayoría, a los efectos de que la causa del Contrato es el interés público. Éste último está representado por el orden público constituido por el conjunto de principios, valores y normas de sabio gobierno democrático, que es parte del estilo de vida del pueblo de Puerto Rico, y que actúa como instrumento jurídico progresivo de nuestro ordenamiento constitucional. Realmente el interés público dimanante de esos valores, nos imprimen el deber de considerar el referido Convenio dentro de nuestra obligación de garantizar que el mandato electoral de la ciudadanía, emitido para el período de 1ro de enero de 1993 al 31 de diciembre de 1996, se pudiera traducir en la acción que el pueblo, a través de su gobierno electo, entendió como de su beneficio, en conformidad con los valores y los intereses escogidos por ellos libremente en esa elección general. Cualquier otro interés, cede ante la prominencia e importancia de este último en nuestro sistema democrático de gobierno.

Por no considerar la Mayoría, el extender los beneficios de los que claramente quedaron excluidas las agencias demandadas de autos en el texto del Art. 13.008 de la Ley de Municipios Autónomos, *supra*, y, por el contrario, imprimirle la obligatoriedad ya señalada a las agencias demandadas de autos, a tenor de lo prescrito en su Art. 13.011, *supra*, la aplicación de tales estatutos queda reducida al vicio de la inconstitucionalidad. Por otro lado, de escoger la ruta de realizar el ejercicio de hermenéutica constitucional y determinar eventualmente sobre la constitucionalidad de las referidas disposiciones estatutarias, permitiéndole al gobierno electo armonizar el Plan de Ordenación Territorial del Municipio de Ponce a las prioridades sobre política pública de todo el pueblo, los tribunales salvaban la situación indicada de contravención del Convenio con el interés público fundamental representado por el orden público

constituido por el conjunto de valores de gobierno democrático contenidos en nuestro magno documento.

De entender los tribunales que han intervenido en este asunto, que no era posible la realización de tal ejercicio hermenéutico, por no encontrar en la *mens* legislativa apoyo alguno para ello, entendemos que su única alternativa era decretar como nulos los Arts. 13.008 y 13.011 de la Ley de Municipios Autónomos, *supra*, por ser contrarios al esquema constitucional democrático de Puerto Rico, así como decretar nulo e inexistente el Convenio celebrado entre las partes, por ser contrario al interés público, representado por el orden público, que tiene un rol activo y prominente dentro de nuestro ordenamiento constitucional.

## VIII

Por los fundamentos antes expuestos, disentimos, muy respetuosamente, de la opinión mayoritaria.